UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal
Representative of the Estate of Desiree
Gonzales, deceased,

     Plaintiff,

v.                                                                        Case No. 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS,
Deputy Warden/Acting Youth Development
Administrator, in his official and individual
capacities, GABRIEL VALENCIA, Youth
Development Administrator, Individually,
MATTHEW EDMUNDS, Corrections
Officer, individually, JOHN ORTEGA,
Corrections Officer, MOLLY ARCHULETA,
Corrections Nurse, Individually, ST.
VINCENT HOSPITAL, and NATHAN
PAUL UNKEFER, M.D.,

     Defendants.

## DEFENDANT MOLLY ARCHULETA'S MOTION FOR SUMMARY JUDGMENT

Defendant Molly Archuleta ("Archuleta") moves the Court for summary

judgment on all of plaintiff's claims against her. In Count I of the complaint,

Plaintiff asserts a Section 1983 claim against Archuleta for Eighth Amendment

violations based on the theory of deliberate indifference to serious medical needs.

Archuleta is entitled to qualified immunity from the plaintiff's Section 1983 claim.

She is also entitled to summary judgment on Count III, plaintiff's negligence claim

based on Section 41-4-12 of the New Mexico Tort Claims Act.

Defendant Santa Fe County's Motion for Summary Judgment sets forth a background narrative concerning Desiree Gonzales' heroin overdose on May 7, 2014, her admission and release with a medical clearance from St. Vincent's Hospital, her detention at the YPD for a little over 3 hours on May 7 and May 8 and her later readmission to St. Vincent's hospital on May 8 where she succumbed to complications from her heroin use. Accordingly, this motion focuses on Archuleta's telephone contact with Matthew Edmunds on the evening of May 7, which is the only relevant event for the purposes of the plaintiff's claims against her.

A.   Statement of Facts in Support of Motion for Summary Judgment

1. On May 7 and May 8, 2014, Defendant Molly Archuleta was a nurse employed by Santa Fe County at the Youth Development Program. Exhibit 1, Archuleta Dep. 5:21-6:19.

2. When plaintiff's decedent Desiree Gonzales arrived at the YDP, shortly after 10:00 p.m. on May 7th, Ms. Archuleta was not physically present at the facility. Archuleta Dep. 12:17-23, 48:1-5.

3. The YDP did not have 24-hour nursing staff. Nursing coverage was available for approximately 12 hours a day from 8:00 a.m. to 8:00 p.m. During the evening hours, the YDP had a nurse on call. Archuleta Dep. 11:16-19, 12:17-20.

4. Ms. Archuleta was the nurse on call the evening of May 7, 2014 and received a telephone call from Defendant Matthew Edmunds shortly after 11:00 p.m. that evening concerning Desiree Gonzales. Archuleta Dep. 60:9-61:7, 62:11-13.

5. According to the plaintiff's version of facts, Mr. Edmunds came to the conclusion that Ms. Gonzales was not in a normal state of mind. Her eyes looked groggy and her speech was slurred.

6. Mr. Edmunds called Ms. Archuleta and advised of Ms. Gonzales's state and asked several questions about her medical clearance. Archuleta Dep. 61:24 - 62:8.

7. Plaintiff contends that the terms "advised of her state" in Mr. Edmunds' witness statement implies that Mr. Edmunds told Ms. Archuleta that her eyes looked groggy and her speech was slurred.

8. Ms. Archuleta's recollection of the phone call does not include Edmunds informing her of any signs of an observable medical condition. Archuleta dep. 61:1 – 68:17.

9. It is undisputed that Ms. Archuleta and Mr. Edmunds had a discussion about the medical clearance that Ms. Gonzales received from the hospital. Archuleta Dep. 61:24-62:10.

10. Specifically, Ms. Archuleta and Mr. Edmunds discussed the use of the terms "A&O" on the medical clearance, which is a common abbreviation for alert and oriented. Archuleta Dep. 61:24-63:4.

11. Following this discussion, Ms. Archuleta then gave a series of directions to Mr. Edmunds. Ms. Archuleta told Mr. Edmunds that they needed to have her sleep in a boat either in the dayroom or the horseshoe but that he and the staff needed to keep a very close eye on her during the night, monitor her breathing and to let her know immediately if they had any concerns. Archuleta Dep. 64:21-66:4.

12.  According to Mr. Edmunds' statement, Archuleta told him to keep a very close eye on her and to notify her of any changes.  The decision was made to house Desiree in the dayroom in the Anasazi C Pod to keep a closer eye on her.

13.  According to Ms. Archuleta's note, Mr. Edmunds advised her that Ms. Gonzales was at the YDP and had previously overdosed on heroin and had been administered Narcan. Archuleta Dep., Ex. 20 thereto.

14.  Mr. Edmunds told Mr. Archuleta that Ms. Gonzales came to the facility with a medical clearance from the hospital.  Id.

15.   Ms. Archuleta documented that she asked him if the clearance stated that she was cleared for jail and he stated, "Yeah" or "Yes," it did say that.  Id.

16.   Edmunds told Archuleta said that the clearance also said that she was "A&O," and he asked me what "A&O" meant, and Archuleta said it meant alert and oriented. Id.

17.   Archuleta asked Edmunds if Ms. Gonzales was alert and oriented, and Mr. Edmunds responded that, "Yes, she was." Id.

18.   Archuleta told Mr. Edmunds that the YDP staff needed to have Ms. Gonzales sleep in a boat either in the dayroom or the horseshoe but that he and the staff needed to keep a very close eye on her during the night, monitor her breathing and let Archuleta know immediately if they had any concerns.  Id.

19.   The next contact between Archuleta and any staff at YDP was approximately at 1:57 a.m., by which time Ms. Gonzales was unresponsive at the YDP. Id.

20.     Ms. Archuleta went to the facility, but by that point, Ms. Gonzales was already in the care of EMT's, and Ms. Archuleta assisted in getting medical equipment to the EMT's.  Id.

21.     According to testimony that plaintiff's counsel elicited from defendants' expert Gary Vilke, a nationally prominent expert on the effects of heroin toxicity and the use of naloxone in emergency settings, Ms. Gonzales did not appear to be re-intoxicated with heroin based on her appearance on the videotape when she returned to the YDP.  Dr. Vilke also does not agree that her death is consistent with a recurrence of heroin intoxication. He also does not agree that the she exhibited a severe, observable medical condition or need before staff perceived that she was unresponsive.  See generally, Exhibit 2, Dr. Vilke's deposition at 51-53.

22.     According to her expert witness, the plaintiff's theory of the cause of Ms. Gonzales's death appears to be that she had recurrent heroin intoxication after her initial doses of naloxone at approximately 7:30 that evening.  The plaintiff contends that the naloxone wore off, that Ms. Gonzales became intoxicated again from the effects of the heroin, leading to a recurrence of nervous system depression and that she essentially died from a recurrence of the overdose after becoming unresponsive at approximately 1:45 a.m. on the morning of May 8th – approximately 6 1/2 to 7 hours after she initially overdosed on heroin. Plaintiff's principal expert has never encountered such a situation and does not know of anyone who has.  See generally Exhibit 3, Deposition of Michael Cohen at 9:2 -12:24.

23.  Video evidence from the facility indicates that at the time of Mr. Edmunds' call to Ms. Archuleta, Ms. Gonzales was able to walk and talk. She was oriented to time and place. She was able to fully comply with a strip search. She was able to talk with her mother. Ms. Gonzales did not exhibit signs of respiratory distress during her intake into the YDP or at the time of Edmunds' phone call to Archuleta. Exhibit 3,Deposition of Cohen, 67:20 – 6814, 150:8-12.

24.  Plaintiff's expert Michael Cohen, M.D. contends that Ms. Archuleta should have given more specific guidance to YDP staff in observing Ms. Gonzales with regard to frequency of breaths, depth of breathing, pauses in breathing or unusual noises during breathing that might have been indicative of recurrent narcotic effects on breathing. However, Dr. Cohen concedes that he himself has never given such instructions, and that the YDP staff already knew how to do the things he faults Ms. Archuleta for not providing instruction during her 11:00 p.m. call with Mr. Edmunds.  Exhibit 3 deposition of Cohen, 96: 2 – 99:16.

25.  Dr. Cohen further opined that the symptoms Mr. Edmunds reported were consistent with "an altered mental state" and that this should have prompted Ms. Archuleta to refuse the admission despite the medical clearance and send Ms. Gonzales back for evaluation by medical personnel.

26.  At the time of Ms. Gonzales's death, Ms. Archuleta held the position of a registered nurse and held no other positions.  Ex. 1, Archuleta Deposition, 6:9-23.

27.     Ms. Archuleta's job duties at the time of the incident are those of a nurse, and not of a law enforcement officer. Ex. 1, Archuleta Dep., Exhibit 19 thereto.

**B.     Standards for Summary Judgment**

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See, *Celotex Corp. v. Catrett*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). See, *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party

asserting that a fact . . . is genuinely disputed must support the assertion by . . .
citing to particular parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or declarations, stipulations
(including those made for purposes of the motion only), admissions, interrogatory
answers, or other materials." Fed. R. Civ. P. 56(c)(1).  It is not enough for the party
opposing a properly supported motion for summary judgment to "rest on mere
allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.; *Otteson v.
United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("[O]nce a properly supported
summary judgment motion is made, the opposing party may not rest on the
allegations contained in his complaint, but must respond with specific facts showing
the existence of a genuine factual issue to be tried." (citation omitted) (internal
quotation marks omitted)).

   Nor can a party "avoid summary judgment by repeating conclusory opinions,
allegations unsupported by specific facts, or speculation." *Argo v. Blue Cross & Blue
Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).  In responding to a
motion for summary judgment, "a party cannot rest on ignorance of facts, on
speculation, or on suspicion and may not escape summary judgment in the mere
hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794
(10th Cir. 1988)).

   To deny a motion for summary judgment, genuine factual issues must exist
that "can be resolved only by a finder of fact because they may reasonably be
resolved in favor of either party." *Anderson*, 477 U.S. at 250. A mere "scintilla" of

evidence will not avoid summary judgment. (*Anderson*, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. *Id.*, 477 U.S. at 251 "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." *Id.*, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247-248.

## C.    Standards for Qualified Immunity

Motions for summary judgment raising qualified immunity questions are handled differently from other summary judgment decisions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. *Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 172 L. Ed. 2d 565 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).

In *Pearson*, the Supreme Court held that the court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. In this case, Ms. Archuleta contends that she did not violate Ms. Gonzales' Eighth Amendment rights under the clearly established law in this Circuit.

**D.    Standards for Deliberate Indifference to Serious Medical Needs**

Under the Fourteenth Amendment due process clause, "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985). A claim for inadequate medical attention will be successful if the plaintiff shows "'deliberate indifference to serious medical needs.'" *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1995) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). The Supreme Court has cautioned that "an inadvertent failure to provide adequate medical care" does not rise to a constitutional violation. *Estelle*, 429 U.S. at 105-06.

The test for deliberate indifference is both objective and subjective. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159 (internal quotation marks omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference. The question is: "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Id.*

The factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. However, the Supreme Court has cautioned that an obvious risk cannot conclusively establish an inference that the official subjectively knew of the substantial risk of harm, because "a prison official may show that the obvious escaped him." *Id.* at 843, n.8.

Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts

gave rise was insubstantial or nonexistent." *Farmer,* 511 U.S. at 844.  In addition,

prison officials who actually knew of a substantial risk to inmate health or safety

may be found free from liability if they responded reasonably to the risk, even if the

harm ultimately was not averted. *Id.*  Whether one puts it in terms of duty or

deliberate indifference, prison officials who act reasonably cannot be found liable

under the Cruel and Unusual Punishments Clause. *Id.* at 845.

E.   **Ms. Archuleta is entitled to qualified immunity because the evidence does not establish she recognized Ms. Gonzales had a substantial risk of death at approximately 11:00 p.m. on May 7, 2014.**

As the Tenth Circuit has pointed out, it is the harm claimed by the prisoner

that must be sufficiently serious to satisfy the objective component, and not solely

"the symptoms presented at the time the prison employee has contact with the

prisoner." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (2009) (citation omitted).  Thus,

in a similar case involving death from complications of intoxication, the Tenth

Circuit has held that the objective harm is death and not intoxication. *See id.* (*See*

*also* Response to Plaintiff's Motion for Partial Summary Judgment, Doc.  filed April

8, 2016) Accordingly, the question in this case focuses on the subjective component,

whether Ms. Archuleta knew from her phone call with Mr. Edmund (which phone

call was the universe of information about Ms. Gonzales that was available to Ms.

Archuleta) that Ms. Gonzales faced a substantial risk of death at that time and

whether Ms. Archuleta deliberately disregarded that risk.

Here there is no evidence that at the time of the phone call any physician had

identified in Ms. Gonzales any serious pending medical condition.  To the contrary,

the only evidence from a physician that Ms. Archuleta knew about was the medical clearance from St. Vincent's hospital, just one hour old, clearing Ms. Gonzales to the YDP facility with "no further cares." Thus, plaintiff must prove that it was obvious to Ms. Archuleta that – despite the medical clearance – Ms. Gonzales had an objective risk of death based solely on the information she learned during phone call with Mr. Edmunds. In other words, plaintiff must show from the evidence that despite the medical clearance, Ms. Archuleta "drew the inference" that Ms. Gonzales was at risk from impending death. *See Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Plaintiff asserts that during Ms. Archuleta's conversation with Mr. Edmunds, he informed her of Ms. Gonzales' "state," which plaintiff infers as meaning Mr. Edmunds told Ms. Archuleta that Mr. Gonzales had symptoms of "groggy eyes" and "slurred speech." Plaintiff's contends that this is evidence of an "altered mental state." Perhaps so. Or perhaps those are descriptions of being exhausted or withdrawing from opiate abuse. Regardless, such symptoms are not evidence themselves of an impending "fatal medical condition," particularly, as in this case, where the freshly written medical clearance from a medical doctor stated "no further cares," and where Edmunds stated to Archuleta that Ms. Gonzales was alert and oriented at the moment. Plaintiff cannot overcome summary judgment, because she cannot show that Archuleta was subjectively aware of the specific harm claimed by the prisoner and not simply aware that harm, in a general sense, could occur. *Doty v. Broomfield*, 2015 U.S. Dist. LEXIS 144255 ¶16 (citing *Martinez*, 563

F.3d at 1089).

Further, to the extent the plaintiff claims that "groggy eyes" and "slurred speech" are consistent with re-intoxication, the clearly established law within this circuit holds that intoxication symptoms are not, as a matter of law, obvious signs of a risk of impending death. *Martinez v. Beggs*, 563 F.3d 1082, 1088-1890 (2009).

In *Martinez*, a detainee Kenneth Ginn, who had been held at a county detention center, died from a heart attack, precipitated in part by acute alcohol intoxication. Identical to Ms. Gonzales' claims here, medical experts testified that if the detention center had transported Ginn to the hospital instead of holding him in custody, he likely would have lived. The experts opined that,

> the medical facility would have measured Ginn's blood alcohol level, that level would have exceeded 300 mg/dl, "which is associated with coma and depressed vital signs"; Ginn would have been kept in the facility for observation; while under observation Ginn would have "experienced an acute coronary syndrome and ventricular arrhythmia"; Ginn's cardiac experiences would have been reversed with medical supervision and treatment . . ..

*Martinez*, 563 F.3d at 1087.

In affirming a summary judgment on the grounds of qualified immunity in favor of the custodial officers and the county, the Tenth Circuit panel, consisting of Judges Kelly, Brisco and McConnell, held that defendants had to subjectively disregard the risk of detainee's claimed harm—death and heart attack—and not merely the risks of intoxication. The Court concluded that "[n]othing in the record indicates that Ginn exhibited symptoms that would predict his imminent heart attack or death." *Martinez*, 563 F.3d at 1091.

Significantly, the custodial officers in *Martinez* were aware of far more detailed facts than the limited information that Ms. Archuleta received here. The officers knew that Mr. Ginn had consumed an entire bottle of whiskey, could not walk without help, was too incoherent to be booked into jail, had not been medically screened, may have been unconscious for a short time and was talking as if he were hallucinating. A bystander to the arrest thought he needed medical care. None of the jail staff performed any regular checks on Ginn. *Martinez*, 563 F.3d at 1090.

The Tenth Circuit panel agreed with the District Court's determination that the officers subjectively knew that Ginn was intoxicated. However, the Tenth Circuit agreed that there was no evidence to show that anyone would have known that Ginn would face an imminent heart attack or death, much less that the individual county defendants subjectively knew that Ginn was at risk of heart attack or death. *Martinez*, 563 F.3d at 1090..

Other Tenth Circuit cases have reached similar results. *See e.g., Cox v, Glantz*, 800 F.3d 1231, 1250-1252 (10th Cir. 2015) (plaintiff had to show actual knowledge by a prison official of an individual inmate's substantial risk of suicide). *Sealock v. Colorado*, 218 F.3d 1205 at 1208, 1211, 1212 n.7 (10th Cir. 2000) the subjective component was not met where a prison nurse misdiagnosed an inmate's chest pains as the flu, and failed to recognize symptoms suggesting an impending heart attack." *Bruner-Mcmahon v. Jameson*, 566 Fed. Appx. 628, 634 (10th Cir. 2014) (unpublished) (it is not sufficient—for a constitutional claim—to show that defendants observed that Mr. Bruner appeared to have the flu or was acting in a

strange way that might have been related to a mental health condition: appellants were required to produce evidence showing that defendants appreciated that Mr. Bruner "had a risk of a fatal medical condition and chose to disregard" that risk).

In the present, case, it is undisputed that Ms. Archuleta was aware that Ms. Gonzales had just arrived at the YDP with a medical clearance for admission into that facility, issued within the hour. There were no special instructions for care or monitoring conveyed to Ms. Archuleta.

Indeed, plaintiff has not shown any evidence that Ms. Archuleta would even have been aware of the potential for heroin re-intoxication hours after the administration of the naloxone and observation and clearance by the hospital. This entire theory is something that the plaintiff's experts pieced together -- with the luxury of hindsight and review of medical literature. None of the numerous liability experts in this lawsuit have ever experienced the plaintiff's scenario, and their experience has, if anything, been the very opposite of what the plaintiff contends occurred. Thus, the evidence falls far short of suggesting that Mr. Gonzales was at obvious risk of death when she arrived at the YDP.

In sum, plaintiff's evidence of Ms. Archuleta's conversation with Mr. Edmunds, including the inferences that plaintiff urges about "groggy eyes" and "slurred speech" does not establish that Ms. Gonzales was at an imminent risk of death from some form of complications with her heroin abuse. Plaintiff has failed to present sufficient evidence that Ms. Archuleta, who knew that Ms. Gonzales had a medical release, instead "drew the inference" that Ms. Gonzales was at a risk of

impending death from complications from her heroin abuse.  Ms. Archuleta is entitled to qualified immunity on plaintiff's Eighth Amendment claim.

**F.  Ms. Archuleta is also entitled to qualified immunity because Plaintiff has not established that Ms. Archuleta was deliberately indifferent to Ms. Gonzales' medical needs.**

The subjective component is not satisfied, absent an extraordinary degree of neglect, where a medical professional merely exercises considered medical judgment. Matters that traditionally fall within the scope of medical judgment are decisions such as whether to consult a specialist or undertake additional medical testing. *See, e.g., Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (noting that types of medication prescribed and referrals to specialists are generally matters of medical judgment). The Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves "the question whether additional diagnostic techniques or forms of treatment is indicated." *Estelle*, 429 U.S. at 107. Where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law.

In the end, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999). So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met. The subjective inquiry is limited to

consideration of the provider's knowledge at the time she prescribed treatment for the symptoms presented, not to the ultimate treatment necessary. See *Mata*, 427 F.3d at 753 (opining that the symptoms presented at the time the physician has contact with the patient is relevant to the subjective inquiry only; objective seriousness is based on the ultimate harm presented).

After discussing the case with Mr. Edmunds, Ms. Archuleta instructed Mr. Edmunds to make special arrangements for monitoring Ms. Gonzales that evening. These arrangements included placing her in a portable bed ("boat") in the Anasazi community room in the immediate vicinity of the desk where Mr. Edmunds and another staff member John Ortega were working that evening. Ms. Archuleta instructed Mr. Edmunds to keep a close eye on her that evening and to notify her of any changes.

Although plaintiff claims that Ms. Archuleta should have given Mr. Edmunds more explicit instructions, plaintiff's contentions simply do not establish that Ms. Archuleta was deliberately indifferent to Mr. Gonzales under the clearly established law within this circuit. Ms. Archuleta knew that the YDP had a medical clearance from the hospital, issued within the hour. Ms. Archuleta testified that a medial clearance is the "gold standard" for admission into the facility. Despite the medical clearance, Ms. Archuleta went on to ask Mr. Edmunds to take additional precautions for monitoring Ms. Gonzales that evening. Such conduct by Ms. Archuleta is the very opposite of deliberate indifference – it shows a concern by Ms. Archuleta to adopt a more intensive monitoring protocol that was above and beyond

the "no further cares" specified in the medical clearance issued by the physician.

Plaintiff's contentions boil down to little more than an assertion that Ms. Archuleta should have second guessed that medical clearance and directed Mr. Edmunds to refuse the admission. But that sort of criticism is at most a difference in judgment in handling the admission that evening. This does not rise to the level of deliberate indifference under the clearly established law within this circuit. Ms. Archuleta is entitled to qualified immunity.

## G.    Ms. Archuleta is entitled to immunity because she is not a law enforcement officer as defined under the New Mexico Tort Claims Act.

Count III of Plaintiff's complaint fails as a matter of law, because Ms. Archuleta is not a law enforcement officer, and therefore is not subject to suit under this count. Count III asserts negligence claims, and relies upon the waiver of sovereign immunity set forth in NMSA 1978, Section 41-4-12. See Complaint For Wrongful Death [Doc. No. 1, Exhibit A], ¶7 (stating that sovereign immunity is waived for purposes of this action in "Sections 41-4-12 and 41-4-16" [1]), and ¶80 (stating that the waiver of immunity at issue in this case is pursuant to "Section 41-4-12 [in which] immunity is waived when *law enforcement officers* cause wrongful death…") (emphasis added).

The New Mexico Tort Claims Act ("Act") provides governmental entities and public employees acting in their official capacities with immunity from tort suits unless the Act sets out a specific waiver of that immunity. See, NMSA 1978, Section

---

[1] Section 41-4-16 sets forth the procedure for serving a notice of tort claim upon a governmental entity; it does not contain a waiver of immunity.

41-4-4; *Abalos v. Bernalillo County Dist. Attorney's Office*, 105 N.M. 554, 557, 734

P.2d 794, 797 (N.M. Ct.App. 1987), *cert. quashed*, 106 N.M. 35, 738 P.2d 907 (1987);

*Weinstein v. City of Santa Fe, ex rel. Santa Fe Police Dep't.*,121 N.M. 646, 649, 916

P.3d 1313, 1316 (1996). Section 41-4-12 of the Act waives immunity for wrongful

death resulting from the "deprivation of any rights, privileges or immunities

secured by the constitution and laws of the United States or New Mexico when

caused by law enforcement officers while acting within the scope of their duties."

Section 41-4-3(D) defines a "law enforcement officer" as follows:

> [A] full-time salaried public employee of a governmental entity, or a
> certified part-time salaried police officer employed by a governmental
> entity, whose principal duties under law are to hold in custody any
> person accused of a criminal offense, to maintain public order or to
> make arrests for crimes, or members of the national guard when called
> to active duty by the governor[.]

Determining whether a person is a law enforcement officer as intended by

Section 41-4-3(D) involves a mixed question of fact and law. See, *Limacher v.*

*Spivey*, 145 N.M. 344, 346, 198 P.3d 370, 372 (Ct. App. 2008); see also, *Baptiste v.*

*City of Las Cruces,* 115 N.M. 178, 181, 848 P.2d 1105, 1108 (Ct. App. 1993)

(recognizing that whether a person is a "law enforcement officer" involves questions

of fact regarding the person's duties as well as legal questions regarding whether

those duties fall within the statutory definition of a law enforcement officer). In

order for a governmental employee to fall within the law enforcement exception to

sovereign immunity, the employee's principal duties must be encompassed within

the enumerated duties listed in Section 41-4-3(D). See, *Limacher*, 145 N.M. at 346,

198 P.3d at 372. Additionally, the court should consider various factual and legal questions, including the following: (1) whether a majority of the governmental employee's time is devoted to maintaining public order; (2) insofar as the duties of the governmental employee involve maintaining public order, whether those duties are traditionally performed by law enforcement officers; and (3) if the duty is not a traditional duty of law enforcement officers, whether it comes within the meaning of "maintaining public order" pursuant to Section 41-4-3(D). See, *Baptiste,* 115 N.M. at 181, 848 P.2d at 1108.

In this case, the Plaintiff asserts her claims under the law enforcement exception to sovereign immunity, and sued Ms. Archuleta in her individual capacity, stating she "was a corrections nurse" at the YDP facility. See, *Complaint*, ¶12 [Doc. No. 1, Ex. A].

Plaintiff's unwarranted conclusion that Ms. Archuleta is a law enforcement officer notwithstanding, under the governing standard Ms. Archuleta cannot be considered law enforcement officer for purposes of the Act's waiver of sovereign immunity. At the time of Ms. Gonzales's death, Ms. Archuleta held the position of a registered nurse and held no other positions. The job description for a registered nurse in the corrections department, as referenced in the Santa Fe County Human Resources Manual, specifies the nurse's primary purpose is to "[p]erform a variety of routine, non-emergency medical duties for the purpose of initial screening of new arrivals and diagnosis of ongoing and new medical problems." Exhibit 1, Deposition

of Molly Archuleta, Ex. 19 thereto. The job description also outlines the following

job functions:

- Monitor disbursement of medications as directed by the facility physician to ensure they are administered in accordance with standing orders. Inventory medical supplies needed for sick call. Submit requisitions for replacements and additional supplies as required by the facility physician so supplies will be on hand when needed.

- Conduct brief medical screening on each new arrival within 24 hours of admission. Complete medical information forms and keep on file to ensure the staff has information available to safely provide for residents' physical needs. Schedule new arrivals for physical examination by facility physician. Notify the Nurse Administrator of any unusual or contagious health problems so that the spreading of contagious infections or diseases is contained.

- Conduct in-house sick call under the direction of the facility physician and make recommendations as appropriate to excuse the inmate from the schedule to see the facility physician to insure the health and safety of the resident is maintained. Under the guidance of the Nurse Administrator and the facility physician, provide in-service training to staff regarding emergency medical procedures, administering medication, etc., so the health and well-being of the residents is maintained and contract requirements are met.

- Establish and maintain confidential health records and medical files on all residents, insuring that forms and procedures are updated on a regular basis so that contract requirements are met. Maintain confidentially obtained through job duties regarding resident, employees, vendors, outside agencies, etc., so that sensitive information is only given on a "need to know" basis.

- Comply with facility safety rules; take appropriate corrective action to ensure work is performed in a safe manner and without injury to self or others. Communicate effectively with staff in a manner that promotes a team spirit.

*Id.*

Ms. Archuleta is not a law enforcement officer subject to suit under NMSA 1978 Section 41-4-12. Her job duties as a registered nurse are medical in nature, and bear no similarities or overlap with the characteristics of a law enforcement officer's duties (i.e., holding inmates in custody, keeping public order, and making arrests) as defined in NMSA 1978, Section 41-4-3(D). There is no evidence that Ms. Archuleta has ever been a law enforcement officer, or that her job duties are of the kind traditionally performed by law enforcement officers.

Insofar as her claims against Ms. Archuleta are concerned, Plaintiff cannot establish that her injuries or damages were "caused by law enforcement officers while acting within the scope of their duties," as required by NMSA 1978, Section 41-4-12. Since Ms. Archuleta was not acting as law enforcement officer, Plaintiff has failed to establish a waiver of immunity under the New Mexico Tort Claims Act, and therefore, Ms. Archuleta is entitled summary judgment on Count III of Plaintiff's Complaint.

## Conclusion

There is no basis for any Section 1983 claim or negligence claim against Ms. Archuleta in this lawsuit. Ms. Archuleta is entitled to summary judgment as a matter of law.

RESNICK & LOUIS, P.C.

*/s/ Steven L. Gonzales*
Steven L. Gonzales
3840 Masthead St. NE
Albuquerque, New Mexico 87109
505-652-1339

And

LONG, KOMER & ASSOCIATES, P. A.
MARK E. KOMER
2200 Brothers Road/P. O. Box 5098
Santa Fe, NM  87502-5098
505-982-8405
mark@longkomer.com

*Attorneys for Defendant Molly Archuleta*

## Certificate of Service

I hereby certify that on the 15th day of April, 2016, I filed the foregoing *Defendant Molly Archuleta's Motion for Summary Judgment* electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Lee R. Hunt, Esq.
lee@leehuntlaw.com

and

Santiago Juarez, Esq.
santiagojuarezlaw@gmail.com

*Attorneys for Plaintiff*

Mark E. Komer, Esq.
email@longkomer.com
*Attorneys for Defendant*
*Santa Fe County and its employees*

Joe L. McClaugherty
Tamara R. Safarik
maclaw@spinn.net
tamara@mcclaughertyandsilver.com

*Attorneys for Defendant Nathan Unkefer, M.D.*

William P. Slattery

Zachary T. Taylor
wslattery@hinklelawfirm.com
ztaylor@hinklelawfirm.com

/s/ Steven L. Gonzales
Steven L. Gonzales