# AOC - Estate of Desiree Gonzales

# *Molly Archuleta, RN - Vol. I*

### 7/23/2015

Condensed Transcript

Prepared by:

Vicki R. Marco
Long, Komer & Associates, P.A.

Tuesday, August 11, 2015



Ex. 1

Page 5

1 County?
2    A.  I originally started working for Santa Fe
3 County in 2007 -- July of 2007.  I took a break from
4 employment in 2011, and went back to work for Santa
5 Fe County in December of 2012.
6    Q.  And in 2011, when you took a break, about
7 when was that?
8    A.  March.
9    Q.  So from March through -- March 2011 through
10 February 2012?
11    A.  December 2012.
12    Q.  December 2012.  What did you do during that
13 period?
14    A.  I had a baby.
15    Q.  Excellent.  I was hoping that was going to
16 be your answer.
17    A.  That's my answer.
18    Q.  Good thing to do.
19    A.  And I did some part-time work after she was
20 born, before I went back to work.
21    Q.  Wonderful.  And then you started back
22 December of 2012, and when you started in December of
23 2012, what was the position that you were in at that
24 time?
25    A.  Registered nurse.

Page 6

1    Q.  Was that the same position you were in
2 before?
3    A.  Yes.
4    Q.  Let me show you -- we received your
5 personnel file this morning, and I think one of the
6 documents that was in there we'll mark as Exhibit 19.
7        (Exhibit 19 marked.)
8        MR. GONZALES:  May I?
9    Q.  What you're going to get a chance to look
10 at is the job description for a registered nurse.  I
11 think -- does that appear to be what Exhibit 19 is?
12    A.  Yes.
13    Q.  Okay.  And it has the date on there
14 December 2012, so that was the job description when
15 you started back in 2012; is that right?
16    A.  Yes.
17    Q.  Is that also the position that you were in
18 in May of 2014?
19    A.  Yes.
20    Q.  Okay.  In May of 2014, other than being in
21 the position of registered nurse, did you have other
22 job titles?
23    A.  No.
24    Q.  So as far as any form of medical director
25 or anything like that?

Page 7

1    A.  No.
2    Q.  And in -- back up for me just a second and
3 tell me where you received your education?
4    A.  I received my nursing degree from Santa Fe
5 Community College.
6    Q.  When did you get that?
7    A.  In 2006.
8    Q.  And then after you got your nursing degree
9 in 2006, what was your first job in nursing?
10    A.  I was a registered nurse at the
11 Penitentiary of New Mexico.
12    Q.  And that was in 2006?
13    A.  Yes, it was.
14    Q.  And you stayed there until 2007?
15    A.  That's correct.
16    Q.  About how long was that?  A year?
17    A.  About one year I worked at the
18 penitentiary.
19    Q.  And then in 2007, when you started working
20 for the county, where did you work at that time?
21    A.  At the Adult Detention Facility.
22    Q.  In between 2007 and 2011, were you at the
23 adult facility the whole time?
24    A.  I was.
25    Q.  And then when you started back in December

Page 8

1 of 2012, where were you then?
2    A.  At the Youth Development Program.
3    Q.  And in between December 2012 and May 2014
4 you were at the Youth Development Program the whole
5 time?
6    A.  Yes.
7    Q.  Are you currently there?
8    A.  I am.
9    Q.  I want to talk for a minute about the YDP
10 program, and how many -- and let's focus right now --
11 not currently; we'll get to that.  But when you
12 started working at the YDP program in 2012, how many
13 nurses were there that worked there full time?
14    A.  Two.
15    Q.  And at that time what was the coverage as
16 far as nursing?
17        MR. GONZALES:  Object to form.
18    A.  The schedule was 8:00 a.m. to 8:00 p.m.,
19 seven days a week.
20    Q.  And tell me this:  How was it that two
21 nurses were able to cover that?  I mean, I get the
22 12-hour shifts, and I assume you had at least one day
23 a week off?
24    A.  I did.  What was regularly done, with some
25 exceptions, I worked Monday 8:00 a.m. to 8:00 p.m.,

Page 9

1 Tuesday 8:00 a.m. to 8:00 p.m., Wednesday 8:00 a.m.
2 to 8:00 p.m., and then we shared Thursday. I worked
3 half a day on Thursday. The other full-time employee
4 came in -- I worked the first half of the morning she
5 would come in and work the second half of the
6 afternoon -- second half of the day, and then she
7 would work -- so half day Thursday, all day Friday
8 all day Saturday, all day Sunday, and then started
9 all over again with me on Monday.
10    Q.   So in 2012, there was a nurse on staff 24
11 hours a day, seven days a week at the YDP?
12    A.   No. No. 12 hours a day.
13    Q.   There was a nurse on staff 8:00 a.m. to
14 8:00 p.m., seven days a week?
15    A.   Yes. Sorry. Yes.
16    Q.   I'm sure that's what you said, and I just
17 misunderstood. I thought somebody else worked the
18 other part. And currently, what is the staffing
19 arrangement for nursing?
20    A.   Currently we cover 24 hours a day, seven
21 days a week with a nurse.
22    Q.   And when did that start?
23    A.   I don't have the exact date, but I believe
24 it was July. It might have been August, 2014.
25    Q.   And going back to 2012, why don't we -- in

Page 10

1 2012, I understand, I think what you've described is
2 at that time there was a nurse on staff 12 hours a
3 day, seven days a week?
4    A.   Yes.
5    Q.   And were there LPNs that also worked at the
6 facility?
7    A.   The nurse who was not me -- the only other
8 employee is an LPN.
9    Q.   Were -- other than -- who's the other
10 nurse?
11    A.   She doesn't work there any longer, but her
12 name was Marie Robinson -- or is Marie Robinson.
13    Q.   I'm sorry. So, in 2012 you and Marie
14 covered 12 hours a day. You're an RN, Marie was an
15 LPN?
16    A.   Yes.
17    Q.   Other than you and Marie covering
18 8:00 a.m. to 8:00 p.m., was there other nursing staff
19 at the YDP?
20    A.   On occasion there may have been a nurse
21 from -- an agency nurse, but, no, I think her and I
22 mostly covered for each other. I don't think we
23 started using agency nurses until we went to 24 hour
24 a day cover. I would have to say, no, I don't think.
25 So it was just her and I -- her and me.

Page 11

1    Q.   And the -- in 2014 -- so in May of 2014, in
2 particular -- I know things changed somewhere around
3 July and August of 2014, but before that, what was
4 the arrangement as far as nursing coverage at the
5 YDP?
6         MR. GONZALES: Object to form.
7    A.   I'm not sure. Are you asking me a
8 different question. I'm not sure I understand your
9 question.
10    Q.   Sure. Let me ask it differently.
11         You've described how things were in 2012?
12    A.   Yes.
13    Q.   Did that staffing arrangement continue all
14 of the way through until July or August of 2014?
15    A.   Yes.
16    Q.   So in May of 2014 there was nursing
17 coverage from 8:00 a.m. to 8:00 p.m., seven days a
18 week?
19    A.   Yes.
20    Q.   And 8:00 p.m. to 8:00 p.m., there was
21 not -- there were no nurses on site?
22    A.   8:00 p.m. --
23         MR. GONZALES: Object to form and
24 foundation.
25         Go ahead.

Page 12

1         MR. HUNT: What's the foundation and form?
2         MR. GONZALES: You said there were no
3 people -- she can read back the question.
4         MR. HUNT: No, I asked you. I mean, I
5 don't want to sit here and have an objection to every
6 single question all day. I asked a very simple
7 question, from 8:00 p.m. to 8:00 a.m., what is their
8 nursing coverage.
9         MR. GONZALES: That's not the question you
10 asked. You said 8:00 p.m. to 8:00 p.m., and that's
11 why I objected.
12         MR. HUNT: Fine.
13    Q.   (By Mr. Hunt) From 8:00 p.m. to
14 8:00 a.m. in 2014, was their nursing coverage at the
15 YDP?
16    A.   No.
17    Q.   And in 2014, from 8:00 p.m. to 8:00 a.m.,
18 was there any medical personnel on staff at the YDP?
19    A.   I consider myself on staff when I'm not in
20 the building. Do you mean in the building?
21    Q.   In the building.
22    A.   There was not a nurse in the building from
23 8:00 p.m. until 8:00 a.m.
24    Q.   And in May of 2014, other than yourself
25 and -- at the time, was the other nurse someone

Page 13

1 different than Marie?
2   A.  Yes, I believe it was.
3   Q.  In May of 2014 were there two full-time
4 nursing staff?
5   A.  Yes.
6   Q.  Any more than that?
7   A.  Not at that time.
8   Q.  Now, in May of 2014, how often was a doctor
9 on site?
10  A.  Approximately -- most of the time, in any
11 given week, twice a week.
12  Q.  And for how long?  Meaning, when the doctor
13 would come twice a week, how long would he or she
14 stay?
15  A.  There was, I believe, also at that time a
16 nurse practitioner -- no, I'm sorry, a physician's
17 assistant.  So it was either the doctor or the
18 physician's assistant, and they would stay anywhere
19 from 30 minutes to six hours, depending on the needs
20 of the clinic.
21  Q.  What was normal?
22  A.  Two hours.
23  Q.  Which days was that?
24  A.  Tuesdays and Fridays.
25  Q.  And what times were typical?

Page 14

1   A.  8:00 a.m. to noontime.
2   Q.  And you said that that was the clinic part
3 of it, meaning the doctor visits were shared between
4 a physician and a PA?
5   A.  Yes.
6   Q.  Who was the physician?
7   A.  Tim Taylor.
8   Q.  Was Tim Taylor the medical director of the
9 YDP?
10  A.  Yes.
11  Q.  Who was the PA that came?
12  A.  Ben Martinez.
13  Q.  And who is the medical director now?
14  A.  Dr. Olivares, Mel Olivares.
15  Q.  And do you know how long Dr. Taylor was the
16 medical director?  And just take me back to 2012 when
17 you started working at the YDP.  Was he in that
18 position then?
19  A.  No.
20  Q.  Okay.  But in May of 2014, Dr. Taylor was
21 the medical director?
22  A.  Yes.
23  Q.  And the clinic hours that you described as
24 two days a week, varying from 30 minutes and six
25 hours, some of those were covered by Dr. Taylor and

Page 15

1 some were covered by Mr. Olivares?
2   A.  No.  Some were covered by Dr. Taylor and
3 some were covered by Ben Martinez at that time.
4   Q.  Okay.  Thank you.
5       Let's talk about the change in 2014.  In
6 July or August of 2014 there was a change to -- you
7 tell me, but what was the change as far as nursing
8 coverage?
9   A.  Are you talking about in staffing?
10  Q.  I'm talking about the change that you
11 described that occurred in July or August of 2014
12 related to nursing care at the YDP?
13  A.  Instead of covering 12 hours a day with a
14 nurse, we, starting in July or August, then covered
15 24 hours a day.  There was a nurse in the facility 24
16 hours a day.
17  Q.  And why was the change made?
18  A.  I don't know --
19      MR. GONZALES:  Foundation.
20  A.  -- that I know the answer to that question.
21 I didn't make the change.  It was made by the
22 administration and told to me that you know, I'd have
23 nurses there 24 hours a day.
24  Q.  When -- did anybody ever talk to you about
25 the change, and saying we're thinking about making a

Page 16

1 change to providing 24-hour nursing coverage, and ask
2 your input?
3   A.  I'm sure they did, yes.
4   Q.  Tell me about that?
5   A.  I think -- I was asked to produce a
6 schedule that would have covered 24 hours a day.  How
7 many nurses would we need, who would they be, and
8 what would their schedules look like, and I did that.
9   Q.  Was the change to 24-hour nursing coverage
10 in some way related to what occurred with Desiree?
11  A.  I don't know.
12  Q.  Were you involved -- after Desiree's death,
13 were you involved in any reviews of the care and what
14 was provided to Desiree at the YDP?
15      MR. GONZALES:  Stop.  I'm instructing you
16 not to answer the question to the extent that it
17 would require you to disclose any information that
18 you received or provided in the course of obtaining
19 legal counsel.
20      If you are able to provide an answer
21 otherwise, then you may do so.
22  A.  Can you ask me the question again, please?
23  Q.  (By Mr. Hunt) Sure.  After Desiree
24 Gonzales's death, were you involved in any
25 investigation into the circumstances of her death?

Page 17

1  MR. GONZALES: Same instruction, and
2 objection.
3  A. I was not involved in any investigation.
4  Q. Were you involved in any review of the care
5 that she was provided?
6  MR. GONZALES: Instruct the witness not to
7 answer the question to the extent --
8  MR. HUNT: You're welcome to say same
9 objection.
10  MR. GONZALES: Well, same objection,
11 plus --
12  MR. HUNT: I don't want 15 questions every
13 time.
14  MR. GONZALES: I'm sorry, same objection.
15 Plus, to the extent it would require you to disclose
16 information about -- involved in any meetings or
17 reviews that were made for the purpose of obtaining
18 mental health counseling for yourself or any other
19 county employees, I'll instruct you not to answer the
20 question.
21  A. Okay. Yes. I have had conversations about
22 the care Desiree received.
23  Q. (By Mr. Hunt) And here's what I would like
24 to do. Obviously, we're dancing around objections,
25 and at this point I want to understand what those

Page 18

1 were. Don't tell me the content of the
2 communications yet. I don't think the fact of
3 whether or not reviews occurred is privileged. So
4 let's get that out first, and then we can go the next
5 route.
6  So, again, not content right now, okay.
7  A. I understand.
8  Q. So help me understand what reviews you were
9 involved in?
10  A. So the morning that Desiree passed away,
11 there was debriefing at the facility.
12  Q. Can you tell me who was present for the
13 debriefing, again, without content, but who was
14 present?
15  A. I'll do my best to tell you who was
16 present. I don't know that I remember everybody who
17 was present. I was there. The warden at the time,
18 his name was Mark Gallegos, he was there. I believe
19 the director of public safety, Pablo Sedillo, was
20 there. I believe Pablo Sedillo's administrative
21 assistant, Tilla Rendon-Varela, was there. I believe
22 Aaron Garcia, who at the time held the position of
23 case manager, was there. Matthew Edmunds was there.
24 Esmeralda Coronado was there. Ted Lovato from CYFD
25 was there. Roberta Herzenberg, who is a mental

Page 19

1 health employee was there. One of the investigators
2 from Santa Fe County, Corky, whose last name I do not
3 know how to spell or pronounce.
4  Q. Ojinaga?
5  A. Yes, he was there.
6  Q. Who is he?
7  A. Investigator, Santa Fe County.
8  Q. So, with the police?
9  A. No, he is a Santa Fe County -- he's the --
10 my understanding is he's the corrections department
11 investigator.
12  Q. Okay.
13  A. He's not a police officer, to my knowledge.
14  I'm confident there were other people
15 there, but that's who I can come up with at this
16 time.
17  Q. And what was the purpose of that meeting?
18  MR. GONZALES: Object to foundation.
19  A. I don't know that I -- I didn't call the
20 meeting, so I don't know what the intended purpose of
21 the meeting was. A good portion of it could have
22 been based, and I think was based -- I was asked to
23 call Roberta Herzenberg, who is the mental health
24 provider -- one of the mental health providers. I
25 was asked to call her to be there, so I'm making the

Page 20

1 assumption -- well, I'm not making the assumption. I
2 know she was called to be there for the mental health
3 well-being of the employees involved.
4  Q. She didn't meet privately with you, did
5 she?
6  A. Prior to the meeting, her and I sat on a
7 couch outside of meeting room, so we didn't -- we sat
8 there for a few minutes, yes.
9  Q. Sure. So the meeting itself, though, how
10 long did the meeting last, approximately? An hour?
11 More than that?
12  A. Approximately, and I'm sorry, I can't say I
13 know for sure, one hour, maybe an hour and a half.
14  Q. And during that hour part of the meeting
15 all of the folks that you described were present
16 in -- was it at the YDP?
17  A. Yes, it was.
18  Q. Kind of in that conference room?
19  A. In a break room.
20  Q. Everybody was present for that part of the
21 meeting, correct, for the hour you described?
22  A. I imagine some people went in and out, but,
23 yes, for the most part.
24  Q. Was part of that meeting to debrief,
25 meaning to get an understanding of what had happened?

Page 21

1     MR. GONZALES: Object to form. Now, you're
2 getting into the content of the meeting.
3     MR. HUNT: Absolutely. Because there's
4 nothing privileged about it. There were no lawyers
5 present. There was no ability to say this is an
6 attorney-client privilege meeting. No ability to say
7 it's a work product meeting. No ability to say it's
8 privileged and confidential. This is a debriefing
9 that occurred at the Santa Fe County Youth
10 Development Program, so I absolutely believe we're
11 entitled to ask questions about content.
12     MR. GONZALES: I instruct the witness not
13 to answer.
14     MR. KOMER: I need to make an objection on
15 behalf of the clients. To the extent this is -- she
16 is describing a critical incident stress debriefing,
17 which has been identified in discovery, we're
18 claiming that is -- privilege attaches to
19 communications made during that meeting, because it
20 was for the purpose of assisting employees with
21 mental health issues, and accordingly, falls within
22 the privilege recognized by the United States Supreme
23 Court, as well as New Mexico psychotherapists'
24 privilege. There was a mental health counselor
25 present during that time.

Page 22

1 And so the objection, Lee, just to be
2 clear, at least as regards to a critical incident
3 stress debriefing, which did occur, that objection is
4 related to those privileges.
5     Q. (By Mr. Hunt) Did you talk to
6 Ms. Herzenberg during the one-hour meeting?
7     A. I don't recall. I don't know.
8     Q. Was Ms. Herzenberg the one that was leading
9 the meeting?
10     A. No, sir.
11     Q. Was she the one that called the meeting?
12     A. No, sir.
13     Q. Who called the meeting?
14     A. I don't know.
15     Q. To your understanding, the meeting that
16 occurred that we're talking about, the morning after
17 this happened, were -- again, not content right now,
18 but were the facts of what happened discussed?
19     MR. GONZALES: Object to --
20     MR. HUNT: I'm not asking for content. I'm
21 asking whether facts were discussed. If you are
22 going to assert a privilege, I'm entitled to explore
23 whether I think it's a legitimate privilege. I'm not
24 asking for content.
25     MR. GONZALES: You're asking what they

Page 23

1 discussed.
2     MR. HUNT: I'm asking whether they
3 discussed facts. It's a yes or no answer. I'm not
4 asking for the facts.
5     I think it is your burden to prove this is
6 some sort of stress debriefing. I think I have the
7 right to explore whether or not I think that's true,
8 and then we can, obviously, take it up with the
9 judge.
10     I understand nothing is going to happen
11 over the next 15 minutes, talking about this meeting,
12 where all of a sudden you are going to say, you know
13 what, Lee, you're right. Tell him everything that
14 happened in the meeting. I'm not going to get that
15 information. I'm not going to try to get that
16 information, but I think I'm entitled to explore
17 whether or not I agree with the privilege, which I
18 don't, so ultimately it will be a decision for the
19 judge.
20     So if you're precluding me from getting
21 information that will allow us to determine whether
22 or not the judge can decide whether this is
23 privileged, then I think all we are doing is setting
24 up Ms. Archuleta to come back and talk to the judge
25 during that hearing, so you decide.

Page 24

1     MR. GONZALES: Let me add that I object to
2 the form.
3     If you could be more specific, I'll
4 reconsider my objection. I think "the facts" -- I
5 don't even know what you're asking. I think you're
6 asking to talk about --
7     MR. HUNT: I'll tell you what I'm asking
8 instead of that.
9     Q. (By Mr. Hunt) My question is simply this,
10 Ms. Archuleta: I don't want to know what facts were
11 discussed. I don't want to know anything about the
12 content. What I want to understand is whether the
13 people that were present at that meeting discussed
14 the facts related to Desiree Gonzales's intake,
15 admission and time at YDP before her death? It's a
16 yes or no answer.
17     MR. GONZALES: She's not going to answer
18 that question. You're asking her to tell you --
19 you're back-dooring the content of the conversation.
20     MR. HUNT: I don't want the content, Steve.
21 I've said that five times. It's a yes or no.
22     MR. GONZALES: You could ask a lot of yes
23 or no questions and still get to the content.
24     MR. HUNT: I'm not asking her --
25     MR. GONZALES: I'm instructing her not to

Page 45

1  Q.  -- before intake?
2  A.  I wasn't there. I don't know.
3  Q.  I'm just talking common practice.
4  A.  I honestly don't know. I wouldn't imagine
5  so, but they all do receive first aid, CPR training
6  and they are taught how to check a pulse.
7  Q.  Let me make sure I understand. They are
8  instructed to find -- your understanding of their
9  training, and part of your job is to be involved in
10 that training; is that correct?
11 A.  To some extent, yes.
12 Q.  The training that's received in first aid
13 and CPR, is they are able to check whether or not a
14 person has a pulse, correct?
15 A.  Correct, and probably to tell you what that
16 pulse rate is.
17 Q.  Do you know whether they have any training
18 in determining whether or not a pulse is normal?
19 A.  I don't give the first aid, CPR AED
20 training, but I have been trained in that, and, yes,
21 part of taking that training is to learn what a
22 normal pulse is.
23 Q.  Do they have any ability to check blood
24 pressure, the life skills workers?
25 A.  The equipment is there. I can't speak to

Page 46

1  their individual ability, but the equipment is there.
2  Q.  Have you ever seen a life skill worker
3  check blood pressure?
4  A.  No.
5  Q.  Have you ever seen a life skill worker
6  check pulse on intake of a resident?
7  A.  No.
8  Q.  The practice in 2014, again pre-July, was
9  that if a resident -- potential resident is coming
10 from the hospital and arrives at the facility with a
11 medical clearance, then that patient is accepted as a
12 resident, from a medical perspective; is that true?
13 A.  Yes.
14 Q.  And is it also my understanding that the
15 practice in 2014 was that if a patient has a medical
16 clearance, then there's no separate medical
17 assessment that's done for a resident who arrives
18 when nursing care is not present; is that true?
19 A.  The medical assessment at the facility
20 would be completed by a nurse first thing when they
21 came on shift at 8:00 a.m., first -- when there
22 was -- we're talking pre-July, I would come in at
23 8:00 in the morning, had a little in-box for me, that
24 showed me if anybody was brought in during the night.
25 Prior to doing anything else, that resident would

Page 47

1  come down to medical and I would do my nurse
2  assessment.
3  Q.  Okay. Can we agree that for Desiree
4  Gonzales, she did not receive a medical assessment
5  during the time that she was at the YDP, correct?
6  MR. GONZALES:  Object to form.
7  A.  She did not receive a medical assessment
8  from me. She was seen by medical personnel, but not
9  employees of YDP.
10 Q.  Okay. and I'm talking about -- not after
11 she was found unresponsive. I mean, she was seen by
12 the fire department, after she was found
13 unresponsive?
14 A.  That's what I'm talking about.
15 Q.  Okay. So, I'm talking about before that.
16 During intake of Desiree Gonzales, can we agree that
17 there was no medical assessment performed?
18 MR. GONZALES:  Object to form and
19 foundation.
20 A.  We can agree.
21 Q.  Okay. And --
22 A.  But I wasn't there. We can agree that I
23 didn't do one.
24 Q.  And that was not my question.
25 A.  Okay.

Page 48

1  Q.  My question was: Can we agree no medical
2  assessment was done for Desiree Gonzales when she
3  arrived?
4  MR. GONZALES:  Foundation.
5  A.  I wasn't there.
6  Q.  Let's be clear on that. Desiree Gonzales
7  arrived when there was no nursing personnel; is that
8  your understanding?
9  A.  That's my understanding.
10 Q.  And if there was no nursing personnel
11 present when Desiree Gonzales arrived, then she would
12 not have a received a medical assessment, true?
13 MR. GONZALES:  Foundation.
14 MS. SAFARIK:  Join.
15 A.  I don't know what the life skill workers
16 did for her. I don't know what the life skill
17 workers did for her at that time. I wasn't there.
18 The RN and the LPN, I think, yes, that's what we were
19 at the time, were not on staff. She did not receive
20 an assessment from either of the two nurses who were
21 employed.
22 Q.  Is it your position, or do you have some
23 reason to believe she had a medical assessment
24 performed by a life skills worker?
25 MR. GONZALES:  Form. Foundation.

Page 57

1 personnel?
2    A.  If somebody was having difficulty
3 breathing, the instruction would have been to dial
4 9-1-1, and then make other contacts after that, but
5 get emergency medical services activated immediately.
6    Q.  And certainly on that side of things, the
7 instruction was if it is recognized that a person
8 stops breathing, the first thing that should happen
9 is to call 9-1-1, correct?
10    A.  Yes.
11    Q.  I mean -- was that the instruction that was
12 given to the life skills workers by yourself?
13    A.  I don't teach the CPR.  I'm not the
14 instructor for that part of the training, but like
15 I've said, I've been trained in that before.  So in
16 that training, CPR AED, first aid, if somebody is not
17 breathing, activate emergency medical services.
18    Q.  And it would be the training that if a
19 person is not breathing, and then they start
20 breathing again, that 9-1-1 should still be
21 activated, correct?
22       MR. KOMER:  Object to form.
23       MR. GONZALES:  Join.
24    A.  I've never been posed with that question
25 before.  I've never spoken about if somebody stops

Page 58

1 breathing.  I've not had that conversation.
2    Q.  Whether you've had the conversation or not,
3 certainly, within your practice in nursing, if it was
4 observed that a patient had stopped breathing, kind
5 of gasped for air and started breathing again, that
6 would be a patient you would have concern was having
7 breathing difficulty, first of all, wouldn't it?
8       MR. KOMER:  Object to form.
9    A.  It would depend on the situation.
10    Q.  I understand it would depend on the
11 situation --
12    A.  If there is an airway obstruction that was
13 resolved, you know, they are no longer having
14 difficulty breathing, if the airway obstruction has
15 been resolved.
16    Q.  Sure.  But if the concern is that this is a
17 patient who may be experiencing respiratory
18 depression due to a systemic issue, and they are
19 found to be not breathing, and kind of gasp for air
20 and start breathing again, and have those kinds of
21 issues, that's something that should be brought to
22 medical personnel, correct?
23       MR. GONZALES:  Form and foundation.
24       MR. KOMER:  Object to form and foundation.
25    A.  Are you asking me what I would do as a

Page 59

1 medical professional?
2    Q.  No.  I'm asking based upon your experience
3 in the detention setting, if that was the
4 circumstance that was observed by a life skills
5 worker or corrections officer, that would be
6 something they would be advised to inform medical
7 personnel?
8    A.  Yes.
9    Q.  And part of the reason that -- I guess, let
10 me ask you this:  Why would it be the instruction
11 that if a corrections officer or life skills workers
12 observed a patient who was stopping breathing and
13 then gasping for air, why would the instruction be
14 that they should inform medical personnel?
15       MR. GONZALES:  Form.
16       MR. KOMER:  Objection to form and
17 foundation.
18    A.  Because, like I said, the three things you
19 need to maintain life are airway, breathing and
20 circulation.  And from the situation you just
21 described to me, either the airway and/or the
22 breathing have been compromised.  If you don't have
23 breathing for a long period of time, you jeopardize
24 life.
25    Q.  In your involvement with Desiree's care, I

Page 60

1 believe, and we'll mark these as exhibits here in a
2 minute, and make sure you've looked at them lately.
3 There were two progress notes that you wrote,
4 correct?
5    A.  You are talking about that day -- the day
6 she passed away.
7    Q.  Yes?
8    A.  Yes.
9    Q.  And one of the progress notes mentions that
10 you received a phone call at home.  That was kind of
11 your first notification that Desiree had been -- or
12 was becoming a resident at the facility; is that
13 right?
14    A.  Yes.
15    Q.  What -- the phone that you got a call on,
16 was that your cell phone?
17    A.  Yes.
18    Q.  And what is that cell phone number?  And it
19 doesn't go out to the public, but what's that number?
20    A.  (505)501-5464.
21    Q.  Who is the provider?  Is it Verizon?
22    A.  AT&T.
23    Q.  And who was it that called you?
24    A.  Matthew Edmunds.
25    Q.  And what was --

Page 61

1  A.  The first phone call I received was Matthew
2 Edmunds.
3  Q.  What was your understanding of why he was
4 calling?
5  A.  He was letting me know that he had Desiree
6 in the facility, and that she had been to the
7 hospital prior to coming into the facility.
8  Q.  What was the practice in 2009 -- I'm sorry,
9 2014, of a resident that came to the facility when
10 there was not nursing care -- let's say they hadn't
11 come from the hospital, would a nurse come in and do
12 an assessment of that patient --
13  A.  No, sir.
14  Q.  -- or that resident?
15  A.  No, sir, not at that time.  That is what I
16 would do first thing in the morning, or whoever the
17 nurse was who came in at 8:00 a.m.
18  Q.  Was the practice that anytime a resident
19 came to the facility off hours, that you or the other
20 nurse were called?
21  A.  Not every time, but if they came with a
22 hospital clearance, more than likely, I believe, we
23 got phone calls.
24  Q.  What did you understand was the reason
25 Mr. Edmunds was calling you?  And I don't mean -- the

Page 62

1 reason he was calling is because Desiree was there,
2 and that she was being admitted as a resident; is
3 that correct?
4  A.  I don't know exactly what his reasoning
5 was, but I know that he called.  He told me she was
6 there, told me what had happened prior to her coming
7 into the facility.  He asked me for some
8 clarification on what the hospital clearance said.
9 It had some acronyms, letters on it, and he wanted to
10 know for his understanding what they meant.
11  Q.  And I believe that the timed document says
12 11:09 p.m.
13    How is it that you know it was 11:09 p.m.?
14  A.  Because it said so on my cell phone.
15  Q.  How long was the phone call?
16  A.  About five minutes.
17  Q.  And during that five minutes did you ask
18 Mr. Edmunds about Desiree's condition?
19  A.  I did.
20  Q.  I'm sorry, go ahead.
21  A.  He said to me -- he asked me -- I asked him
22 to read me the hospital clearance.  He did.  He said
23 that the letters A and O were on there.  And then he
24 said, "What does A and O mean?"
25    I told him A and O means "alert and

Page 63

1 oriented."
2    I then said, "Is she alert and oriented?"
3    And he said, "Yes, she was alert and
4 oriented."
5  Q.  Did Mr. Edmunds tell you that she appeared
6 "out of it" when she got to the facility?
7  A.  No.
8  Q.  Did Mr. Edmunds tell you that she was
9 having breathing difficulty around the time of your
10 phone call?
11  A.  Absolutely not, no.
12  Q.  Did Mr. Edmunds tell you that she was --
13 would stop breathing, and then would gasp for air at
14 around 11:00 p.m.?
15  A.  No.
16  Q.  Did Mr. Edmunds tell you that she was
17 making gurgling noises when she would breathe?
18  A.  No.
19  Q.  If you, as a medical professional, had
20 known or had been told that Desiree Gonzales appeared
21 out of it, was having breathing difficulty, was
22 gasping for air, what would you have done?
23    MS. SAFARIK:  Form.
24    MR. GONZALES:  Form.  Foundation.
25    MR. TAYLOR:  Join.

Page 64

1    MR. KOMER:  Objection.  Calls for
2 speculation.  Lack of foundation.
3  A.  I would have immediately hung up the phone
4 and -- told him to call 9-1-1, and hung up the phone.
5  Q.  As a medical professional, you recognize
6 that a patient who had experienced a severe drug
7 overdose that had required multiple doses of Narcan,
8 you understand that that patient is at risk for
9 respiratory depression, correct?
10    MR. KOMER:  Objection to form foundation.
11    MR. GONZALES:  Join.
12    MS. SAFARIK:  Join.
13    MR. TAYLOR:  Join.
14  A.  I understand that heroin can cause
15 respiratory depression, yes.
16    Can I please use the ladies' room.  I
17 really need to use the ladies' room.
18    MS. SAFARIK:  Join.
19    MR. HUNT:  Then you can.
20    (Recess was taken from 10:49 to 10:59 a.m.)
21  Q.  (By Mr. Hunt) Ms. Archuleta, we were
22 talking about the phone call with Mr. Edmunds, and I
23 think you described it as about a five-minute phone
24 call.  And during that phone call, at some point did
25 you tell Mr. Edmunds anything to watch for?

Page 65

1   A.  I believe I did, yes.
2   Q.  What did you tell him?
3   A.  I think at the end of -- towards the end of
4   our phone call, I told him to keep an eye on her
5   breathing.
6   Q.  Why? Why did you tell Mr. Edmunds to keep
7   an eye on Desiree's breathing?
8   A.  Because opiates can cause respiratory
9   depression, I know this. I've known this. And that,
10  in my mind, sticks out as one of the major issues
11  that opiates -- heroin can cause. So my mind went to
12  respiratory depression. I know we have a hospital
13  clearance, but let's be above and be beyond and keep
14  an extra close eye on her, please.
15  Q.  And when you told him to watch her
16  breathing, monitor her breathing, and I think the
17  report or progress note says that you also said to
18  keep a very close eye on her during the night,
19  monitor her breathing, and let me know immediately if
20  they had any concerns; is that correct?
21  A.  Sounds correct.
22  Q.  Is that what you told Mr. Edmunds?
23  A.  I think so, yes, sir.
24  Q.  And when you told him to notify you
25  immediately if he had any concerns, why did you do

Page 66

1   that?
2   A.  Because I want him to know that even though
3   I'm at home, I'm completely available to him if he
4   feels he needs my help.
5   Q.  Did you expect that your instructions to
6   Mr. Edmunds would be followed?
7   A.  Yes.
8   Q.  Did you expect that if he observed any
9   difficulty breathing, that he would notify you?
10  A.  Yes.
11      MR. KOMER: Object to form.
12  Q.  And if you had been notified of difficulty
13  breathing, or even of potential concerns of
14  difficulty breathing, did you have the ability to
15  come in and see Desiree?
16      MR. KOMER: Object to form.
17  A.  I always have the ability to go to work.
18  Q.  Was there anything at 11:10 p.m., on the
19  night of May 7th, 2014 -- was there anything going
20  on in your life that prevented you from going to the
21  YDP to assess Desiree Gonzales?
22  A.  No.
23  Q.  And --
24  A.  I'm not sure I understand what you mean,
25  though. I had a working vehicle, is that --

Page 67

1   Q.  I mean anything. All we know is he called
2   your cell phone. Were you in Santa Fe when he called
3   you?
4   A.  Yes.
5   Q.  Were you at your home when he called you?
6   A.  Yes.
7   Q.  Was there anything -- I mean, certainly --
8   I don't remember what day it was, whether it was
9   weekend or not, do you know?
10  A.  It was a weekday.
11  Q.  Was there anything that prevented you from
12  going?
13  A.  No.
14  Q.  During your conversation with Mr. Edmunds,
15  at any point did you consider going in to see
16  Desiree?
17  A.  No.
18  Q.  Have there been times when you've been at
19  home, not a normal work time, during the time period
20  when there was not 24-hour coverage, and a resident
21  came in and you decided, you know, I better go see
22  them now and not wait until the morning?
23  A.  No.
24  Q.  Had anyone from Santa Fe County ever told
25  you that that was something you ought to do, is if

Page 68

1   you have any concerns about a resident, to go to the
2   facility even if it's not working hours?
3   A.  I've gone to the facility when I haven't
4   been working, but not to check on one specific
5   resident with one specific problem, necessarily,
6   because I'm not emergency medical services. I can't
7   get there any faster than the ambulance. So in a
8   situation like you're describing, I think, if
9   somebody -- if there is any doubt if somebody is
10  okay, it's time to go to the hospital. It's not time
11  to wait for the nurse to come in to work.
12  Q.  Did you tell Mr. Edmunds if they had any
13  concerns with her breathing, to call 9-1-1?
14  A.  I don't think I did say that.
15  Q.  And did Mr. Edmunds express to you any
16  concerns that he had about Desiree's condition?
17  A.  He did not.
18  Q.  You've worked with Mr. Edmunds for -- has
19  he been there at the YDP the whole time you have,
20  since 2012?
21  A.  Yes, he has.
22  Q.  And, I mean, have you found him to be a
23  competent life skills worker?
24      MR. GONZALES: Object to form and
25  foundation.



# Santa Fe County Human Resources

www.santafecounty.org
949 W. Alameda SF, NM 87501
Ph: 505-992-9880 - Fax: 505-992-9895

**Job Title:** Registered Nurse
**Department/Division:** Corrections
**Salary:** $25.7764/hr - $38.6646/hr     **Range:** 41
**Position Status:** Full-Time/ Classified
**FLSA Status:** Covered

### Primary Purpose:
Under the supervision of the facility's Registered Nurse Administrator and the supervising physician, performs a variety of routine, non-emergency medical duties for the purpose of initial screening of new arrivals and diagnosis of ongoing and new medical problems.

### Essential Job Functions:
*The following duties ARE NOT intended to serve as a comprehensive list of all duties performed by all employees in this classification, only to provide a summary of the major duties and responsibilities. Incumbent(s) may not be required to perform all duties listed and may be required to perform additional, position-specific duties.*

- Monitor disbursement of medications as directed by the facility physician to ensure they are administered in accordance with standing orders. Inventory medical supplies needed for sick call. Submit requisitions for replacements and additional supplies as required by the facility physician so supplies will be on hand when needed.
- Conduct brief medical screening on each new arrival within 24 hours of admission. Complete medical information forms and keep on file to ensure the staff has information available to safely provide for residents' physical needs. Schedule new arrivals for physical examination by the facility physician. Notify the Nurse Administrator of any unusual or contagious health problems so that the spreading of contagious infections or diseases is contained.
- Conduct in-house sick call under the direction of the facility physician and make recommendations as appropriate to excuse the inmate from the schedule to see the facility physician to insure the health and safety of the resident is maintained. Under the guidance of the Nurse Administrator and the facility physician, provide in-service training to staff regarding emergency medical procedures, administering medications, etc., so the health and well-being of the residents is maintained and contract requirements are met.
- Establish and maintain confidential health records and medical files on all residents, insuring that forms and procedures are updated on a regular basis so that contract requirements are met. Maintain confidentiality obtained through job duties regarding residents, employees, vendors, outside agencies, etc., so that sensitive information is only given on a "need to know" basis.
- Comply with facility safety rules; take appropriate corrective action to ensure work is performed in a safe manner and without injury to self or others. Communicate effectively with staff in a manner that promotes a team spirit.

### Knowledge and Skills:
- Knowledge of current treatment modalities.
- Ability to make an accurate assessment of medical needs; refer to appropriate medical personnel.

### Minimum Qualifications:
- Sufficient to meet requirements for Physician's Assistant License or Registered Nurse and one year of post-graduate nursing or Physician's Assistant experience, preferably in an institutional setting.
- Must pass background check (driver's license, criminal history, and wanted persons).
- Must possess a valid New Mexico Class D driver's license. Incumbent may be appointed to drive a Santa Fe County vehicle while conducting County business.

### Working Conditions:
Detention center setting, incumbent may at the discretion of the Corrections Director operate within the Adult Detention Facility or Youth Development Program. Office areas are well illuminated and are relatively quiet. Frequent standing, walking, sitting, bending, lifting (25 lbs max.); must be able to visually observe residents and staff; hear, understand, and interpret resident and employee behavior; detect odors through sense of smell for such things as marijuana and alcohol. Resident population may become unruly at times, requiring quick reflexive responses. Work is primarily in an office environment. Some fieldwork may be required in various weather conditions. May be required to work evening and weekend hours. Manual and finger dexterity required. Incumbent will be subject to random pat down searches and random drug screening. May be subject to exposure to CRT's VDT's and UV rays. Essential employees shall be required to work assigned shifts regardless of adverse weather conditions or holidays.

Candidate must submit to and pass a County paid pre-employment physical and drug/alcohol screening.
Submit Applications to:
Santa Fe County Human Resources
949 West Alameda Santa Fe, NM 87501
Resumes will not be accepted in lieu of the official Santa Fe County employment application.
Proof of education, certificates and/or endorsements must be attached to each application
Revised 11/12/09

MOLLY ARCHULETA     DATE 12/27/12

Confidential - Personnel File

EXHIBIT 19
DEAN ASSOCIATES

## Santa Fe County Youth Development Program

### Progress Notes

Name: Desiree Gonzales  DOB: 4/14/97
Date/Time: 5/8/14  1000  Notes

Yesterday, 5/7/14, @ 11:09 PM I received a phone call from Matthew Edmonds advising me that Desiree Gonzales was at our facility (YDP). He stated that she had overdosed on heroin and had been administered Narcan. He stated she came to the facility with a medical clearance from St. Vincent Hospital. I asked him if the clearance stated she was cleared for jail and he stated that "yes" it did say that. He said it also said she was "A+O" and he asked me what A+O ment. I said it means alert and oriented. I asked if she was alert and oriented and Mr. Edmonds responded that "yes" she was. I told Mr. Edmonds that we needed to have her sleep in a boat either in the dayroom or the horseshoe but that he and his staff needed to keep a very close eye on her during the night, monitor her breathing and let me know immediately if they had any concerns. He assured me that he would do so. We hung up.

At 1:57 AM I received a call from Renee Fernandez, YDP Administrator, and she told me that Desiree Gonzales was found by YDP security staff to be "unresponsive." I asked if 9-1-1 had been called and she responded, "yes"



Confidential  Not to Be Released to Any Agency, Perso[n]  DEAN & ASSOCIATES  32A-2-32  pg 1  000148  EXHIBIT 20

## Santa Fe County Youth Development Program

### Progress Notes

Name: Desiree Gonzales   DOB: 4/14/97
Date/Time: 5/8/14   1000   Notes:

I arrived @ YDP @ 2:17AM. The paramedics/EMT's were rendering care to resident Desiree Gonzales in Anasazi C Pod. I observed for a few minutes, one of them stated they had a pulse and would be transporting her to the hospital. I saw that they did not have a back board and I asked if they wanted ours. One of them responded affirmatively. I went to Medical, got the back board and returned to Anasazi. Upon my return they had already moved her from the floor to their gurney and were exiting C pod. As they were exiting, 4 police officers were entering, 2 Sheriff Officers and 2 SF City Officers. I walked behind the paramedics to booking, they departed the facility via ambulance. As Lt Mr. Edmonds went along on the transport.
I called Dr. Tim Taylor @ 3:30 AM and gave him report.
I spoke to Mr. Mark Caldwell when he called the facility at approx. 3:35AM.
I called the Mental Health On-Call and spoke to Roberta Hertzenberg @ 3:46 AM.
Renee Fernandez called me @ 4:14 AM and stated they were waiting to hear an update but that she had no new information from St. Vincent Hospital, her current location.
I left the facility @ 4:17 AM and went home.
End of report.
Molly Archuleta RN

Confidential   Not to Be Released to Any Agency, Person or Institution Per NMSA 1978, §32A-2-32   pg 000149

## Santa Fe County Youth Development Program

### Progress Notes

Name: Desiree Gonzales   DOB: 4/14/97
Date/Time: 5/8/14   4:09 AM   Notes

I received a phone call at home at 1:57 AM from Renee Fernandez telling me that new intake Desiree Gonzales was found to be unresponsive. She stated that Security staff had called 911. I arrived @ YDP @ 2:17 AM. The paramedics/EMT's were rendering care to resident Desiree Gonzales. They transported her from YDP to CSVRMC via ambulance. Officer Edmonds went along on the transport. Upon departure from YDP the paramedics/EMTs reported she had a pulse.

Called Dr. Taylor @ 3:30 AM same report
Called MH @ 3:46 AM
Spoke c Mr. Caldwell approx 3:40 3:35 AM

EXHIBIT
21

Confidential    Not to Be Released to Any Agency, Person or Inst...   BEAN & ASSOCIATES   000150