Aimee Bevan, et al. v. Santa Fe County, et al.  February 22, 2016
Gary Vilke, M.D.  1:15-CV-00073-KG-SCY

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal )
Representative of the Estate of )
Desiree Gonzales, deceased, )
)
      Plaintiffs, )
)
vs. ) Case No.
) 1:15-CV-00073-KG-SCY
SANTA FE COUNTY, MARK GALLEGOS, )
Deputy Warden/Acting Youth )
Development Administrator, in his )
Official and individual )
capacities, GABRIEL VALENCIA, )
Youth Development Administrator, )
individually, MATTHEW EDMUNDS, )
Corrections Officer, individually, )
JOHN ORTEGA, Corrections Officer, )
individually, MOLLY ARCHULETA, )
Corrections Nurse, individually, )
ST. VINCENT HOSPITAL, and NATHAN )
PAUL UNKEFER, M.D., )
)
      Defendants. )
_____)

DEPOSITION OF GARY M. VILKE, M.D., FACEP, FAAEM
MONDAY, FEBRUARY 22, 2016


Reported by:  PAIGE I. HUTCHINSON
      CA CSR No. 13459, WA CCR No. 3336



b99a0b8d-6bbc-4078-8a2d-8f5ab1e82403

Aimee Bevan, et al. v. Santa Fe County, et al.  
Gary Vilke, M.D.

February 22, 2016  
1:15-CV-00073-KG-SCY

### Page 50

1  there. She, at the facility, also demonstrated, you
2  know, as far as her activity -- we sort of discussed
3  this already -- appeared appropriate, ambulatory,
4  stable gait, not, you know -- not comatose, not -- you
5  know, we talked about red flags already -- she looked
6  appropriate.
7     And so you put all those together, that she's
8  been seen, she was evaluated, and, you know, I know the
9  vital signs were normal. I don't know if those were
10 transmitted, but she had normal vital signs, medically
11 cleared, and again, once at the facility, she's
12 ambulatory. She's walking around acting like a
13 17-year-old girl. There was no evidence of a severe
14 medical condition is basically what my opinion is.
15    Q. Okay.
16    MR. KOMER: Lee, whenever you're ready, if we
17 would take a break because it's been a little over an
18 hour, I think.
19    MR. HUNT: Sure. Now's fine.
20    MR. KOMER: Okay.
21    (Whereupon, a recess was held from
22    1:29 p.m. to 1:40 p.m.)
23    MR. HUNT: Back on the record.
24 BY MR. HUNT:
25    Q. Doctor, we were talking about the third

### Page 51

1  opinion listed in your report talking about no evidence
2  of severe medical condition. And if I could -- and
3  again sometimes these depositions become quite
4  tedious -- but in your own terms, when you use the
5  phrase "severe medical condition or need," what do you
6  mean?
7     A. Sure. Basically something that is evidenced
8  by the presentation that would be indicative of
9  something of a clear medical problem: True altered
10 mental status, paralysis, you know, things that would
11 be obviously there. Certainly there could be medical
12 conditions that are silent that nobody's going to be
13 able to pick up because they're silent. You know, the
14 heart attack without chest pain, you can't pick that
15 up. So what I'm talking about is what you can see and
16 evaluate based on the presentation that she's having
17 there.
18    Q. Okay. And I think before the break you kind
19 of described the basis for your testimony in terms of
20 what was reviewed or what was perceived by the jail
21 staff -- and let me back up.
22    This testimony on here, is it your testimony
23 that no one from the jail staff had the ability to
24 recognize that a severe medical condition or need was
25 ongoing?

### Page 52

1     A. It's my opinion that based on her presentation
2  and the reports and the documentation and the video
3  that's available, there was no evidence of a severe
4  medical condition occurring whether it's jail staff or
5  even in my case as a physician, I didn't see anything
6  that I would have picked up as a concerning medical
7  issue.
8     Q. Okay. And as far as just understanding, kind
9  of, the foundation of that from your perspective, as
10 far as any -- what information are you relying on for
11 what the jail staff observed about Desiree?
12    A. Well, observed and known; right? They know
13 she had a heroin overdose earlier. It's been a number
14 of hours since that occurred and so that part
15 basically, you know, out of the woods, concerning from
16 a medical perspective. The presentation that she had,
17 again, ambulatory, interactive, you know, directable,
18 they knew that.
19    They had the interactions with her. They had
20 the -- getting her to her bed area. The only other
21 thing that sort of comes up that seems to be
22 questionable is if she was snoring versus making
23 respiratory noises at some point which would be
24 basically strong evidence that she's breathing versus
25 that she was in recurrent heroin overdose; that would

### Page 53

1  be the opposite. She wouldn't make any noise because
2  her breathing would be so shallow you wouldn't even
3  know it was happening. So all those things put
4  together when I review it as a medical evaluator for
5  that, leads me to believe that there was no severe
6  medical condition that could have been picked up by
7  them or, again, myself if I was evaluating it.
8     Q. Okay. Any other information or evidence that
9  you rely upon in forming that opinion that there was no
10 evidence of severe medical condition?
11    A. The hospital paperwork is helpful as well,
12 not -- the part that was sent with her but also the
13 evaluation of the ED discharge. Her vital signs were
14 stable at the time of discharge. The timing of the
15 medication dosages all are part of my evaluation of the
16 case and that. You know, but from a pure clinical
17 perspective, it's the observations and the
18 interactions.
19    Q. Okay. Do you have any understanding of the
20 jail staff's training as relates to opiate overdose or
21 observation?
22    A. I couldn't tell you I know exactly how they
23 were trained or what they were trained on, no, I
24 couldn't answer that.
25    Q. All right. Did you look at that in your

14 (Pages 50 to 53)