---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

* * * * * * * * * * * * * * * * * * *

AIMEE BEVAN, as Personal Representative of
the Estate of Desiree Gonzales, deceased,

        Plaintiff,

  -vs-      Case No. 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS,
Deputy Warden/Acting Youth Development
Administrator, in his official and individual
capacities, GABRIEL VALENCIA, Youth Development
Administrator, Individually, MATTHEW EDMUNDS,
Corrections Officer, Individually, JOHN ORTEGA,
Corrections Officer, MOLLY ARCHULETA, Corrections
Nurse, Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

        Defendants.

* * * * * * * * * * * * * * * * * * *

    EXAMINATION BEFORE TRIAL of
MICHAEL D. COHEN, M.D., held at Breakell Law
Firm, 10 Airline Drive, Albany, New York on
Thursday, January 21, 2016, commencing at
10:35 a.m., before NORA B. LAMICA, Court Reporter
and Notary Public in and for the State of New York

AMF REPORTING SERVICES, INC.
518-982-1341
WWW.AMFREPORTING.COM

---

**Page 2**

APPEARANCES:

Attorneys for Plaintiff:

    LEE HUNT LAW, LLC
    Attorneys at Law
    518 Old Santa Fe Trail, Suite 501
    Santa Fe, New Mexico 87504
    (505) 954-4868

    BY: LEE HUNT, ESQ.
        Lee@leehuntlaw.com

Attorneys for Defendant Santa Fe County:

    LONG, KOMER & ASSOCIATES
    Attorneys at Law
    2200 Brothers Road
    PO Box 5098
    Santa Fe, New Mexico 87502
    (505) 892-8405

    BY: MARK KOMER, ESQ.
        mark@longkomer.com

Attorneys for Defendants Molly Archuleta and Santa Fe County:

    RESNICK & LOUIS, PC
    Attorneys at Law
    3840 Masthead Street Northeast
    Albuquerque, New Mexico 87109
    (505) 417-3898

    BY: STEVEN GONZALES, ESQ.
        sgonzales@rlattorneys.com

AMF REPORTING SERVICES, INC.
518-982-1341
WWW.AMFREPORTING.COM

---

**Page 3**

APPEARANCES (Continued):

Attorneys for Defendant St. Vincent Hospital:

    HINKLE SHANOR, LLP
    Attorneys at Law
    PO Box 2068
    Santa Fe, New Mexico 87504
    (505) 982-4554

    BY: ZACHARY T. TAYLOR
        ztaylor@hinklelawfirm.com

Attorneys for Defendant Dr. Unkefer:

    McCLAUGHERTY & SILVER, P.C.
    Attorneys at Law
    55 Old Santa Fe Trail
    PO Box 8680
    Santa Fe, New Mexico 87504-8680
    (505) 988-8804

    BY: JOE L. McCLAUGHERTY, ESQ.
        maclaw@spinn.net

AMF REPORTING SERVICES, INC.
518-982-1341
WWW.AMFREPORTING.COM

---

**Page 4**

I N D E X

E X A M I N A T I O N S

                      Page

MICHAEL COHEN, M.D.

  Examination by MR. KOMER        7
  Examination by MR. McCLAUGHERTY  107
  Examination by MR. TAYLOR       126
  Examination by MR. GONZALES     136
  Examination by MR. KOMER       157
  Examination by MR. HUNT        163

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 101 | Notes | 9 |
| 102 | Dr. Cohen's 8/18/15 report | 15 |
| 103 | Dr. Cohen's 1/15/16 report | 15 |
| 104 | Letter dated 8/12/15 between Dr. Cohen and Mr. Hunt | 15 |
| 105 | List of cases in which Dr. Cohen consulted | 16 |
| 106 | Dr. Cohen's curriculum vitae | 27 |
| 107 | Billing records from Dr. Cohen to Mr. Hunt | 30 |
| 108 | Page from a recent edition of Bates Guide to Physical Examination and History Taking | 35 |

AMF REPORTING SERVICES, INC.
518-982-1341
WWW.AMFREPORTING.COM

Ex.3

Page 9

1           (Exhibit 101 marked for identification.)
2    Q.   Doctor, just in terms of kind-of a basic
3         chronology for the case, I think what the -- what
4         you're contending in terms of just a general
5         overview of the case is that Desiree Gonzales was
6         a juvenile who overdosed at about 7:30 p.m.. She
7         was given Narcan by EMTs. She was then
8         transported to St. Vincent's Hospital, where she
9         was observed for a period of time. She received
10        a medical clearance from that facility, and then
11        she arrived at the YDP, the county facility I
12        represent, about two to three hours after the
13        overdose and after she received the Narcan, and
14        then later began to develop symptoms consistent
15        with a recurring overdose. Is that kind-of a
16        basic working fact pattern for you here?
17   A.   That's a basic fact pattern, I think, but I
18        really didn't express an opinion about the
19        original overdose, or the EMT resuscitation in
20        the field, or the hospital care prior to her
21        transfer.
22   Q.   And I'm not asking you to do that. I'm just
23        trying to see if we can agree that that's the
24        basic working fact pattern that you're dealing

Page 10

1         with here?
2    A.   Could you repeat the part about what happened at
3         the detention center?
4    Q.   Sure. She arrived at the YDP approximately two
5         to three hours after her overdose and receipt of
6         Narcan, and then -- and began to exhibit symptoms
7         consistent with recurrence of the overdose?
8              MR. TAYLOR: Form.
9    A.   I guess so. Symptoms consistent with heroin
10        overdose. Whether it's recurrent or continuing,
11        I don't know that.
12   Q.   And I'm not asking you to. What I am going to
13        ask you, though, is how many times in your career
14        have you seen this particular fact pattern of a
15        juvenile overdosing, receiving Narcan, going to
16        the hospital, getting a medical clearance, and
17        then going to a detention facility with the
18        clearance, and then developing either a
19        recurrence or a continuing overdose?
20   A.   I have not seen that before.
21   Q.   You would agree with me this is a very unusual
22        case?
23             MR. HUNT: Object to the form.
24   A.   I don't know that.

Page 11

1    Q.   You've never encountered it, correct?
2    A.   Correct.
3    Q.   How many years have you been practicing in the
4         juvenile detention setting?
5    A.   Well, I was in a state agency for twenty years in
6         a largely administrative position, where we did
7         not have youth coming from the street into our
8         facilities. I spent one year working at the
9         New York City jail at Riker's Island, which was a
10        pre-adjudication detention facility, but the
11        youth coming into our custody at that time had
12        usually spent two or three days in police lockup
13        and central booking before they got to the
14        island. So it would not have occurred in the
15        settings in which I practiced.
16   Q.   I see. So you've never encountered this
17        particular fact pattern?
18   A.   That's right.
19   Q.   And have you talked to any colleagues that have
20        ever experienced a fact pattern like this?
21   A.   No.
22   Q.   Are you aware of any discussion in any medical
23        literature that describes a fact pattern like
24        this?

Page 12

1    A.   I've seen discussions of recurrent overdose, but
2         not exactly this fact pattern.
3    Q.   I see. And I got a -- what's been called a
4         supplemental expert report from you by
5         plaintiff's counsel last Friday, January 15th.
6         You're aware of that supplemental report?
7    A.   Yes.
8    Q.   And so the opinions that you're expressing in
9         this case are based on seven months of work and
10        reflection on the various -- at least seven
11        months on the various records and materials in
12        the case, correct?
13   A.   Yes.
14   Q.   You've had the benefit of hindsight, correct?
15   A.   Well, I didn't have all the documents available
16        to me for seven months. Some of the documents
17        were only made available in December, in
18        particular the depositions and the sheriff's
19        report and the training records.
20   Q.   But you've had an opportunity, during the time
21        that you worked on the case, to reflect back over
22        with an extensive period of time about the facts
23        and the circumstances, correct?
24   A.   Yes.

**Page 93**

1 they're unconscious?
2 A. Or sleeping, yes.
3 Q. Because it's during the period of unconsciousness
4 that they're failing to protect their airway
5 adequately, right?
6 A. Well, protecting the airway is a different issue
7 entirely, but when people who are suffering from
8 excess narcotics or are awake and alert, or when
9 they're stimulated to wake back up, they will
10 continue to breathe, but when they're asleep or
11 passed out, then the breathing -- the abnormal
12 breathing pattern will emerge and they may indeed
13 stop breathing.
14 Q. Is that -- let me just ask it in a different way.
15 Is that a common symptom for a person who is
16 under the influence of heroin to report that I'm
17 just having trouble breathing?
18 A. I don't think so, unless there's some other
19 medical complication going on. If they had a
20 pulmonary embolus from a heart valve infection or
21 something like that, that's not relevant to this
22 case.
23 Q. And that's what I'm saying. Let's exclude other
24 things. If we're just talking about a heroin

**Page 94**

1 overdose, people don't usually say, "I'm having
2 trouble breathing." That doesn't -- it's usually
3 not vocalized that way as a symptom, right?
4 A. Yes. Just give me a minute to think about it,
5 though.
6 Q. Sure.
7 A. I mean, it really depends on the history of the
8 individual, what kind of symptoms they may have
9 had before they shot up and so on.
10 Q. Again, I'm excluding other causes. I'm just
11 saying they're talking about heroin.
12 A. So your hypothetical is in the pure, let's say
13 first time shot heroin overdose?
14 Q. Not necessarily first time shot, but any kind of
15 heroin overdose. Let's just limit it to that.
16 A. Well, I don't know that there is such a thing as
17 a pure heroin overdose.
18 Q. I'm saying without complicating factors like
19 pulmonary edema.
20 A. Right. As long as they're awake, I would not
21 expect them to complain about breathing problems,
22 unless there's some other medical issue going on
23 related to the heroin. But she -- we don't know
24 what else may have been going on with her when

**Page 95**

1 she was complaining to her mother.
2 Q. Did you see any indication anywhere that
3 Ms. Gonzales conveyed any of the information
4 that's reflected in this paragraph to anyone at
5 the time?
6 A. No. She was asked many questions about whether
7 she called the facility, whether she talked to
8 the doctors or nurses. She did not. I don't
9 recall if she was asked whether she talked to her
10 older son or anyone else about it. I don't know
11 that.
12 Q. I mean, at that time, she also had a concern that
13 she was going to be arrested that evening on her
14 own warrant?
15    MR. HUNT: Object to the form.
16 A. Well, no. Once she was in the room with Desiree,
17 I believe that had been addressed already,
18 because they wouldn't let her in the room, I
19 don't believe, until that had been settled, if I
20 remember correctly.
21 Q. Were you aware that there were also police
22 officers in the room?
23 A. I don't know if they were in the room or at the
24 door. My impression was that they were at the

**Page 96**

1 door.
2 Q. I'm just scrolling down the report here. You had
3 some opinions that Nurse Archuleta should have
4 given more explicit direction to the correctional
5 officers about how to monitor Ms. Gonzales'
6 breathing under these circumstances; is that
7 right?
8 A. Yes.
9 Q. Is that something that you've given instruction
10 about before in your practice?
11 A. I don't think so. I don't think so. I haven't
12 given or asked nurses on call to give advice
13 about how to observe someone that's post-heroin
14 overdose.
15 Q. You have a little list on Page 8 and 9 of your
16 second report. Actually, it's on Page 8 about
17 some breathing observation methods. That's what
18 I'm going to call it. Where did you obtain that
19 information on Page 8?
20 A. Those were things that came to mind as I thought
21 about the type of instruction that she could have
22 given them. So it's based on my clinical
23 experience and experience working with nurses and
24 working with direct care staff in juvenile

**Page 97**

facilities. These are the kinds of things that we do, or in my agency that we did occasionally ask staff to do when they needed to observe someone.

I also found, when I was reviewing the training records, that there was some specific questions in the CPR AED post-test that mimic these almost exactly, but I wasn't reading those training records until yesterday or the day before and I wrote this report --

Q. On Friday?

A. -- the previous week.

Q. What CPR -- what records are you referring to?

A. The training records of -- I think I saw them in Edmunds, Ortega and Valencia, at least two of the three. I think Edmunds and Ortega for sure. I don't recall if I saw them in Valencia's, as well.

Q. And you say that's in CPR training?

A. Well, there's training -- documentation of training, some files for each of those individuals.

And the post-test for I think the 2011, the 2010, maybe 2009 First Aid/CPR/AED training

**Page 98**

included two specific questions. One was about when do you call 9-1-1. Of the four choices, when the person was having trouble breathing is the correct answer.

And the other question was which of the following are signs or symptom - I don't remember the exact words - of troubled breathing. And one is more rapid or slower, and another was painful. Another was turning blue, or strange sounds was part of the answer, unusual or strange sounds breathing. And then another was unusual color of the skin of blue or dark. Blue or pale, I think it said. So in any case, the answer to that question was all of the above.

Q. So that's in the context of what, just general medical emergencies; is that --

A. It was the First Aid/CPR/AED class. These are the things that the people who are being trained to provide life-saving treatment are being taught, and we're documenting their answers in their training records.

Subsequent to that year, the training records have only the question number and the letter of the answer, so they had to fill out an

**Page 99**

answer sheet, filling in slugs, as opposed to the previous year, where they had the whole test, the question, and they circled the correct answer.

So in those earlier years that I was just discussing, you could -- as a reviewer, I could see what the question was and what the answers were. Subsequently, that wasn't in the record.

Q. Does that information impact your opinion about what you believe the nurse should have communicated in terms of instruction?

A. Well, it supports my belief that things like counting the number of breaths per minute or listening for unusual sounds or looking at the color were things -- supports the idea that these are things that lay staff could do, because it was part of their First Aid/CPR/AED training.

Q. My question is this. Do you -- there's a criticism of the nurse about not providing more specific guidance for observations of Desiree Gonzales with respect to her breathing. Are you saying now that based on this training that you've just noticed over the last couple days that, well, she didn't really need to do that?

**Page 100**

A. No, not at all. I'm saying that because they had had that training, there was all the more reason why she should have felt comfortable giving them advice about, more specifically, how to observe their breathing.

Q. Because they, as correctional officer staff, may not have discerned or understood how to look at breathing in a particular way. That was more detailed than what they would ordinarily do in doing unit checks, right?

A. If I understand the question correctly, yes, that is part of the point I was making is that I believe she would have known what their usual or routine unit checks consisted of, which is looking in the window, into the room, observing that the youth's chest is moving, and therefore, they're okay, move onto the next room. And that routine would not have been appropriate for Desiree, and that's why additional instruction would have been needed.

Q. I think ultimately, though, you would say that at least in this case, the nurse shouldn't even have gotten to that point because Desiree Gonzales should have been sent to the hospital regardless?