IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal Representative of the Estate of Desiree Gonzales, deceased,

Plaintiff,

vs. NO: 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS, Deputy Warden/Acting Youth Development Administrator, in his official and individual capacities, GABRIEL VALENCIA, Youth Development Administrator, Individually, MATTHEW EDMUNDS, Corrections Officer, Individually, JOHN ORTEGA, Corrections Officer, MOLLY ARCHULETA, Corrections Nurse, Individually, ST. VINCENT HOSPITAL and NATHAN PAUL UNKEFER, M.D.,

Defendants.

DEPOSITION OF KERRI CRADDOCK, R.N.
May 28, 2015
2:03 p.m.
218 Montezuma Avenue
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. LEE R. HUNT
Attorney For Plaintiff

REPORTED BY: Arlette McClain, CCR #85
Bean & Associates, Inc.
Professional Court Reporting Service
201 Third Street, Northwest, Suite 1630
Albuquerque, New Mexico 87102
(3020L-AM)

EXHIBIT
C

**Q. Did you understand that the patient had been found in the community, essentially, comatose?**
A. Yes.
**Q. And did you understand that she had received multiple doses of Narcan in the field?**
A. I knew she had received Narcan. I did not know the amount.
**Q. When you said, yes, you understand she had been, essentially, comatose in the field. What did you understand about that?**
A. The monitor tech told me, EMS is bringing a heroin overdose that was found unresponsive in the field, and had Narcan administered, and is now alert and oriented.
**Q. When you learned that this was a patient who had been found unresponsive in the field, who needed Narcan, and then became responsive after receiving the Narcan, did you understand that to be a serious drug overdose?**
MR. TAYLOR: Form and foundation.
MS. SAFARIK: Join.
A. I understood it to be a drug overdose. I wouldn't clarify whether it was serious or not until I could lay eyes on the patient.
**Q. There is a difference in a drug overdose**

**between a drug overdose with a patient who is found essentially comatose, versus one who is brought in that was alert and breathing on their own, isn't there?**
MR. TAYLOR: Form and foundation.
MS. SAFARIK: Join.
A. There is. And if a person was alert and oriented it would not be called a drug overdose and would not receive Narcan.
**Q. You understood that the drug overdose was serious enough that the, one, the patient was comatose?**
A. Yes.
**Q. And, two, the patient needed Narcan to be revived; is that right?**
A. Correct.
**Q. And the question has been asked to other folks, and it doesn't mean anything on you, but of whether or not this was understood to be a serious drug overdose at the time Desiree Gonzales got to the emergency department. Those other folks said, based on the fact she was comatose and needed Narcan to be revived, they considered it a serious overdose.**
**I guess I just want to ask you that. If, in fact, Desiree Gonzales was unresponsive in the**

**field, was found not breathing and needed Narcan to be brought back around, and needed multiple doses of Narcan to be brought back around, would that be something you would consider as a serious overdose?**
MR. TAYLOR: Form. Foundation.
MS. SAFARIK: Form.
A. I think that varies amongst your nursing triage. I would say yes, because of the unresponsiveness at the beginning, but I think that varies when the patient comes through the door, whether you would still consider that serious.
**Q. And by the time the patient, meaning at triage, which is when you first saw Desiree Gonzales; is that right?**
A. Correct.
**Q. And at the time you saw her, she was -- it had been after the Narcan, she was breathing on her own, she was alert, she was talking -- she was doing those things at that time, correct?**
A. Correct.
**Q. So she was in a very different condition when she saw you, versus when the EMS arrived on the scene?**
A. Correct.
MR. TAYLOR: Foundation.

**Q. When did you first see Desiree Gonzales?**
A. I saw her as she came through the door of the EMS bay, and they followed me into the room.
**Q. Did you take her straight to a room?**
A. Yes.
**Q. And did you talk to the EMS folks?**
A. Yes. They gave me a report.
**Q. What did they tell you about her condition?**
A. That she was found unresponsive, had been administered Narcan once intranasally, and then the second time intravenously, and was now alert and oriented, and that she had vomited.
**Q. Did you see her vomit?**
A. I did see her vomit. She vomited in the room.
**Q. And there was a note, I think it was from Dr. Unkefer, of vomiting three times in the ER?**
A. She vomited quite a bit.
**Q. What did the EMS folks tell you about how she was when they found her?**
A. The only thing that I can recall is that they said she was unresponsive.
**Q. And in your language -- in the language of talking with the EMS folks, "unresponsive" means what?**

A. Not responding to verbal stimuli or physical stimuli.

**Q. Did you have an understanding of whether or not she was breathing when they found her?**

A. They said she was blue.

**Q. Based upon what you understood from the EMS providers giving you the information, was it -- would it be fair to say Desiree Gonzales was in a condition, initially, that without the Narcan, without medical intervention, she may not have survived?**

MR. TAYLOR: Form and foundation.

MS. SAFARIK: Join.

**Q. Do you know one way or the other?**

A. It's quite possible.

**Q. When you first spoke with Desiree Gonzales, tell me about that?**

A. I was triaging her, so I was having to ask her the triage questions that are a structured questionnaire that we have to ask. So I was asking her about her allergy status, if she had any medical conditions, and her height and weight -- we were trying to estimate that. She was vomiting, so we took off her top to put her in a gown. She was very agitated. She did not want to be there. She was

uncooperative, and had ripped out her IV.

**Q. And let's talk about that for a minute. When she first got to the emergency department, were the police present?**

A. No.

**Q. When did the police get there?**

A. I don't know the answer to that.

**Q. Were you still working with Desiree when the police arrived?**

A. No.

**Q. You worked with her, obviously, in triage. Did you work with her after triage?**

A. No.

**Q. And when you were asking her the questions that you described, was Dr. Unkefer there with you?**

A. Yes.

**Q. At any time did -- you described, kind of, that she was agitated -- one, I guess she was throwing up; is that right?**

A. Yes.

**Q. At any time did she push you or push your hands away, or slap your hands, or anything like that?**

A. She was never physically combative. She did try to get up off of the bed, but she was never

physical with the staff.

**Q. In asking her questions about allergies, did she answer your question?**

A. Yes.

**Q. In your documentation -- let me back up. When you were in there getting the initial assessment of Desiree, initial triage, and I think you said that Dr. Unkefer was also in the room; is that right?**

A. Yes.

**Q. Was Dr. Unkefer's scribe also in the room?**

A. I can't recall.

**Q. Was anybody else in the room other than you and Dr. Unkefer at that time?**

A. There was a Nurse Russel that was in the room.

**Q. And what was Russel's role at that time?**

A. He was helping to get the patient undressed, and trying to help calm the patient.

**Q. During that initial triage, did the patient -- did you put her in a gown?**

A. We put her in a gown, and we placed her on the monitor.

**Q. And to put her in a gown, I guess you took off whatever clothes she had on?**

A. I believe we took off her top and put her

in a gown. We did not take her pants off.

**Q. Do you know if during the initial hospitalization, if at any time the pants that she had on, if those were taken off of her?**

A. I do not know.

**Q. Did anybody do any search of Desiree during the initial hospitalization to see if she had drugs in her pockets or in her shirt, or anything like that?**

MR. TAYLOR: Foundation.

A. I do not know. And as nurses, we usually do not search the patients.

**Q. Did you help her take off the top?**

A. I believe Russel and I both did, yes.

**Q. In talking with the EMS folks, did you have an understanding of how they found Desiree at the apartment complex where she was?**

A. As mentioned before, I believe they just found her unresponsive.

**Q. Do you know whether or not they found her in an ice bath?**

MS. SAFARIK: Form. Foundation.

A. I do not.

**Q. Did you ever become aware that at some point Desiree was given an ice bath when she was at**

**you know what that's based on?**
MR. TAYLOR: Form and foundation.
MS. SAFARIK: Join.
A. I do not.
**Q. And there's also -- this documentation is, as it says at the top, is 2040. There's another documentation. Have you seen your record where you documented, I think it is the Richmond Agitation Scale?**
A. Yes. It's in here somewhere.
**Q. And I think -- do you recall what your assessment was of -- on the Richmond scale?**
A. I do. I recall that it was agitated.
**Q. And, in fact, you, I think wrote, "three plus"?**
A. I did not write "three plus." The way that scale is done is are boxes that you check, and it gives you a score based on what boxes you check. So I do not make up the three plus.
**Q. So the three plus -- as I understand it, there is a scale, and from one to four -- do you understand, or is it one to five, or do you know?**
A. I think it is one to five. I can't remember now.
**Q. And whether or not a patient is one, two,**

**three, four, or something, that's based upon your filling out a -- on the computer system, checking boxes about the patient?**
A. Correct.
**Q. Based upon your understanding of the Richmond Agitation Scale, is three plus something more than slightly anxious?**
A. I think it is variable, because the boxes are so set that there's no less or more, so you have to fall into a category. So I think that is a variable, plus three agitated.
**Q. Okay. Hold on one second. I'm not checking e-mail. Let me show you what I think I'm showing you. And you tell me whether or not that is true, the Richmond Agitation Sedation Scale, and it shows, I guess from zero to four plus; is that right?**
A. Uh-huh.
**Q. Is that yes?**
A. Yes.
**Q. Have you seen something like this before, what you're looking at, meaning a table showing the Richmond Agitation scale?**
A. I have.
**Q. Does the scale that is in front of you appear to be an accurate representation of the**

**Richmond Agitation scale?**
MR. TAYLOR: Form and foundation.
A. Yes.
**Q. And the scale, as I understand it, lists three plus, and it uses the phrase out to the side of it, "very agitated." And one of of the things under the description is "pulls to remove tubes"; is that right?**
A. Correct.
**Q. Based upon your interactions with Desiree Gonzales, one of the things that you likely would have checked is pulling, removing -- trying to remove IV tubes; is that right?**
MS. SAFARIK: Form.
A. Correct.
**Q. Based upon your interaction with Desiree Gonzales, is most likely reason that the computer generated a three plus on the agitation scale, is because you documented she was trying to remove IVs?**
MR. TAYLOR: Form and foundation.
MS. SAFARIK: Join.
A. I can't recall. I think the scale that we have in the triage form is slightly different from this one. I believe, with me checking that the patient was vomiting and, yes, trying to remove

tubes, was partly how that came about, yes.
MR. TAYLOR: When you're done with that, can we look at it.
MR. HUNT: Yeah, of course. Why don't we take it out of the computer world, since we talked about it.
Arlette, I'll send it to you, and then we can attach it, so it doesn't disappear in space.
**Q. (By Mr. Hunt) Going back to the agitation scale, if we could, and at any point was Desiree Gonzales screaming at you?**
A. She was very tearful and did not want to be there. She wasn't screaming at staff, no.
**Q. And I think earlier you said she was not combative?**
A. She was not combative. She was trying to get off of the bed and leave. She was trying to pull her IV out. She was very upset about being there.
**Q. And at any point was she spitting at people?**
A. I do not remember any spitting.
**Q. Was she cussing at you?**
A. I can't recall the exact words used. I can't recall.
**Q. As we sit her today, do you remember**

**Desiree Gonzales cussing at you?**
A. No.
**Q. Do you remember her cussing at Dr. Unkefer?**
A. Not to my knowledge, no.
**Q. Did you observe Desiree Gonzales screaming at either you or Dr. Unkefer?**
A. Again, she wasn't screaming, but she did not want us removing her shirt, and was very agitated by us trying to put the monitor on.
**Q. When you were in the room with Dr. Unkefer, at any time did he tell you that he wanted to order Ativan for Desiree Gonzales?**
A. He did.
**Q. When did he tell you that?**
A. I don't recall the time. I just know it was at some point while the triage was occurring.
**Q. And so, was it a verbal order that he gave to you?**
A. Yes. Not a verbal order for me to administer it myself, but that we would be administering Ativan.
**Q. Did you take any action in that, meaning did you then go enter it into the system?**
A. I believe I entered it in the system, but I did not administer it.



**Q. And what did you understand, or did you understand the purpose of giving Ativan to Desiree?**
MR. TAYLOR: Form.
MS. SAFARIK: Join.
A. The purpose of the Ativan was to calm her. She was very upset. She was trying to leave, and we wanted to calm her down. She was vomiting, so we wanted to get her at a more relaxed state.
**Q. Do you remember Dr. Unkefer or yourself talking to Desiree and telling her that you were going to give her Ativan?**
A. I do not remember.
**Q. Do you remember Dr. Unkefer having a discussion with Desiree, something to the effect of, "Desiree," or "Ms. Gonzales, we're going to give you a medication to help you calm down. It's called Ativan." Anything like that?**
A. I don't remember.
**Q. As we sit here now, do you remember any conversation where Dr. Unkefer told Desiree Gonzales that he was going to administer Ativan?**
A. Not to my knowledge.
**Q. And we can certainly look in the records, and I'm happy to do that if you would like, but my understanding is that the Ativan was delivered IV.**



**Do you understand that as well?**
A. Yes.
**Q. So if the Ativan was delivered IV, after the triage, Desiree had not pulled her IV out; is that true?**
A. That sounds like it would be true, yes.
**Q. As I understand, in your memory the ER staff did not insert an IV?**
A. Not while I was in the room. It could definitely have occurred after I left.
**Q. And the -- according to the MAR, it lists the order from Dr. Unkefer for the Ativan is documented as 2040.**
**Do you know how in the MAR, the time is entered for an order?**
A. There is a little -- there is a spot when inferring a medication that you can backtrack the time to the exact time that it was ordered.
**Q. And so in the record, if in the MAR it lists at 2040 the time the medication was ordered, and it lists Dr. Unkefer as the ordering physician, you have every reason to believe that is an accurate time, correct?**
A. Correct. If it's in the MAR, then most likely that is the time it was actually administered,



and therefore that is why they changed the time at the top.
**Q. So on this, and maybe it is worth showing you.**
MR. TAYLOR: I have a copy handy.
MR. HUNT: I don't know that we need to mark it.
MR. TAYLOR: Page 48 of 53.
MR. HUNT: 47 and 48, actually. I'm looking at 47, but both would be helpful.
**Q. And do you have -- I'll mark as Exhibit 15 page 47 and 48 of 53 of the initial ED record.**
**(Exhibit 15 marked.)**
**Q. So looking at page 47, which is the first page of the exhibit, it lists the order time from Dr. Unkefer as 2040. Do you see that time?**
A. I do see that time.
**Q. And then it lists --**
MR. TAYLOR: I'm sorry, what page did you refer to, Lee?
MR. HUNT: I referred to page 47, the front page.
MR. TAYLOR: Sorry. I just want to make sure we're all looking at the same thing.
**Q. (By Mr. Hunt) Looking at page 47, it has**