Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal Representative of the Estate
of Desiree Gonzales, deceased,

    Plaintiff,

vs.    NO: 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS, Deputy Warden/Acting
Youth Development Administrator, in his official and
individual capacities, GABRIEL VALENCIA, Youth
Development Administrator, Individually, MATTHEW
EDMUNDS, Corrections Officer, Individually, JOHN
ORTEGA, Corrections Officer, MOLLY ARCHULETA,
Corrections Nurse, Individually, ST. VINCENT HOSPITAL
and NATHAN PAUL UNKEFER, M.D.,

    Defendants.


VIDEOTAPED DEPOSITION OF NATHAN PAUL UNKEFER, M.D.
    June 18, 2015
    9:00 a.m.
    119 East Marcy
    Santa Fe, New Mexico


    PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY: MR. LEE R. HUNT
    Attorney For Plaintiff




REPORTED BY: Arlette McClain, CCR #85
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, Northwest, Suite 1630
    Albuquerque, New Mexico 87102
(3116L-AM)



EXHIBIT F

info@litsupport.com    BEAN & ASSOCIATES, INC.
201 Third St. NW, Ste. 1630, Albuquerque NM 87102

Page 18

1      MR. TAYLOR: Join.
2      A.  What did they do about it?  And how come it
3  is almost 2:00 in the morning before she's back in
4  the emergency room?
5      Q.  When you learned that the jail understood
6  that she was gasping for air, and having difficulty
7  breathing, from your position, did you believe that
8  was a person that needed medical attention?
9      MS. SAFARIK: Form.
10     MR. TAYLOR: Join.
11     A.  I mean, I wasn't there, but if the question
12 is, somebody is gasping for air and having difficulty
13 breathing, then, yes, that's somebody who needs
14 medical attention.
15     Q.  And in particular a person who, as in
16 Desiree's situation, that earlier in the evening had
17 had an acute overdose of heroin, had initially been
18 found not breathing, had been revived with Narcan,
19 had been treated in the hospital, and then
20 discharged, so this is a patient with a history, not
21 just somebody who is found gasping for air, correct?
22     A.  Correct.
23     Q.  And given that history, the person who had
24 an overdose, had been brought back around with Narcan
25 and who then, several hours later was found gasping

Page 19

1  for air and having difficulty breathing, that's a
2  person that needed medical treatment, didn't they?
3      MS. SAFARIK: Form.
4      MR. TAYLOR: Join.
5      A.  It is a person who needed medical
6  treatment.  The question of how that is tied in to
7  the earlier overdose is still the question of the
8  day, right.
9      Q.  Well, maybe; maybe not.  It's a question,
10 and it wasn't my question for what I'm asking you
11 right now.
12     The question I'm asking you right now is
13 given the context of Desiree Gonzales, meaning what
14 had occurred beginning at 7:30 p.m., all of the way
15 on through until 11:00 p.m., if we use the 11:00 p.m.
16 time as written by Dr. Best.  For Desiree Gonzales,
17 when it was noted at 11:00 p.m. that she was having
18 difficulty breathing, was gasping for air, and would
19 stop breathing and then have a gasping respiration,
20 at that time she needed medical care, didn't she?
21     A.  She did.
22     Q.  And we talked to Dr. Prock, and -- meaning
23 we took a deposition of Dr. Prock.  And do you know
24 Dr. Prock?
25     A.  I do.

Page 20

1      Q.  She was the intensive care doctor who took
2  care of Desiree the second ER visit?
3      A.  Correct.
4      Q.  Have you ever spoken to her about Desiree's
5  care?
6      MR. TAYLOR: Form.
7      A.  No.
8      Q.  One of the things that we talked to
9  Dr. Prock about was, had Desiree Gonzales been
10 brought back to the emergency room, or been brought
11 back to the hospital around 11:00 p.m., or around the
12 time when she was initially found at the county to
13 have gasping respiration, difficulty breathing, and
14 there's also a note that she was making gurgling
15 noises -- had she been brought back to the hospital
16 at that time, it is most likely that treatment would
17 have been available and would have prevented her from
18 dying at that time.
19     And based upon your knowledge of the
20 treatment of either drug overdose, pulmonary edema,
21 and your treatment of Desiree Gonzales, had she been
22 brought back to the hospital when it was initially
23 found at the county that she was having the
24 difficulty breathing, including gasping and gurgling
25 noises, is it most likely that treatment would have

Page 21

1  been available and that she would have survived this
2  event?
3      MR. KOMER: Object to form.
4      MS. SAFARIK: Form.
5      MR. TAYLOR: Join.
6      A.  It is most likely.
7      Q.  And let's talk about that for just a
8  minute.  In your practice, since 2007, you've treated
9  many heroin overdose patients, haven't you?
10     A.  Yes.
11     Q.  And we asked -- Anne Marie Munger was one
12 of the other folks we took a deposition, and we asked
13 her to estimate on a weekly or monthly basis how many
14 drug overdose patients she sees, and the number was
15 quite high.
16     And so I don't even recall what it is, but
17 a better question would be, for you, on a given week,
18 do you -- is it typical for you to treat a heroin
19 overdose patient at least weekly?
20     A.  If we're just asking heroin use or overuse,
21 probably daily.  If we're asking true overdoses
22 needing Narcan reversal, maybe once a week, probably
23 not quite that frequent.  Definitely once a month.
24     Q.  And overdose from heroin is a condition
25 that in the emergency room you have tools that you

Page 82

1  every time you look at the monitor bank there are
2  vitals going on, and so I'm constantly looking at
3  them to make sure they're normal. There's one spot
4  check right there that's normal, too.
5      Q. And would you agree that based on the
6  vitals that are recorded, the set that's listed on,
7  if we go to the vitals page, the 2148 set of vitals
8  is -- are the only set of vitals that are all normal?
9      A. They are the only set that are in the
10 reference range but, again, it's context.
11     Q. Well, I'm just -- you would agree that
12 based on what we're looking at, the vitals page, the
13 only time the pulse was within the normal reference
14 range, was at 2148?
15     A. This is so -- it's difficult to answer,
16 because similar to the glucose question, where if you
17 just are a computer looking at a number, you go, that
18 glucose is high, but it's not actually out of quote,
19 unquote, normal for what's happening.
20     Q. My question was the reference range, not
21 context. Do you agree that the only time the pulse
22 was within the normal reference range was the 2148
23 set of recorded vitals?
24     A. Yes.
25     Q. Now, you prescribed medications for Desiree

Page 83

1  Gonzales; is that right?
2      A. I did.
3      Q. And you prescribed Ativan and Zofran; is
4  that right?
5      A. Correct.
6      Q. And in your practice within the emergency
7  room, is it often that you're the person that enters
8  the orders into the system?
9      A. Yes, often.
10     Q. And I don't know --
11     A. Can I give a caveat to that? The nurses
12 can take verbal orders, and so they can enter the
13 order in and I can later sign off on it.
14     Q. And looking at -- I think this is in the
15 records, and maybe we'll pull it in a minute. It's
16 pages 48 of 53. This is the order sheet that
17 includes the Ativan and the Zofran. Under there, I
18 guess they have -- let's, actually, look at page 49.
19 And looking at that page, if we just focus on the
20 Ativan for a minute. At the bottom of that section
21 it says "Action type, order," and then it lists you
22 as the action personnel; do you see that?
23     A. I do.
24     Q. And it lists a time of 2040; is that right?
25     A. Correct.

Page 84

1      Q. And so based upon the order as it's
2  presented in this page, would it be your
3  understanding that you entered the order for Ativan
4  at 2040, and then also entered the order for Zofran
5  at 2040?
6      MR. TAYLOR: Form.
7      MS. SAFARIK: Join.
8      A. Whether it was actually me putting it in
9  the computer or whether it was a verbal order under
10 my name that I later checked off on, I don't
11 remember.
12     Q. And either way, I guess what occurred was
13 that the orders for Ativan and Zofran were made at
14 2040, however it was entered?
15     MS. SAFARIK: Form.
16     MR. TAYLOR: Join.
17     Q. Is that right?
18     A. Yes.
19     Q. And the reason for prescribing Zofran was
20 what?
21     A. She was vomiting, and gagging.
22     Q. And what was the reason for prescribing
23 Ativan?
24     A. Because she was agitated.
25     Q. Did you talk with Desiree about giving her

Page 85

1  Ativan?
2      A. I don't remember. I typically would say
3  something to the effect of, Let's give you some
4  medication to help you relax.
5      Q. Whether or not you had that conversation
6  with Desiree -- as we sit here now, do you remember
7  having that conversation, first of all?
8      A. I may have -- I don't remember the
9  specifics. I remember she wasn't saying much to me.
10     Q. When you're dealing with a minor -- and you
11 understood Desiree was a minor; is that right?
12     A. Yes.
13     Q. When you're dealing with a minor, it's
14 still your obligation as a physician to inform them
15 of the types of treatment that you're providing,
16 isn't it?
17     A. There are exceptions, but, yes.
18     Q. And in -- often when you're treating a
19 minor, the conversations about the types of
20 treatments that you're providing occur with their
21 guardian or their parent; is that true?
22     A. If they're available.
23     Q. And when a minor's guardian or parent is
24 not available, and they're a minor who is, say, upper
25 teenage range, is it typical for you to have

Page 134

1   their breathing. And for 30 minutes you say, great,
2   you have not re-overdosed. You do not have a
3   respiratory problem. Two hours and a half, three
4   hours, three and a half, is not going to change that.
5   The Narcan isn't part of the equation at all at the
6   two-hour mark.
7       Q.  Are you now saying that you didn't cut it
8   close?
9           MS. SAFARIK: Form.
10          MR. TAYLOR: Join.
11      A.  I'm saying that using the term "cutting it
12  close," while true, it was quite close to my, what I
13  think is appropriate, my two-hour mark, I feel like
14  it's -- that terminology is being used to try to
15  suggest that I was taking a risk.
16          So instead of saying cutting it close, we
17  could say, you kept her past the appropriate time.
18  Yes, I did. It means the same thing, sounds much
19  different. Cutting it close, while true, is not what
20  I did in the sense I didn't take a risk by doing so.
21      Q.  Well, you did say in your testimony that
22  you cut it close, right?
23      A.  I did cut it close.
24      Q.  And we're not changing that today, right?
25      A.  But you --

Page 135

1           MS. SAFARIK: Form.
2       A.  I think you understand, and I understand
3   what you're saying. I did cut it close, technically.
4   I did not cut is close by taking a risk.
5       Q.  In retrospect, do you think you cut it too
6   close?
7       A.  No, sir.
8       Q.  I think we covered in the testimony this
9   morning about individuals who would be checking on
10  Ms. Gonzales at the YDP, and you didn't -- weren't
11  aware what their background would be, but that they
12  would be checked at some interval; is that right?
13      A.  Correct.
14      Q.  And where did you gain that information?
15      A.  I believe it was the police officer that
16  was waiting with the patient.
17      Q.  And tell me about that conversation, to the
18  best of your recollection?
19      A.  Again, the specifics of the conversation --
20  if I start trying to say, I said this. She said
21  this. It would just be me anticipating what it was,
22  without -- I don't remember.
23      Q.  I don't want you to speculate or
24  reconstruct. Tell me to the best of your
25  recollection.

Page 136

1       A.  I know I asked whether she was in custody,
2   and if she was going with the officers, and they
3   said, "Yes."
4           And I said, "When she goes, is she watched
5   or observed?"
6           And they said she is checked on every 15
7   minutes.
8       Q.  And did you know what the nature of the
9   checks would be?
10      A.  No. But I knew they didn't need to be very
11  medical. Meaning I didn't need somebody to do a
12  psychological assessment, or even check her vital
13  signs. I needed somebody to make sure she was
14  breathing and not overdosed.
15      Q.  And when you discharged her, did you have
16  any understanding as to whether the facility she was
17  going to end up at had some ability to intervene in
18  any way if she developed problems?
19          MS. SAFARIK: Form.
20          MR. TAYLOR: Join.
21      A.  I knew that the intervention needed to be
22  nothing more than calling 9-1-1, so, yes, I knew they
23  would be able to.
24      Q.  So if a 9-1-1 call is going to be placed,
25  then you're thinking someone from outside the

Page 137

1   facility will have to come and respond if there's a
2   problem later, right?
3       A.  The problems that I anticipated were not
4   problems that happen immediately. So I knew that
5   there should be time for an outside ambulance to get
6   there.
7       Q.  But there would certainly be some gap in
8   time, between the outside agency responding to the
9   detention facility, and their receiving the call,
10  right?
11          MS. SAFARIK: Form.
12          MR. TAYLOR: Join.
13      A.  Yes, and that is okay with me. I send
14  patients like this home with their parents and say,
15  if they start to look like they're not breathing,
16  call 9-1-1, and that's appropriate.
17      Q.  One of the benefits to keeping a patient in
18  a medical facility is that they can be watched by
19  trained medical providers, correct?
20      A.  Correct.
21      Q.  And one of the benefits of keeping a
22  patient in a medical facility is that the medical
23  facility can provide immediate emergent response,
24  should a problem arise that's life threatening,
25  correct?

Page 150

1    Our shifts try to follow a circadian sort
2    of rhythm, so if we work an evening shift, the next
3    day is either evening or night. You go forward in
4    time. You would never go evening to day. So it
5    would either be the same shift, or later.
6        Q. And so we can discern from your testimony
7    that you spoke to no one later on the 7th or on the
8    morning of the 8th about Ms. Gonzales, when she
9    returned to the ER?
10       A. Correct. I did not learn about what
11   happened until I came back to work the next day.
12       Q. Below your writing -- I was just curious
13   about this -- it says "referred to" -- do you see
14   that section?
15       A. Yup.
16       Q. And I think that's "PCP." I don't know
17   what that is?
18       A. Primary care physician. There's one of the
19   preselected choices on the discharge instructions
20   that says, follow up with your primary care provider
21   as recommended or something. And I think the scribe
22   just took that, and put it onto this.
23       Q. And then below that it says, "Counseled
24   patients regarding diagnosis and need for follow up."
25   What did you tell her?

Page 151

1        A. I don't remember the specific conversation,
2    but it would be something to the extent of, Hey, do
3    you still feel okay? You breathing all right? Let
4    me take a quick listen to your lungs. And then, All
5    right. It looks like -- this is my typical line, It
6    looks like you have bigger things to deal with than
7    me right now, but at this point you're safe. You
8    haven't re-overdosed, and you're going to be
9    discharged into custody.
10       Q. Can you go back to Exhibit 3, please. What
11   is your understanding of the purpose of this form?
12          MR. TAYLOR: Form.
13          MS. SAFARIK: Join.
14       A. It is to give the personnel at the
15   correctional facility a quick overview of the
16   patient's emergency room visit.
17       Q. And down -- further down you've written for
18   recommended treatments, medication, "No further
19   cares." Did I read that right?
20       A. Yes.
21       Q. What did you expect a layperson receiving
22   this form to take from that notation?
23       A. That there was no more treatment or
24   medication that was needed.
25       Q. Why did you use the word "cares"?

Page 152

1        A. I don't know. Because I covered treatments
2    and medications. It's easier than writing "no
3    further treatments or medications." I could have
4    wrote "no further needs."
5        Q. A layperson reading that form would think
6    there were no further cares for this patient, right?
7           MR. TAYLOR: Form.
8           MS. SAFARIK: Join.
9        A. Well, they would think that there is no
10   treatments. She doesn't need bandages changed, or
11   whatever, treatments and/or medication. She doesn't
12   have a prescription for antibiotics or anything else.
13       Q. No need for medical intervention?
14          MR. TAYLOR: Form and foundation.
15          MS. SAFARIK: Join.
16       Q. Right?
17       A. No. No. No. In terms of the overdose
18   that happened at 7:44, whatever -- when she got the
19   Narcan, there was no further care necessary. This
20   does not suggest that if something new happens, don't
21   worry about it. If she fell and broke her leg,
22   nobody is going to be like, Dr. Unkefer said don't do
23   anything about it. If she threw up blood, whatever.
24   So when she stops breathing well, it is completely
25   inappropriate to suggest that I recommended not doing

Page 153

1    anything about that.
2        Q. Do you believe, as you sit here today, that
3    her problems with breathing are the result of her
4    original heroin overdose?
5        A. No.
6        Q. What do you believe?
7           MR. TAYLOR: Form.
8           MS. SAFARIK: Join.
9        A. I believe that the Narcan wore off. I had
10   30-plus minutes to see whether she was going to
11   re-overdose. She did not. Not only did she not, I
12   even gave her Ativan, which would have made it even
13   more pronounced of an overdose. It didn't happen.
14   She had gotten past that initial overdose.
15          There's -- it is impossible for someone to
16   be so overdosed that they nearly die, recover from
17   that, I'm great. I'm going to walk out of here
18   talking to everyone like nothing's wrong. And then
19   that same heroin from the initial overdose to kick in
20   again so strong that she dies from it.
21       Q. That's impossible?
22       A. It is impossible.
23       Q. So what's your explanation?
24       A. Now, it can look that way quickly because
25   of Narcan covering up the opiates. In fact, that is