Case 1:15-cv-00073-KG-SCY   Document 165-7   Filed 04/15/16   Page 1 of 7

BEVAN vs. SANTA FE COUNTY, et al.                                    Robert Henry, M.D.
1:15-CV-00073-KG-SCY                                                 December 29, 2015

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal Representative of
the Estate of Desiree Gonzales, deceased,

      Plaintiff,

vs.                   Case No. 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS,
Deputy Warden/Acting Youth Development
Administrator, in his official and individual
capacities, GABRIEL VALENCIA, Youth Development
Administrator, Individually, MATTHEW EDMUNDS,
Corrections Officer, Individually, JOHN ORTEGA,
Corrections Officer, MOLLY ARCHULETA, Corrections
Nurse, Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

      Defendants.


DEPOSITION OF ROBERT HENRY, M.D.

9:38 a.m.
December 29, 2015
McClaugherty & Silver, P.C.
55 Old Santa Fe Trail
Santa Fe, New Mexico


    PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this
deposition was:

TAKEN BY:    MR. JOE L. McCLAUGHERTY
              Attorney for the Defendant Unkefer

REPORTED BY:  Dawn Redwine, RPR, CRI, NM CCR #165
              WILLIAMS & ASSOCIATES, LLC
              1608 Fifth Street, NW
              Albuquerque, NM  87102
              (505) 843-7789
              www.WilliamsNM.com

EXHIBIT G

BEVAN vs. SANTA FE COUNTY, et al.
1:15-CV-00073-KG-SCY

Robert Henry, M.D.
December 29, 2015

## Page 1

```
          UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal Representative of
the Estate of Desiree Gonzales, deceased,

          Plaintiff,

vs.                    Case No. 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS,
Deputy Warden/Acting Youth Development
Administrator, in his official and individual
capacities, GABRIEL VALENCIA, Youth Development
Administrator, Individually, MATTHEW EDMUNDS,
Corrections Officer, Individually, JOHN ORTEGA,
Corrections Officer, MOLLY ARCHULETA, Corrections
Nurse, Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

          Defendants.


          DEPOSITION OF ROBERT HENRY, M.D.

                    9:38 a.m.
                December 29, 2015
             McClaugherty & Silver, P.C.
               55 Old Santa Fe Trail
                Santa Fe, New Mexico

     PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this
deposition was:

TAKEN BY:     MR. JOE L. McCLAUGHERTY
              Attorney for the Defendant Unkefer

REPORTED BY:  Dawn Redwine, RPR, CRI, NM CCR #165
              WILLIAMS & ASSOCIATES, LLC
              1608 Fifth Street, NW
              Albuquerque, NM  87102
              (505) 843-7789
              www.WilliamsNM.com
```

## Page 2

```
          APPEARANCES

For the Plaintiff:  Mr. Lee R. Hunt
                    LEE HUNT LAW
                    1640 Old Pecos Trail, Suite D
                    Santa Fe, NM 87505-4777
                    (505) 954-4868
                    lee@leehuntlaw.com

For Defendant Santa Fe County:

                    Mr. Mark E. Komer
                    LONG, KOMER & ASSOCIATES, P.A.
                    2200 Brothers Road
                    P.O. Box 5098
                    Santa Fe, NM 87502-5098
                    (505) 982-8405
                    mark@longkomer.com

                    Mr. Steven L. Gonzales
                    RESNICK & LOUIS, P.C.
                    3840 Masthead Str., NE
                    Albuquerque, NM 87109
                    (505) 672-5784
                    sgonzales@rlattorneys.com

For Defendant St. Vincent Hospital:
                    Mr. William P. Slattery
                    HINKLE SHANOR, LLP
                    218 Montezuma Ave.
                    Santa Fe, NM 87501
                    (505) 982-4554
                    wslattery@hinklelawfirm.com

For Defendant Nathan Paul Unkefer, M.D.:

                    Mr. Joe L. McClaugherty
                    McCLAUGHERTY & SILVER, P.C.
                    55 Old Santa Fe Trail
                    P.O. Box 8680
                    Santa Fe, NM 87504-8680
                    (505) 988-8804
                    maclaw@spinn.net
```

## Page 3

```
                    INDEX
                                          PAGE
EXAMINATION OF ROBERT HENRY, M.D.
  By Mr. McClaugherty                       5
  By Mr. Slattery                         128
  By Mr. Gonzales                         135
  By Mr. Slattery                         136
  By Mr. Komer                            136
  By Mr. McClaugherty                     144
  By Mr. Hunt                             146
  By Mr. Slattery                         153

DEPONENT SIGNATURE AND CORRECTION PAGE     156

REPORTER'S CERTIFICATE                     157

EXHIBITS                                MARKED
72 - Curriculum Vitae and Expert Report      6
73 - UpToDate printout of "Acute opioid intoxication
     in adults"     14
74 - PubMed printout of "Pulmonary edema in fatal
     heroin overdose"     14
75 - Radiopaedia printout of "Heroin induced
     pulmonary edema"     14
76 - Medscape printout of "Heroin Toxicity Treatment &
```

## Page 4

```
     Management"                            14
77 - NIH Public Access printout of
     "Polydrug abuse: A review of opioid and
     benzodiazepine combination use."       14
78 - The Merck Manual printout of "Opioid"   15
79 - Red binder provided by Mr. Hunt         21
80 - Blue binder provided by Mr. Hunt        38
81 - Blank St. Vincent T-Sheet:
     52a Depression, Suicide Attempt, Overdose (5)  57

82 - St. Vincent T-Sheet utilized by Dr. Unkefer    65

83 - Page 4 of 6 of the EMS record           67

84 - Journal of Toxicology: Clinical Toxicology
     printout of "Do Co-intoxicants Increase
     Adverse Event Rates in the First 24 Hours
     in Patients Resuscitated from Acute Opioid
     Overdose?"    112

85 - Transcript of the deposition of Dr. Henry,
     Silva vs. Presbyterian, et al.   121
86 - Billing records pertaining to this case   126
87 - Presbyterian Protocols (referenced on pg. 131)
     (Document was not produced for attachment.)

              * * * * *
```

Case 1:15-cv-00073-KG-SCY   Document 165-7   Filed 04/15/16   Page 3 of 7

Page 14 (Pages 53-56)

BEVAN vs. SANTA FE COUNTY, et al.                          Robert Henry, M.D.
1:15-CV-00073-KG-SCY                                       December 29, 2015

Page 53

1   A.   Yes.
2   Q.   And that reading was what you called a, quote,
3   mere, close quote, 89 percent on room air. Do you recall that?
4   A.   Yes.
5   Q.   At the time of that '89 percent, her respiratory
6   rate was not increased. True?
7   A.   Correct.
8   Q.   She had clear breath sounds. True?
9   A.   That is what is recorded, yes.
10  Q.   And she was showing no signs of respiratory
11  distress. True?
12  A.   That's what is recorded by Dr. Unkefer, yes.
13  Q.   Now, you practice in Albuquerque, not in Santa Fe.
14  What do you use as the lower limit of normal at the altitude in
15  Santa Fe for the purpose of O2 sats.?
16  A.   It would be in the low 90s.
17  Q.   Are you aware of what's used in Santa Fe, at
18  7,000-feet-plus?
19  A.   92 or so percent was considered normal when I
20  practiced here a long time ago.
21  Q.   When did you last practice in Santa Fe?
22  A.   It was a very long time ago. It was -- It was
23  toward the end of my residency.
24  Q.   But you don't have any idea what it may be in the
25  last 20 years, in terms of the standard in Santa Fe?

Page 54

1   A.   I don't -- I wouldn't know why it would change, but
2   the answer to your question is no.
3   Q.   If -- If an oxygen saturation of 89 percent were a
4   sign of respiratory decline, as you suggest, it would get
5   worse, not better, true, if there's a decline occurring?
6   A.   That's too broad of a question for me to answer.
7   Q.   Well, if it's a sign of respiratory decline, by
8   definition, it's declining. True?
9   A.   Of course.
10  Q.   All right. So you would expect it, if it is, in
11  fact, respiratory decline that's being exhibited rather than
12  maybe something else affecting that saturation level, you would
13  expect the following O2 saturations to at least stay the same
14  or continue to decline. Correct?
15  A.   No. The question is not one that I'm able to
16  comprehend because, to me, it's not realistic. The 89 percent
17  oxygen saturation reveals a point in time. It does not point
18  to either improvement or decline, in and of itself.
19  Q.   Isn't it true that, in fact, her oxygen saturations
20  after that 89 percent finding were all normal?
21  A.   Yes.
22  Q.   And isn't it true that all documentation in the
23  medical record and all witness testimony that you may have
24  reviewed show no evidence of respiratory distress in the
25  emergency room on that first admission on May the 7th, 2014?

Page 55

1   A.   There is no recording of that, that's correct.
2   Q.   You also have criticism of Dr. Unkefer about the
3   T-sheet that was used. Correct?
4   A.   Yes.
5   Q.   At Presbyterian where you practice, who chooses
6   which T-sheet to use?
7   A.   The physician.
8   Q.   Who fills out the T-sheet at Presbyterian?
9   A.   The physician did.
10  Q.   Do you have scribes at Presbyterian?
11  A.   We do now. We don't use T-sheets anymore. But
12  when we used T-sheets, the physician filled them out.
13  Q.   So you don't even use T-sheets at Presbyterian
14  anymore.
15  A.   That's correct.
16  Q.   Did you replace it with something else?
17  A.   Yes.
18  Q.   What did you replace it with?
19  A.   Electronic medical recording. As per the
20  Healthcare Act, it's mandated.
21  Q.   So factually, in terms of May 7, 2014, in the
22  Emergency Department at St. Vincent's, are you aware who choose
23  the T-sheets?
24  A.   No.
25  Q.   You assumed it was Dr. Unkefer for purposes of your

Page 56

1   opinion. Correct?
2   A.   Yes.
3   Q.   Do you know who fills out the T-sheets at
4   St. Vincent's as of May 7, 2014?
5   A.   I don't know for a fact. I know that there are two
6   separate styles of writing on Desiree's T-sheets, so that means
7   to me that there are two people. My assumption is that a
8   scribe or some other person is writing on the T-sheet in
9   addition to Dr. Unkefer.
10  Q.   Well, are you able to recognize Dr. Unkefer's
11  handwriting on the T-sheet?
12  A.   No, I can't tell. I just know that there are two
13  different people.
14  Q.   But you've assumed that one of them is Dr. Unkefer.
15  A.   Yes.
16  Q.   And have also assumed that -- Were you aware that
17  they have scribes? I'm sorry. Were you even aware that
18  St. Vincent's had scribes in the Emergency Department?
19  A.   Yes.
20  Q.   So did you assume that one of the other persons
21  writing on the T-sheet was a scribe?
22  A.   Yes.
23  Q.   But you have no way of knowing who wrote what on
24  that T-sheet on May 7, 2014. True?
25  A.   That's correct.

Case 1:15-cv-00073-KG-SCY   Document 165-7   Filed 04/15/16   Page 4 of 7

Page 22 (Pages 85-88)

BEVAN vs. SANTA FE COUNTY, et al.
1:15-CV-00073-KG-SCY

Robert Henry, M.D.
December 29, 2015

Page 85

1 basis. Correct?
2  A. That's only in part. The rest of it is the time
3 frame. To give Ativan, as I said in my report, as soon as it
4 was given was inappropriate and dangerous. Those aren't the
5 exact words I use, but that's what I was conveying, trying to
6 convey.
7  Q. You then talk about, in your report, that
8 Dr. Unkefer didn't discuss the use of Ativan with the patient
9 or anyone else associated with her care, like police or
10 parents. Do you recall that?
11  A. Yes.
12  Q. Well, her parents weren't there. True?
13  A. Correct.
14  Q. And the police don't have any authority to make a
15 decision about medical treatment, do they?
16  A. No.
17  Q. And there is a consent to treatment on file for
18 her, isn't there, in the medical record?
19  A. That was -- I have not seen it.
20  Q. Okay. Well, should they not treat a 17-year-old
21 heroin overdose patient if the parents don't show up?
22  A. No, they should. I think it would have been
23 appropriate to have told her that they were giving her some
24 medication to calm her down, but I'm not -- I'm not going to
25 overaccentuate that process.

Page 86

1  Q. And you don't know whether Dr. Unkefer did or did
2 not tell her what he was going to do as he did it.
3  A. I do not.
4  Q. And do you know the policy and procedure of the
5 nurses at St. Vincent's is always to tell the patient before
6 they push the meds what they're doing?
7  A. That was my assumption. It is my assumption that
8 that would be a policy and procedure. That's why I mentioned
9 it in my report.
10  Q. Do you agree that a vast majority -- or at least
11 most heroin overdose patients that are reversed with Narcan
12 have multiple central nervous system depressants in their
13 system?
14  A. No.
15  Q. Do you agree that the medical literature which
16 supports a two-hour observation period after the administration
17 of Narcan includes the considerations of other CNS depressants
18 in the system of recipients of Narcan?
19  A. Oh, yes.
20  Q. Isn't it true that when the Narcan wears off, the
21 physicians and other healthcare professionals have any other
22 medications, drugs, anything that might be in the system, front
23 and center for evaluation?
24  A. If you could repeat that.
25  Q. Sure.

Page 87

1  A. You trailed off at the end.
2  Q. Yeah. When the Narcan wears off, the healthcare
3 professionals treating the patient have all other intoxicants
4 in that patient that kind of come out front and center once the
5 Narcan is gone. True?
6  A. I don't understand what you mean.
7  Q. Well, if there's things underlying it that the
8 Narcan is suppressing, once it wears off, those things then
9 present themselves for evaluation by the healthcare
10 professionals. True?
11  A. They may, depending upon the time interval.
12  Q. Well, Ativan kicks in quickly. Correct?
13  A. It does, relatively quickly.
14  Q. Peaks at about an hour. True?
15  A. That's correct.
16  Q. And it doesn't get more effective after it peaks.
17 Correct? It, instead, decreases in effectiveness after it
18 peaks.
19  A. In general, that's true, but it's -- it's different
20 in everybody. Its effects, as with other medications, are
21 different in everybody.
22  Q. Well, by definition, after it peaks, it has to
23 diminish. True?
24  A. Yes, but it doesn't peak at one hour in everybody
25 all the time. It's variable.

Page 88

1  Q. Right, but it certainly is going to peak within the
2 accepted medical standard that Dr. Fisher testified to, between
3 half an hour and 90 minutes. True?
4  MR. HUNT: Object to the form.
5  A. In general, I think that's true, but truly it --
6 when it peaks is variable.
7  Q. And you -- I'm sorry.
8  A. Well, it -- I have seen that. I mean, this is --
9 this is a medication -- these are two medications that I use,
10 utilize in the ER, four or five times a week in a different --
11 for other than sedation of agitation. I use them for
12 procedural sedation. And what I'm attempting to convey here is
13 that since I use them so much, I know that I can never predict
14 how soon they're going to take effect, and, more importantly, I
15 can never predict how long they're going to last. It's
16 different in everybody. We all metabolize differently.
17  Q. Well, isn't that why, though, they set the standard
18 that they set for Narcan in terms of the studies that are done,
19 that that's its effective period? It's based on a general
20 population. Correct?
21  A. Yes, but I'm not sure I understand the question.
22  Q. Well, the half-an-hour-to-90-minute effectiveness
23 of Narcan is based on a general application to the population
24 as a whole. Correct? It includes the outliers that you're
25 talking about on both ends of the spectrum. Right?

Case 1:15-cv-00073-KG-SCY  Document 165-7  Filed 04/15/16  Page 5 of 7

Page 24 (Pages 93-96)

BEVAN vs. SANTA FE COUNTY, et al.  
1:15-CV-00073-KG-SCY

Robert Henry, M.D.  
December 29, 2015

**Page 93**

1 Well, I know I didn't --
2     MR. HUNT: Just answer the question. Ignore head
3 nods.
4   A. 41 years doing this and using these medications
5 multiple times a week and seeing these kinds of patients
6 multiple times and knowing what, at the very least, can happen
7 metabolically and knowing logically what does happen
8 metabolically, meaning that they have to have a significant
9 period of time of observation before they're safe to be
10 discharged.
11   Q. How long do you keep patients when you're treating
12 them in the ER at Pres after the administration of Narcan?
13 You, personally.
14   A. Two to three hours. Of course, that's not this
15 case, but that's -- that's a separate case. That's a heroin
16 overdose, you're talking about, who's been given Narcan.
17   Q. And how long do you keep this case, a heroin
18 overdose who's been given Narcan, who's also had some other
19 type of central nervous system depressant given in the ER?
20   A. Hours.
21   Q. How many hours?
22   A. Whatever it takes to know that they are safe. It's
23 whatever that number is, is based upon her presentation and
24 knowledge of what these medications do metabolically.
25   Q. Okay.

**Page 94**

1   A. So I could tell you five hours or I could tell you
2 eight hours. It depends on how she's responding. If in six
3 hours her heart rate is now 72, she's awake, alert and
4 oriented, and not wobbling about the room as she was at the
5 intake at the jail, but acting completely normally, then I
6 would certainly consider discharge to a safe environment. So I
7 can't give you an actual number of hours, but I know it's
8 considerably longer than an hour and 12 minutes.
9   Q. Well, do you have a protocol at Presbyterian, a
10 written protocol on how long you keep patients who heroin
11 overdose with Narcan that are given any other central nervous
12 system depressant?
13   A. We do, and --
14   Q. And is it in writing?
15   A. Yes.
16   Q. Okay. Did you bring it with you?
17   A. No.
18   Q. Okay. What's it say?
19   A. It says that -- First of all, it identifies heroin
20 overdose and necessitation of Narcan reversal is a significant
21 life-threatening event. And then it does not -- And I helped
22 write this, but that's irrelevant. It's just why I know it so
23 well.
24     It doesn't put a specific number on hours. It
25 talks about -- It -- It says that clinical judgment has to be

**Page 95**

1 used. And what "clinical judgment" means is all the things
2 we've just discussed, and that's observation for a long enough
3 period of time to know that the patient is safe. And an
4 hour-and-12-minute discharge from a heroin overdose with
5 administration of Narcan and then administration of IV Ativan
6 would be perceived by reviewers at the hospital where I work as
7 to be poor clinical judgment.
8   Q. Well, you did not exercise any clinical judgment in
9 Ms. Gonzales' case. True?
10   A. Again, that's a constant.
11   Q. I'm just making sure that it's clear on the record.
12   A. Okay.
13   Q. And you're not bringing clinical judgment to this
14 testimony, either, because you never saw the patient. True?
15   A. Well, of course I'm bringing clinical judgment to
16 it. That's what the case is all about.
17   Q. Well, no. You're bringing expert testimony after
18 the fact of the case, when you know the outcome of the case,
19 not clinical judgment based on seeing the patient at the time.
20 True?
21     MR. HUNT: Object to the foundation.
22   A. Well, no. In my opinion, I am bringing clinical
23 judgment. I am saying that clinical judgment was -- reasonable
24 clinical judgment was not utilized in her premature discharge
25 from the emergency room.

**Page 96**

1   Q. Okay. The recognized standard of care for
2 emergency room discharge post Narcan patient for heroin
3 overdose is one to two hours of post Narcan administration.
4 True?
5   A. No. I think it would be more like two to three,
6 but it doesn't matter because that's not this case.
7   Q. Well, that's where I'm starting from. Do we agree
8 or not that the vast majority of medical literature on this
9 topic says that the standard of care for an emergency room post
10 Narcan discharge of a heroin overdose patient is one to two to
11 three hours?
12   A. I'm not saying one hour. I would say two to three.
13   Q. I've got medical authorities that say one hour.
14   A. And it's the point that we made with respect to the
15 medical literature. We can find just about whatever we want in
16 the medical literature. Standard of care in our area, which
17 would include Santa Fe and Albuquerque, for a Narcan reversal,
18 heroin overdose, is two to three hours.
19   Q. Now, that standard in terms of heroin overdose,
20 Narcan, was created to include the possibility of other drugs
21 in the system, including central nervous system depressants.
22 True?
23   A. No. We are talking about simply heroin overdose.
24   Q. But, Doctor, you know, as a clinical physician,
25 that there are going to be many times that someone who is using

Case 1:15-cv-00073-KG-SCY   Document 165-7   Filed 04/15/16   Page 6 of 7

Page 27 (Pages 105-108)

BEVAN vs. SANTA FE COUNTY, et al.
1:15-CV-00073-KG-SCY

Robert Henry, M.D.
December 29, 2015

Page 105

1  observation period beyond the standard-of-care time. I haven't
2  heard a single reference to amount of time, and I'm just
3  waiting to see if you're going to give me that. But you take
4  your time. Give me everything you want to give me out of
5  Exhibit 77.
6      A.  So you're looking for a specific time period, and I
7  have been saying that the answer is clinical judgment and that
8  there is no specific time period, that the knowledge that these
9  two drugs potentiate each other and accentuate respiratory
10 depression when used together is a known fact; and, therefore,
11 logically, a long period of time has to be utilized in
12 observation. And in this case, a long period of time was not
13 utilized. I don't think anybody could possibly say an hour and
14 12 minutes was a long period of time.
15     Q.  Well, she was actually observed from the time -- by
16 medical professionals from the time of the administration of
17 Narcan until the discharge from the hospital. True?
18     A.  But I'm talking about in the ER.
19     Q.  Yeah, but in terms of total observation time, it
20 exceeded two hours. Correct?
21     A.  As far as medical personnel is concerned, yes.
22     Q.  And that's the standard with Narcan, two hours with
23 medical personnel. Correct? Doesn't have to be in the
24 Emergency Department.
25     A.  Two to three hours for Narcan alone.

Page 106

1      Q.  Well, I'm asking -- I'm telling you, here is your
2  opportunity. Tell me in Exhibit 77 if there's anything in
3  there that supports your claim about an extended period of
4  observation after the addition of Ativan.
5      A.  We're not going to find a specific time period.
6  We're -- We're -- These papers are telling us that these two
7  drugs potentiate each other and they stick around a long time
8  and, therefore, the person has to be watched for a long period
9  of time.
10         I -- I don't know that anybody would be so brazen
11 as to say that the time period has to be 5.5 hours, because if
12 that's in the literature, then that could be utilized. Nobody
13 is going to say that. They're going to talk about clinical
14 judgment with the knowledge of, well, pharmacologically,
15 physiologically, metabolically what these drugs do.
16     Q.  All right. You agree with me, don't you, that the
17 other Plaintiff's expert, Dr. Fisher, knows a lot more than you
18 do about interaction of the drugs heroin, Narcan, and Ativan?
19 True?
20     A.  Yes. He's a toxicologist.
21     Q.  And did you review Exhibit 63 that was presented by
22 him in support of his opinions in this case?
23     A.  Yes.
24         MR. HUNT:  What is it?
25         MR. McCLAUGHERTY:  The "Recurrent opioid toxicity

Page 107

1  after pre-hospital care of presumed heroin overdose patients."
2          MR. HUNT:  Who is the author?
3          MR. McCLAUGHERTY:  Boyd.
4          MR. HUNT:  Okay.
5      Q.  And that Conclusion of that article presented by
6  Dr. Fisher was "Allowing presumed heroin overdose patients to
7  sign out after pre-hospital care with naloxone is safe. If
8  transported to an emergency department, a one-hour observation
9  period after naloxone administration seems to be adequate for
10 recurrent heroin toxicity."
11         Did you see that?
12     A.  Yes, I did, and that article talks about heroin
13 only.
14     Q.  No, I'm talking about the one-hour observation
15 period if he goes to an ED. Are you with me on that so far?
16     A.  For opioid only.
17     Q.  All right. Well, then if you want to -- I'll just
18 use Exhibit 64, also presented by Dr. Fisher, who you recognize
19 has more experience than you in this area, where it
20 specifically addresses this question of opioid toxicity
21 recurrence after an initial response to naloxone. And it says
22 in there that "Recurrence of toxicity was more common with
23 long-acting opioids." Heroin is not. Correct? Do you agree
24 heroin is not a long-acting opioid? It's a short-acting
25 opioid. True?

Page 108

1      A.  Heroin -- Pure heroin is. But, again, we don't
2  know what else is utilized.
3      Q.  Well, the article says heroin is a short-acting
4  opioid. Do you disagree with the article?
5      A.  No, I don't disagree with that, but that's why
6  heroin is cut with things that last longer. It's not lucrative
7  or safe for a drug dealer to use pure heroin, because it does
8  last a short period of time. In any case, this article says
9  nothing about the concomitant use of benzodiazepine.
10     Q.  Actually, it does. I'm getting there.
11         MR. HUNT:  Object to the form.
12     Q.  Exhibit 64. It goes "Recurrence of toxicity was
13 more common with long-acting opioids." And to answer your
14 point, you don't have any idea what was in the heroin that
15 Ms. Gonzales took, do you?
16     A.  Correct.
17     Q.  Okay. "Recurrence of toxicity was more common with
18 long-acting opioids, and was not associated with the route of
19 opioid exposure" -- that's IV or some other way -- "or presence
20 of ethanol and other CNS depressants."
21     A.  I am -- I am familiar with that.
22     Q.  Right. And Ativan is a CNS depressant. True?
23     A.  Yes.
24     Q.  So in this study done in the Journal of Clinical
25 Toxicology --

Case 1:15-cv-00073-KG-SCY   Document 165-7   Filed 04/15/16   Page 7 of 7

Page 28 (Pages 109-112)

BEVAN vs. SANTA FE COUNTY, et al.
1:15-CV-00073-KG-SCY

Robert Henry, M.D.
December 29, 2015

Page 109

1  A.  Yes.
2  Q.  -- put forward by Dr. Fisher, who is on your side
3  of this case, it says that there is no recurrence of toxicity
4  that can be proven even with other CNS depressants onboard the
5  patient. True?
6       MR. HUNT: Object to the foundation.
7  A.  I am aware of that article. Yes.
8  Q.  So that does say something that completely
9  disagrees with your point, doesn't it?
10      MR. HUNT: Object to the foundation.
11 A.  I pondered that article a great deal, and I think
12 reading it, as you have, does put it out of context. My
13 interpretation of that is that that is certainly not a
14 guideline that is accepted practice. In other words, it is not
15 a reason to allow people to be discharged in a short period of
16 time who have had concomitant use of benzodiazepine and opiate.
17 Q.  This article is inconsistent with your opinion.
18 True?
19      MR. HUNT: Object to the foundation.
20 A.  May I take a look at the article again? I have it
21 here, as well.
22      The bottom line is the last paragraph of the
23 article, which states that "The results of this evaluation" --
24 the study -- "suggest that the frequency of opioid toxicity
25 recurrence is approximately 20 to 45 percent after an initial

Page 110

1  response to naloxone. While recurrence of toxicity is more
2  frequent with long-acting opioids, it also all occurs with
3  short-acting opioids, including heroin and codeine. There were
4  no clinically useful predictors of which patients would have
5  recurrence of toxicity after an initial response to naloxone."
6       So what the summation is, is that it certainly
7  doesn't give a time period which is safe. It again puts us
8  back into the clinical judgment arena.
9  Q.  That article is inconsistent with your opinion,
10 isn't it?
11      MR. HUNT: Object to the foundation.
12 A.  Well, no, I don't think it is inconsistent.
13 Q.  The conclusions expressed in that article,
14 Exhibit 64, are inconsistent with your claim as to the Ativan
15 being a contributor to the outcome in this case. True?
16      MR. HUNT: Object to the foundation.
17 A.  I do not believe that's what the author is saying.
18 Q.  All right. Have you read or are you familiar with
19 the Journal of Toxicology: Clinical Toxicology?
20 A.  It's not a journal that I read, no.
21 Q.  Do you recognize it as an authoritative journal?
22 A.  I don't know anything about the Journal of
23 Toxicology.
24 Q.  Have you read the article "Do Co-intoxicants
25 Increase Adverse Event Rates in the First 24 Hours in Patients

Page 111

1  Resuscitated from Acute Opioid Overdose?"
2  A.  If I may see the article and see if I've read that.
3       MR. McCLAUGHERTY: Counsel, that is my copy.
4       MR. HUNT: Yeah. I won't write on it or flag it or
5  anything.
6       MR. McCLAUGHERTY: All right.
7       MR. HUNT: And I will return it, as well.
8       MR. McCLAUGHERTY: All right.
9       MR. HUNT: Thank you.
10      MR. McCLAUGHERTY: Thanks.
11 A.  I see the article. I had not read that article.
12 Q.  Okay. This article -- The Conclusion in this
13 article is that "In patients resuscitated from acute opioid
14 overdose, short-term outcomes are similar for patients with
15 pure opioid overdose and multidrug intoxications. A history of
16 co-intoxication cannot be used to identify high-risk patients
17 who require more intensive Emergency Department monitoring or
18 prolonged observation."
19 A.  Yes, I read that.
20 Q.  It's inconsistent with your opinion. True?
21      MR. HUNT: Object to foundation.
22 A.  It is.
23 Q.  In fact, the study itself goes on to state in the
24 body of it that to the knowledge of the authors, "this is the
25 first study to assess the impact of co-intoxicants as

Page 112

1  predictors for the occurrence of short-term adverse events in
2  patients who have been resuscitated from acute opioid
3  overdose."
4       Did you note that in there?
5  A.  Yes.
6  Q.  And it says "Unlike postmortem studies, this study
7  suggests that co-intoxicants do not increase the risk of
8  short-term adverse events in survivors of opioid overdose."
9       That's inconsistent with your opinion. True?
10 A.  It is.
11 Q.  I'm going to mark this one as 84.
12      MR. McCLAUGHERTY: Counsel, I apologize. It's got
13 the highlighting. If you're troubled by that at all, I can get
14 a clean copy to substitute in, but it is highlighted as he was
15 looking at it, so your call.
16      MR. HUNT: Okay. We'll leave it for now and take a
17 look. Let me just see it.
18      MR. McCLAUGHERTY: Okay.
19      (Exhibit 84 marked for identification.)
20 Q.  Doctor, define for me what you mean when you say
21 benzodiazepines are non-competitive inhibitors of opiate
22 metabolism.
23 A.  What it means is that the site in the brain where
24 opiates are broken down is altered by benzodiazepine. And the
25 non-competitive part just means that it's independent of