IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal Representative of the Estate of Desiree Gonzales, deceased,

    Plaintiff,

vs.    NO: 1:15-CV-00073-KG-SCY

SANTA FE COUNTY, MARK GALLEGOS, Deputy Warden/Acting Youth Development Administrator, in his official and individual capacities, GABRIEL VALENCIA, Youth Development Administrator, Individually, MATTHEW EDMUNDS, Corrections Officer, Individually, JOHN ORTEGA, Corrections Officer, MOLLY ARCHULETA, Corrections Nurse, individually, ST. VINCENT HOSPITAL and NATHAN PAUL UNKEFER, M.D.,

    Defendants.

DEPOSITION OF ANNE MARIE MUNGER, R.N.
May 27, 2015
9:33 a.m.
218 Montezuma Avenue
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. LEE R. HUNT
    Attorney For Plaintiff

REPORTED BY: Arlette McClain, CCR #85
    Bean & Associates, Inc.
    Professional Court Reporting Service
    201 Third Street, Northwest, Suite 1630
    Albuquerque, New Mexico  87102
(3018L-AM)

EXHIBIT H

Page 50

1   A. Okay. Sorry.
2   Q. But that doesn't make a difference for you.
3   A. Someone in uniform.
4   Q. That is why I want to make sure, it was my
5   confusion. You understood that the police officer,
6   on the first visit when she was being discharged said
7   to you something to the effect of there's a nurse on
8   staff?
9   A. Yes.
10  Q. Did you understand whether that nurse was
11  physically present in the juvenile detention center,
12  or whether that nurse was simply on call?
13  A. I don't know.
14  Q. Did it make a difference in your comfort
15  level with Desiree being discharged from the
16  hospital, whether there were medical personnel at the
17  juvenile detention center?
18      MR. TAYLOR: Form.
19      MS. SAFARIK: No.
20  A. No.
21  Q. Why not?
22  A. Because she was stable.
23      MR. TAYLOR: When you get to a point, Lee,
24  we've been going about an hour. Can we take a quick
25  break?

Page 51

1       MR. HUNT: Now's good.
2       MR. TAYLOR: Okay.
3       (Recess was taken from 10:29 to 10:39 a.m.)
4   Q. (By Mr. Hunt) I want to go to the beginning
5   of Desiree's visit at the emergency department, and
6   make sure I understand your involvement.
7       When Desiree first got to the emergency
8   department, were you involved in her care at that
9   point?
10  A. No.
11  Q. And you may have seen, and you may not --
12  the initial physician record where Dr. Unkefer does
13  his initial assessment, and talks to her and some of
14  those things. Were you present when Dr. Unkefer
15  first did his assessment?
16  A. No.
17  Q. And you just tell me, when was the first
18  time you were involved in Desiree's care?
19  A. I can't give you a specific time, but
20  probably somewhere around 9:15.
21  Q. And how did you become involved?
22  A. Kerri and Russel gave me report on her, and
23  I went in to check on her at that time.
24  Q. What did Kerri and Russel tell you?
25  A. That -- pretty much what they put in their

Page 52

1   assessment, that she had been found down. EMS had
2   given Narcan on the scene. She'd been alert and
3   oriented with no other problems, other than about
4   being angry about being there and going to jail.
5   Q. Let's break that apart a little bit. Did
6   you understand that when Desiree was found by the EMS
7   folks she was unresponsive?
8   A. Yes.
9   Q. Did you understand that they had given her
10  multiple doses of Narcan in the field?
11  A. Yes.
12  Q. And I think we had a chance to visit with
13  Dr. Unkefer earlier in this case, and have you read
14  his -- the transcript from his testimony at all?
15  A. No.
16  Q. And he was asked a question whether or not
17  Desiree's overdose was a severe overdose, and he
18  answered that it was a severe overdose. Based upon
19  your experience, do you agree that Desiree's was a
20  severe overdose?
21      MR. TAYLOR: Form. Foundation.
22      MS. SAFARIK: Join.
23  A. From a nursing perspective, and from what I
24  was told because I didn't get report from the
25  firefighters, I would say, yes. If a patient is down

Page 53

1   and given Narcan, it is a pretty severe overdose.
2   Q. And when you talked with Kerri and
3   Russel -- why did you become involved in Desiree's
4   care?
5   A. Because I was her primary nurse.
6   Q. Why didn't Kerri or Russel continue to work
7   with her?
8   A. Kerri was a throughput coordinator at the
9   time, so her job is to maintain flow of patients
10  coming from ambulance and triage. She bedded the
11  patient, and did the initial triage. That was to
12  help with the overall flow of the emergency room.
13      And Russel went in there because we work
14  pretty well as a team. We usually try to have a
15  nurse and a tech, if not two nurses, if the tech is
16  not available, to get them on the monitor, if they
17  need blood -- so you can work as a team. While one
18  person is doing the triage in the computer, the other
19  person can get them on the monitor and get that set
20  up. It is more efficient.
21  Q. Now, do you understand whether any of the
22  nurses were present during the initial encounter with
23  Dr. Unkefer?
24  A. I don't know.
25  Q. What would be normal, or common, meaning

Page 54

1  that when the physician does the initial assessment
2  of a patient in similar circumstances to Desiree's in
3  the ED, would a nurse be kind of around while that
4  was going on?
5      A. I don't know. I mean, I would say in my
6  experience for any patient that is coming in, the
7  doctors try and get in there right away so they get
8  orders put in if they need them. Our doctors are
9  pretty awesome.
10     Q. And the initial -- the 2040, as the time
11 seen, that's when the initial -- kind of, this intake
12 was done; is that right?
13          MR. TAYLOR: Form and foundation.
14          MS. SAFARIK: Join.
15     A. I don't know. I don't ever look at these
16 sheets. These are the physician and the scribe. I
17 would assume if it says "time seen."
18     Q. As far as this sheet, the emergency
19 physician record, it's not a form that you fill out,
20 right?
21     A. Never.
22     Q. Is it a form that you ever look at?
23     A. No.
24     Q. Why not?
25     A. It's not something we need to look at. We

Page 55

1  communicate with the doctors, and we do our own
2  assessment. This is theirs.
3      Q. Looking at the assessment that was done by
4  Dr. Unkefer, under the neuropsych part of the
5  assessment, you also do a -- I think it's called a
6  psychosocial assessment. You do an assessment like
7  that, correct?
8      A. Yes.
9      Q. And the doctor also does one, and in that
10 section he documented "slightly anxious"; is that
11 correct?
12     A. That's what it says, yes.
13     Q. And there's also a space for "hostile." Do
14 you see where that is a couple of lines -- "suicidal
15 ideation," and right above that?
16     A. I see it on the sheet.
17     Q. It is not documented or circled, correct?
18     A. Correct.
19     Q. Now, let's go over to Exhibit 2 and look at
20 page 15 for a minute. And the ED general assessment,
21 you did the assessment, correct?
22     A. Yes.
23     Q. And under psychosocial what are you
24 documenting under that portion?
25     A. Her behavior.

Page 56

1      Q. And you wrote "behavior age appropriate";
2  is that correct?
3      A. Yes.
4      Q. You did not write combative?
5      A. She was not combative.
6      Q. Did she ever slap your hands or anything
7  like that?
8      A. No.
9      Q. Did she ever hit you?
10     A. No.
11     Q. Did she ever try to grab anything away from
12 you?
13     A. No.
14     Q. Did you ever see her hit anybody?
15     A. No.
16     Q. Did you ever see her slap the hands of any
17 nurses?
18     A. No. That's a felony.
19     Q. That's right. In this part -- if you see a
20 patient that you believe is severely agitated, where
21 would you document that?
22     A. Under "neuro" and under "psychosocial."
23     Q. And based upon your assessment of Desiree,
24 you did not document that she was anxious?
25     A. No.

Page 57

1      Q. Describe what you saw. You get the report,
2  first of all, from Kerri and Russel?
3      A. Uh-huh.
4      Q. Correct?
5      A. Yes.
6      Q. Have you kind of told us everything about
7  that?
8      A. Yeah.
9      Q. It is fairly brief, right?
10     A. Yeah.
11     Q. And then you go in and you start doing your
12 part of the care providing for Desiree. What did you
13 observe, kind of walk us through that?
14     A. An officer and her mom were in the room.
15 Desiree was on and off the cell phone, and angry that
16 she was going to jail, understandably. I would be
17 angry if I was going to jail, too. Other than that
18 she would answer brief -- have brief answers to
19 questions when I would ask her, but was very intense
20 on her phone call, but was not being aggressive. She
21 was not yelling at anybody at that point. She did
22 yell at her mom once or twice during her stay, but I
23 think it was just because she didn't want to go to
24 jail, and her mom was pretty angry about that, also.
25 But that's making assumptions. I don't know. I

Page 58

1 heard her raise her voice maybe twice. Other than
2 that, she was on and off the cell phone. I don't
3 know who she was talking to.
4   Q. Let's talk about that.
5     You said that -- were you in the room when
6 she was talking to her mom?
7   A. She spoke to her mom on and off when I was
8 in the room, yes.
9   Q. And when you were in the room did she ever
10 yell at her mom?
11   A. Once or twice, I think. More along the
12 lines of, "Shut up." I think she was just on the
13 phone, and her mom was trying to speak to her, and --
14 teenagers, when they don't want to be interrupted on
15 the phone. I was not really paying attention to what
16 the conversation was. I was doing my own assessment
17 and getting everything into the computer and trying
18 to get answers out of her, and get her distracted off
19 the phone. She was appropriately angry that she was
20 going to jail, but she was not aggressive. She was
21 not acting anxious. She was definitely not
22 physically aggressive with anybody that I saw.
23   Q. And her behavior towards you, although she
24 was distracted because she was talking on her phone,
25 and -- was she -- would she answers question you had

Page 59

1 asked of her?
2   A. Yes.
3   Q. Did she seem -- how did she seem --
4 obviously, you wrote awake, alert and oriented times
5 four. Did you ever see her throwing up?
6   A. No.
7   Q. And during your assessment -- so -- what
8 did you hear from her? I know you said you weren't
9 really listening to the conversation, and you had
10 other stuff to do. But one of the things we're
11 trying to do today is understand everything you could
12 testify to at trial. And so as far as conversations
13 between her mother, and conversations on the phone,
14 the content of those, what do you recall?
15   A. I really can't 100 percent say anything. I
16 mean, I -- I remember the situation, but I don't
17 remember what was said to and from. The police
18 officer was quiet. I don't remember hearing a word
19 from the police officer. That, I can attest to. But
20 I don't really remember. I remember hearing her say
21 "shut up" to her mom for one time. For sure I can
22 attest to that. Other than that, she answered
23 questions with "yes" or "no," and I wasn't listening
24 to her on the phone. Patients are always talking on
25 the phone, so you stop listening. I can't

Page 60

1 honestly -- it was a year ago.
2   Q. Did you ask her to put the phone down?
3   A. I did at one point, and she did briefly
4 answer some questions, and then picked it back up
5 again.
6   Q. Did you ask her to turn the phone off?
7   A. No.
8   Q. Did she disobey anything that you asked of
9 her?
10   A. No. She wasn't angry at me.
11   Q. You weren't the bad guy that day?
12   A. I don't remember. I've been yelled at by
13 patients before, and I don't remember her yelling at
14 me.
15   Q. What about her mother? Describe her
16 mother's behavior?
17   A. She seemed exacerbated.
18   Q. In what way?
19   A. Nobody wants to be in the ER with their
20 daughter who overdosed on heroin and is going to
21 jail. I can say when the mother arrived, the police
22 had to call another officer, because they thought the
23 mother had a warrant out for her arrest, also. They
24 cleared that all up. She went out to the car and had
25 the paperwork. She was, I'm sure, stressed out about

Page 61

1 that, too. The mom didn't talk very much. I don't
2 remember her saying a lot.
3   Q. Now, your assessment, describe that part of
4 what you did?
5   A. Listened to her lung sounds, her heart,
6 bowel sounds. She -- and a I didn't document it, but
7 she did get up and use the bathroom. So she was
8 voiding appropriately. We always try and put that
9 in. And just asked her some questions about, How are
10 you feeling? Are you feeling suicidal, or self-harm
11 at this time, and she denied all that.
12   Q. And she was in a robe; is that right?
13   A. Gown. I was not in the room.
14   Q. Oh, "disrobed"?
15   A. She was disrobed. Gowned.
16   Q. Not gowned and robed.
17   A. I was going to say, it's a fancy hospital.
18 I was not in the room when she came in, so if she
19 was -- if she was soaking wet, that is what they
20 would do, is get her out of her wet clothes. Because
21 it says she was in a bathtub full of ice water. I
22 don't know why they do that.
23   Q. Urban legend?
24   A. Movies.
25   Q. Somebody did that to somebody in a movie.

Page 86

1   Kat that day.
2       Q. The instructions that are in the record --
3   let me ask --
4       A. In the discharge paperwork.
5       Q. I'm showing you what is page 13, is that
6   your signature?
7       A. Yes.
8       Q. And we'll mark that as Exhibit 4, the page
9   that you signed.
10          (Exhibit 4 marked.)
11      Q. What was the purpose of those signatures?
12      A. To state understanding of the discharge
13  instructions and education.
14          And the symptoms you were asking about,
15  they're on page 25.
16      Q. And in your practice, did you go over the
17  discharge instructions, heroin abuse and withdrawal,
18  and then there are about four or five pages. Did you
19  go over those in detail with Desiree?
20      A. Not word for word, I didn't read it to her,
21  but yes.
22      Q. Describe what you would have done?
23      A. Specify.
24      Q. Well, here's what I want to understand.
25  Certainly, there is a lot of written material here,

Page 87

1   and the written material was provided to Desiree; is
2   that correct?
3       A. To the jail, to give to her when she was
4   discharged.
5       Q. So you handed the written paperwork to the
6   officer?
7       A. Yes.
8       Q. So the officer --
9       A. With the jail clearance form. That's what
10  we always do.
11      Q. So the officer was given the jail clearance
12  form and also given the discharge documentation?
13      A. Uh-huh.
14      Q. Is that yes?
15      A. Yes.
16      Q. And the details of what you went over --
17  the discharge instructions are four or five pages.
18  How much of that did you go over?
19      A. Just the basics, I would say. You know,
20  she needs to quit using heroin. It can lead to all
21  of these different symptoms, and went over the
22  symptoms of overdose, and the withdrawal symptoms,
23  which she -- which is what we usually go the most
24  over if they're going to jail, because that is,
25  unfortunately, what they have to look forward to.

Page 88

1       Q. One of the symptoms listed on page 24 is
2   drowsiness?
3       A. Uh-huh.
4       Q. How is drowsiness manifested as a symptom
5   of heroin use, or a sign?
6           MR. TAYLOR: Form.
7       A. What do you mean?
8       Q. Let me ask it this way: Are the signs --
9   signs and symptoms that are listed on page 24, are
10  those signs of potential heroin overdose?
11      A. No. Those are signs of using heroin. The
12  overdose is on the next page, at the top.
13      Q. So the overdose -- symptoms of a heroin
14  overdose are the shallow breathing, pinpoint pupils,
15  coma?
16      A. The symptoms on page 24 are what they are
17  looking for, when they get high, to happen.
18      Q. Well, they are not looking for respiratory
19  depression, are they?
20          MR. TAYLOR: Form. Foundation.
21      A. No, euphoria and drowsiness, are what's
22  expected. They have that feeling of the high, from
23  what I've heard from heroin patients, and they get
24  very sleepy after that for a long time.
25      Q. One of the things that was given to the

Page 89

1   officer and also to Desiree is the signs and symptoms
2   of heroin was respiratory depression, which can
3   progress until breathing stops?
4       A. That is a symptom of heroin abuse, and the
5   shallow breathing continues on as the symptom of the
6   overdose. It should be in parentheses over there,
7   but I don't have any control over the discharge
8   paperwork.
9       Q. Did you feel more comfortable discharging
10  Desiree, partly because she was being discharged with
11  police custody and she was going to a detention
12  facility where, one, she wouldn't have access to any
13  drugs, and also where there would be folks there that
14  would be watching here?
15          MR. TAYLOR: Form.
16          MS. SAFARIK: Form.
17      A. I would have been just as comfortable
18  discharging her home to her mother, as I would have
19  to the jail.
20      Q. And it would have been important for you to
21  be just as comfortable with discharging her
22  regardless of where she went, true?
23      A. Right. Yes. But she is 17. I would
24  prefer to discharge her to her mom.
25      Q. Now, after Desiree was discharged, the