Robert Henry, M.D.
5 Satellite Court
Tijeras, NM 87059

## EDUCATION

Duke University, B.A. 1968

University of Kansas, M.D. 1972

University of New Mexico, Residency in Surgery, 1972-1975

## CLINICAL APPOINTMENTS - EXPERIENCE

Medical Director, Division of Emergency Medicine, Lovelace Medical Center, Albuquerque, 1975-1976

Chairman, Department of Emergency Medicine, Presbyterian Hospital, Albuquerque, 1976-1992

Staff Emergency Physician, Presbyterian Hospital, Albuquerque, 1976-present

Medical Director, Albuquerque Ambulance, Albuquerque, 1976-1996

Clinical (Teaching) Staff, University of New Mexico School of Medicine, Department of Emergency Medicine, 1980-present



EXHIBIT J

Choosing the *Alcohol Abuse* chart indicates that Dr. Unkerfer did not adequately respond to a Pt. presenting with a heroin overdose who had been apneic (not breathing) at the scene with an O2 saturation initially of 7%, a GCS of 3 and who required multiple doses of Narcan to restore viable respiratory status. ==At best, he was sloppy in choosing a charting template that had nothing to do with Pt.'s condition.== The T-sheets are designed for prompts to the provider, and the incorrect T-sheet can lead the provider down an incorrect path. This happened with Dr. Unkefer.

Dr. Unkefer, from the beginning, did not appreciate the life-threatening nature of Pt.'s ER presentation. While documenting the chief complaint as "overdose of heroin" the time of occurrence is left blank. The time of the overdose is crucial in an opiate overdose. It is more strongly stressed on the drug overdose T-sheet than on the alcohol T-sheet. The phrase "drug abuse" is circled by Dr. Unkerfer in the "started/time" section of the T-sheet rather than recording the time of overdose. Dr. Unkefer was using the wrong prompts because he was utilizing the wrong T-sheet. His prompts were for alcohol abuse, not heroin overdose.

Dr. Unkefer's Review of Systems (ROS), by leaving "trouble breathing" blank is, in T-sheet parlance, meant to state that there was no trouble breathing. If there were "trouble breathing", the phrase would have been circled, as Dr. Unkefer correctly does with other positive items in the ROS. If there were no "trouble breathing", the phrase would have been back slashed, as Dr. Unkefer correctly does with other negative items in the ROS. Leaving the phrase blank issues it no importance at all. Of course, in reality, "trouble breathing" is what prompted the 911 call, and EMS documents very well that not only did Pt. have trouble breathing, for an unknown time period of at least 3-4 minutes, Pt. was not breathing on her own at all. She had assisted breathing by BVM. "Trouble breathing" is what eventually led to Pt.'s death.

In the Past Medical History section of the T-sheet, Dr. Unkefer only states "h/o (history of) IVDA (IV drug abuse)". The specific drug (heroin) and the pattern of its use is not mentioned. Prior records appear not to have been reviewed Dr. Unkefer incorrectly states, regarding EMS treatment, that "1 mg Narcan IM, 1 Narcan IVP (IV push) came around within 3 minutes".[14] Nothing could be further from the truth. In fact, EMS worked with Pt. for 33 minutes (between 19:35 and 20:08) before oxygenation briefly went as high as 94%. O2 saturation then fell to 89% in the ER at 20:48 (Ms. Craddock's note). Pt. did not "come around" within 3 minutes nearly enough to survive.

In his physical exam, Dr. Unkefer writes down vital signs, which appear to be unremarkable. The vital signs listed on the physical exam are identical to the vital signs listed in the discharge summary. Given the variability, the vital signs were certainly not identical on both initial physical exam and discharge. The claimed explanation is that the vital signs listed on the initial physical exam are actually the vital signs from discharge. Although this may be an explanation, in my years in Emergency Medicine I have never documented discharge vitals on an initial physical exam record.

In addition to the apparent failure to document initial vital signs, Dr. Unkefer's Physical Examination raises serious concerns. He documents that Pt.'s pupils were not dilated ("no mydriasis"). In all likelihood, that is very true. Opiates (including Narcan) do not dilate pupils. They constrict pupils (meiosis). Dr. Unkefer indicates that there was no meiosis. How to explain that physiologicaly is a significant dilemma. Either Pt.'s pupils reacted in a non physiologic way to opiate use, or Dr. Unkefer did not understand the importance of mydriasis vs. meiosis. The status of pupils joins the list supporting a cursory examination and rush to discharge.

---

[14] ED records p. 11 of 53.

Further adding to what appears to be inaccuracy in the physical exam is that Dr. Unkefer documents that Pt.'s "mood was normal, her affect normal, her thoughts were clear, her insight was good, and her judgement was intact"[15] -all of this in a 17 year old who had within the past hour nearly killed herself with a heroin overdose which caused respiratory arrest.

In addition, Dr. Unkefer documents that Pt. was "slightly anxious". This "slight" anxiety would have been written while Dr. Unkefer evaluated Pt., likely around 20:40. Despite documenting slightly anxious, Dr. Unkefer immediately ordered 1 mg of Ativan IV. The decision to give a sedative to a recent heroin overdose patient who was only exhibiting slight anxiety was unwarranted and outside of standards within emergency medicine. According to Dr. Unkefer's testimony, he did not discuss the use of Ativan with Desiree Gonzales or anyone else associated with her care, i.e. police or parents. The decision to give IV Ativan was a decision that required consent and it was a decision that changed Desiree Gonzales from a 'normal' heroin overdose patient to a patient with multiple central nervous system depressants in her system. Such a patient had to be monitored longer than one hour after the last dose of Ativan.

After the intial physical examination was performed by Dr. Unkefer, Pt. remained in the emergency department. Due to low O2 saturation levels, Pt. was maintained on supplemental oxygen. Pt.'s vital signs remained abnormal. At 20:48 pulse was 128 and O2 saturation was 89%, at 21:35 pulse remained high at 122 and O2 saturation had improved with Pt. on 2l/min supplemental oxygen. The next reading was at 21:48. At this time, Pt. had been off of supplemental oxygen for 11 minutes and the O2 saturation was 93% and pulse was borderline

---

[15] ED records p. 11 of 53.

8