IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal Representative of
the Estate of Desiree Gonzales, deceased,

     Plaintiff,

vs.                                    Civ. No. 15-73 KG/SCY

SANTA FE COUNTY, GABRIEL VALENCIA,
Youth Development Administrator, Individually,
MATTHEW EDMUNDS, Corrections Officer,
individually, JOHN ORTEGA, Corrections Officer,
MOLLY ARCHULETA, Corrections Nurse,
Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

     Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon the Motion for Summary Judgment of

Defendants Gabriel Valencia, Matthew Edmunds and John Ortega (Motion for Summary

Judgment), filed on April 15, 2016. (Doc. 166). Plaintiff filed a response[1] on May 17, 2016, and

exhibits on May 19, 2016. (Docs. 183 and 185). Defendants filed a reply on June 22, 2016.

(Doc. 206). Having considered the Motion for Summary Judgment, the briefing, and the relevant

evidence, the Court grants, in part, the Motion for Summary Judgment as described below.

---

[1] Defendants Gabriel Valencia, Matthew Edmunds, and John Ortega (collectively, Defendants)
complain that Plaintiff violated D.N.M. LR Cv 56.1(b) by presenting her lettered additional facts
before addressing Defendants' numbered facts. Local Rule 56.1(b) requires a respondent to a
motion for summary judgment to "state the number of the movant's fact that is disputed" and
letter additional facts. Local Rule 56.1(b), however, does not specify that the respondent must
address the movant's numbered facts first.

*A. Background*

This case involves, in part, whether Desiree Gonzales received adequate medical care while incarcerated at the Santa Fe Youth Development Program (YDP). Just prior to Gonzales' incarceration at the YDP, Gonzales had been treated for a heroin overdose and medically cleared for incarceration. It is undisputed Gonzales stopped breathing while at the YDP. It is also undisputed that when Gonzales stopped breathing and became nonresponsive YDP staff called 911. Several hours later, Gonzales died at St. Vincent Hospital. The Office of the Medical Investigator determined that the cause of death was "Toxic effects of heroin." (Doc. 145-4) at 1.

*1. The Complaint for Wrongful Death (Complaint) (Doc. 1) at 4-19*

This is a removed lawsuit in which Plaintiff is suing, among others, Gabriel Valencia (Valencia) in his individual capacity as a YDP shift supervisor, Matthew Edmunds (Edmunds) in his individual capacity as a YDP assistant shift supervisor, and John Ortega (Ortega) in his individual capacity as a YDP Life Skills Worker. (Doc. 1) at 5-6, ¶¶ 9-11. Plaintiff brings the following claims against Defendants in Count One of the Complaint: (1) 42 U.S.C. § 1983 Fourteenth Amendment due process claims; (2) Section 1983 Eighth Amendment cruel and unusual punishment claims; and (3) cruel and unusual punishment claims under the New Mexico Constitution, Article II, Section 13.

In Count Three of the Complaint, Plaintiff brings New Mexico Tort Claims Act (NMTCA) negligence and wrongful death claims against Defendants for failing to provide Gonzales with adequate medical care. (Doc. 1) at 15, ¶ 82. Plaintiff specifies in Count Three that NMSA 1978, § 41-4-12 of the NMTCA waives immunity from suit. *Id.* at ¶ 80. Section 41-4-12 provides waiver of immunity "when law enforcement officers cause wrongful death through the deprivation of rights, privileges and immunities secured by the U.S. Constitution or New

Mexico Constitution."  *Id.*  Plaintiff further alleges in Count Three that Defendants Santa Fe County and Mark Gallegos negligently operated the building housing the YDP.  *Id.* at ¶ 83.

Defendants move for summary judgment on all claims against them and assert qualified immunity as to the Section 1983 claims.  Plaintiff opposes the Motion for Summary Judgment in its entirety.

### 2. *Facts Relevant to the Motion for Summary Judgment*[2]

#### a. *Facts Pertinent to Valencia*

After receiving care for a heroin overdose at St. Vincent Hospital, Gonzales was discharged at 9:52 p.m. with a medical clearance noting "No further cares [sic]."  (Doc. 166-1); (Doc. 166) at 2.  Gonzales arrived at the YDP at 10:35 p.m.  (Doc. 166) at 2.  Valencia and YDP staff member Esmeralda Coronado interacted with Gonzales in the booking process.

While in the booking area, Valencia had a conversation with Gonzales about how a judge was going to proceed with her case.  (Doc. 166-2) at 2, depo. at 32.  Valencia looked over the arrest paperwork including the medical clearance from St. Vincent Hospital.[3]  *Id.* at 2, depo. at 33.  Valencia observed that Gonzales was coherent but was tired and "a little fogy [sic]."  *Id.* at 3, depo. at 34-35; (Doc. 67-13).  Valencia also retrieved a trash can for Gonzales because she was nauseous.  (Doc. 166-2) at 3, depo. at 35.  Valencia, however, did not see Gonzales either dry heave or vomit.  *Id.*  Coronado, who saw Gonzales dry heaving, expressed a concern about the dry heaving to Valencia who indicated that Gonzales had a medical clearance to be there. (Doc. 185-8) at 3-4, depo. at 41-42.  Because Gonzales was tired, Valencia told Gonzales that

---

[2] Unless otherwise noted, the factual summary reflects the evidence viewed in the light most favorable to Plaintiff.

[3] Plaintiff asserts that Valencia must also have had the hospital release information entitled "Emergency Documentation," which provides follow-up instructions after the hospital discharge. (Doc. 185-1).  However, there is no evidence in the record that Valencia had this document.

she could sign the booking paperwork in the morning.  (Doc. 166-3) at 2, depo. at 30-31; (Doc. 166-4); (Doc. 166-2) at 3, depo. at 35.  Valencia then processed Gonzales' intake at a computer while Coronado finished the booking process.  (Doc. 166-2) at 3, depo. at 36-37.

Coronado then dressed Gonzales out, finger printed her, and added her "to board and count at 10:55 pm and escorted her to the Anasazi C-pod living unit …."  (Doc. 166-4).  Once at the Anasazi C-pod, Gonzales telephoned her mother and spoke with her for about five minutes.  *Id.*  About that same time, Edmunds called the on-call nurse, Defendant Molly Archuleta, "about the intake…."  *Id.*  Edmunds relayed to Valencia, who was apparently now in the Anasazi C-pod, that Archuleta advised them "to monitor [Gonzales] in the Anasazi C-pod dayroom…."  *Id. See* (Doc. 166-2) at 3, depo. at 37.  Valencia understood that this monitoring included watching Gonzales' "breathing patterns, and whether she was having difficulty breathing[.]"  (Doc. 185-7) at 4, depo. at 90.  Edmunds and Valencia placed Gonzales in a "boat" or bed in the dayroom of the Anasazi C-pod.  (Doc. 166-4).  Gonzales was initially "upset about sleeping [in] the dayroom, but understood."  *Id.*  Edmunds and Ortega were tasked with checking on Gonzales every 15 minutes.  *Id.*

Valencia evidently left the Anasazi C-pod around the time Gonzales went to sleep at around 11:15 p.m.  (Doc. 166-2) at 3, depo. at 37; (Doc. 185-2) at 6, transcript at 33.  Valencia apparently returned to the Anasazi C-pod dayroom at about 11:55 p.m. to check on Gonzales along with Edmunds and Ortega.  (Doc. 171), 23:55:35 to 23:56:09.  At that time, someone shook Gonzales.  (Doc. 171), 23:55:35 to 23:56:09.  Valencia subsequently left the Anasazi C-pod dayroom and at some point went to clean the front lobby.  (Doc. 166-4).  At about 1:52 a.m., Edmunds radioed Valencia to inform him that Gonzales stopped breathing.  *Id.*  Edmunds and Ortega then began CPR while Valencia called the Interim Youth Service Administrator at 1:54

a.m. and then called 911 at 1:55 a.m.  *Id.*  Emergency personnel arrived at 2:05 a.m.  *Id.*
Edmunds went with Gonzales to St. Vincent Hospital.  (Doc. 166-7).[4]

Valencia understood that the shift supervisor should call 911 if a shift supervisor believes
a resident is under the influence of drugs or unable to breathe, and that a shift supervisor should
call Nurse Archuleta if a staff member reports that a resident is having trouble breathing.  (Doc.
185-7) at 3, depo. at 22; (Doc. 206) at 11-12.  Valencia also knew that a heroin overdose can
result in difficulty breathing, and that he and the others needed to watch Gonzales' breathing.
(Doc. 185-7) at 4, depo. at 90.

### b. Facts Pertinent to Edmunds and Ortega

At about 11:00 p.m., Edmunds received Gonzales after Coronado escorted Gonzales to
the Anasazi C-pod.  (Doc. 166-6).  Edmunds "immediately" concluded that Gonzales "was not in
a normal state of mind," had "groggy" looking eyes, and had slurred speech.  *Id.*  Edmunds
believed that these characteristics were red flags, but, nonetheless, characterized Gonzales as
alert and oriented.  (Doc. 185-2) at 8, transcript at 36; (Doc. 185-6) at 5, depo. at 151.  Edmunds
called Nurse Archuleta to advise her of Gonzales' "state" and ask questions about the medical
clearance.  (Doc. 166-6).  Nurse Archuleta told Edmunds "to keep an [sic] very close eye on
[Gonzales] and to notify her of any changes."  *Id.*  Nurse Archuleta specifically told Edmunds to
monitor Gonzales' breathing.  (Doc. 145-1) at 1; (Doc. 185-7) at 4, depo. at 90.

---

[4] Edmunds told the emergency room physician that he notified his "supervisor" about Gonzales
having trouble breathing, but did not notify medical personnel.  (Doc. 145-2) at 2.  This
statement is vague and, thus, not probative of Valencia's state of mind or knowledge.  This
statement is also hearsay and not permissible under Fed. R. Evid. 803(4) (Statement Made for
Medical Diagnosis or Treatment).  *See, e.g., McCollum v. McDaniel*, 32 F. App'x 49, 55 (4th Cir.
2002) (statement to physician not admissible under Rule 803(4) if it does not relate to cause of
injury and instead relates to fault).

Edmunds and Ortega conducted 15 minute checks on Gonzales, including "extra checks," according to Nurse Archuleta's instruction to monitor Gonzales' breathing. (Doc. 166-6). The checks "were conducted through the window of the dayroom, and horseshoe," which placed Edmunds and Ortega 2 to 3 feet from Gonzales. *Id.*; (Doc. 185-4) at 4, depo. at 68.

When Gonzales went to sleep around 11:15 p.m., she asked Edmunds to turn off the light. (Doc. 185-2) at 6, transcript at 33. Edmunds did not hear any other dialogue from Gonzales that night. *Id.* Edmunds reported to the emergency room physician that beginning at approximately 11:00 p.m. Gonzales "would stop breathing & gasp for air …."[5] (Doc. 145-2) at 1. Edmunds "also kept the door unsecured because of the unusual breathing that [Gonzales] was having."[6] (Doc. 166-6). In speaking with Santa Fe Police, Edmunds indicated that "Gonzales appeared to be having breathing difficulties so he kept checking on her." (Doc. 145-3). Edmunds stated at

---

[5] Defendants argue that this statement in the hospital record lacks foundation under Fed. R. Evid. 602 and is impermissible hearsay. Defendants, however, concede that Edmunds' statement is "only admissible against Edmunds as a party opponent" under Fed. R. Evid. 801(d)(2), which provides that such a statement is not hearsay. Moreover, because the emergency room physician had personal knowledge of what Edmunds said and Rule 801 applies, Rule 602's personal knowledge requirement does not govern this situation. *See* Federal Rules of Evidence 602 Advisory Committee Notes (stating that Rule 602 "does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement. Rules 801 and 805 would be applicable."). Nonetheless, the emergency room physician's report must still comply with the hearsay rule. *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1132-33 (10th Cir. 2014) (explaining even if "witness merely has personal knowledge of an out-of-court statement offered to prove the fact asserted in that statement—but not the underlying fact—then his or her testimony must comply with the hearsay rule."). Relevant to this case, Fed. R. Evid. 803(4) provides an exception to the hearsay rule for "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensation; their inception or other general cause." That is the case with the emergency room physician's recording of Edmunds' statement describing Gonzales' physical condition. For these reasons, Edmunds' statement to the emergency room physician about Gonzales' physical condition is admissible.

[6] Edmunds later characterized Gonzales' breathing as "snoring." (Doc. 166-5) at 2, depo. at 37.

another time that "we would shake her" to make sure Gonzales was responsive. (Doc. 185-2) at 6, transcript at 33.

Ortega arrived at the Anasazi C-pod at about 11:40 p.m. (Doc. 166-8). Edmunds told Ortega about Gonzales' previous hospitalization for a heroin overdose. *Id.*

As noted before, at 11:55 p.m., someone shook Gonzales, and Edmunds, Ortega, and Valencia checked on Gonzales. (Doc. 171) at 23:55:35 to 23:56:09. At 12:30 a.m., Ortega noted that Gonzales' "breathing was awkward" and that she "was gasping" by taking "deep breaths follow[ed] by extended period [sic] of no breathing repeatedly."[7] (Docs. 166-7 and 166-8). Edmunds shook her once after this episode. (Doc. 185-2) at 3, transcript at 23.

Sometime between about 12:45 a.m. and 1:15 a.m., Ortega shined a flashlight in Gonzales' face which caused her to say something like, "You guys bug." (Doc. 206-6) at 3, depo. at 55-56. Between two to four times throughout the night, Ortega asked Gonzales if she was okay, but she would roll over and not respond. *Id.* at 4, depo. at 57. At 1:43 a.m., Edmunds did not hear Gonzales breathing so he checked on her, conducted a unit check, and "began to shake … her and called her name." (Doc. 166-6). At 1:46 a.m., Gonzales was making a gargling noise while trying to breathe and became unresponsive. (Doc. 142-6) at 3. As a result, Edmunds and Ortega began CPR until emergency personnel arrived. (Doc. 166-6).

Edmunds knew that a breathing difficulty is a serious condition and that medical personnel should be called immediately. (Doc. 185-6) at 2, depo. at 55-56. Ortega, likewise, knew that difficulty breathing is a serious condition and that one should immediately call medical personnel or 911 if a resident has breathing difficulties. (Doc. 185-4) at 2, depo. at 20-

---

[7] Ortega later stated that the "awkward" breathing began at 1:00 a.m. (Doc. 166-8). He also subsequently characterized the breathing as "real loud snoring." (Doc. 185-2) at 3, transcript at 23.

21. Ortega also knew that in monitoring Gonzales, he was monitoring her breathing. *Id.* at 3, depo. at 63.

### c. Expert Evidence

In addition to the above factual evidence, both Plaintiff and Defendants present expert evidence with respect to the constitutional claims addressed in this Motion for Summary Judgment. Because those claims focus on whether each Defendant had a culpable mind, a subjective inquiry involving whether Defendants acted with deliberate indifference, expert evidence in not required. *See Powell v. Shah*, 618 F. App'x 292, 296 (7th Cir. 2015) (holding that where "the only issue in this case was whether the doctors had a 'sufficiently culpable state of mind' … the court accurately recognized [it] as a subjective inquiry that did not require an expert….") (citations omitted); *Campbell v. Sikes,* 169 F.3d 1353, 1371 n. 22 (11th Cir.1999) (finding that expert's affidavit does not support finding of deliberate indifference, which is subjective inquiry). Accordingly, the Court does not consider the expert evidence.

## B. Standard of Review

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's

favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014). Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity. *Id.* "This is a heavy burden." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1208 (10th Cir. 2017).

The Court must grant qualified immunity unless the plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). "[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). As the Tenth Circuit recently clarified:

> "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, "existing precedent must have placed the statutory or constitutional question 'beyond debate.'" "The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established.'" … "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Garcia v. Escalante*, 678 Fed. Appx. 649, 654 (10th Cir. 2017) (quoting *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (citations omitted)). The United States Supreme Court has "emphasized that the clearly-established inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S.

___, 136 S.Ct. 305, 308 (2015)).  On the other hand, "[t]he law is also clearly established if the

conduct is so obviously improper that any reasonable officer would know it was illegal."  *Id.*

(quoting *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)).

The Tenth Circuit Court of Appeals further instructs,

> [i]f the plaintiff indeed demonstrates that the official violated a clearly established
> constitutional or statutory right, then the burden shifts back to the defendant, who must
> prove that "no genuine issues of material fact" exist and that the defendant "is entitled to
> judgment as a matter of law."  In the end, therefore, the defendant still bears the normal
> summary judgment burden of showing that no material facts remain in dispute that would
> defeat the qualified immunity defense.  When the record shows an unresolved dispute of
> historical fact relevant to this immunity analysis, a motion for summary judgment based
> on qualified immunity should be "properly denied."

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citations omitted).

*C.  Discussion*

    *1.  Count One:  Constitutional Claims*

        *a.  Qualified Immunity and Section 1983 Fourteenth and Eighth Amendment
        Claims*

Prison officials violate a pre-trial detainee or post-conviction inmate's constitutional

rights under the Fourteenth and Eighth Amendments, respectively, by acting deliberately and

indifferently to a prisoner's serious medical needs.[8]  *Martinez v. Beggs*, 563 F.3d 1082, 1088

(10th Cir. 2009) (holding that deliberate indifference standard applies to pre-trial detainees under

Fourteenth Amendment); *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (holding that

deliberate indifference standard applies to post-conviction inmates under Eighth Amendment).

"Deliberate indifference has both an objective and subjective component."  *Id.*  To meet the

---

[8] Plaintiff does not specify in the Complaint if she considered Gonzales a pre-trial detainee or a
post-conviction inmate.  Defendants and Plaintiff, however, only refer to the Eighth Amendment
in the Motion for Summary Judgment and accompanying briefing.  Whether Plaintiff brings the
Section 1983 claim under the Fourteenth or Eighth Amendment, the same deliberate indifference
standard applies.

objective component, "[t]he medical need must be sufficiently serious." *Id.* The Court has already determined that Gonzales' claimed respiratory distress and resulting death meet the objective component of Plaintiff's deliberate indifference claim. (Doc. 217). To satisfy the subjective component, Plaintiff must show that Defendants (1) subjectively knew that Gonzales faced a substantial risk of respiratory distress and death, and (2) disregarded those risks "by failing to take reasonable measures to abate" them. *Hunt*, 199 F.3d at 1224 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)).

>    *(1) Subjective Knowledge of Substantial Risks of Respiratory Distress and Death*

Under the knowledge requirement of the subjective component, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... also draw the inference." *Farmer,* 511 U.S. at 837. A factfinder can find subjective knowledge of a substantial risk of a claimed harm through circumstantial evidence, including the symptoms presented to the official. *Martinez*, 563 F.3d at 1089 (holding that symptoms are relevant to subjective component and factfinder may conclude subjective knowledge of substantial risk by circumstantial evidence).

Viewing the facts in the light most favorable to Plaintiff, the facts with respect to Valencia show that (1) Valencia knew that Gonzales was just released from St. Vincent Hospital for a heroin overdose and was medically cleared for incarceration, (2) despite the medical clearance and Gonzales' apparent coherent demeanor, Valencia described Gonzales as tired, "fogy," and nauseous, (3) Valencia knew that a heroin overdose can result in difficulty breathing, and (4) Valencia knew that Nurse Archuleta instructed staff to monitor Gonzales' breathing. From this circumstantial evidence, Valencia could draw the inference that Gonzales was still under the influence of heroin and that a substantial risk of respiratory distress, a life threatening

11

condition requiring medical assistance, existed. The circumstantial evidence further shows that Valencia, indeed, drew that inference when he had staff place Gonzales in a boat in the dayroom of the Anasazi C-pod to facilitate staff's monitoring of Gonzales' breathing at least every 15 minutes, and when he apparently checked on Gonzales at 11:55 p.m. Hence, Plaintiff has shown that Valencia subjectively knew that Gonzales faced a substantial risk of respiratory distress, a condition which could obviously be life threatening.

Next, viewing the facts in the light most favorable to Plaintiff, the facts with respect to Edmunds show that (1) Edmunds knew Gonzales was just released from St. Vincent Hospital for a heroin overdose and was medically cleared, (2) despite the medical clearance and Gonzales' alert and oriented demeanor, Edmunds "immediately" concluded that Gonzales "was not in a normal state of mind," had "groggy" looking eyes, and had slurred speech, (3) Edmunds believed that these characteristics were red flags, (4) Edmunds called Nurse Archuleta about the medical clearance and Gonzales' "state," (5) Nurse Archuleta instructed Edmunds to monitor Gonzales' breathing, and (6) Edmunds was tasked with checking on Gonzales every 15 minutes. From this circumstantial evidence, Edmunds could draw the inference that Gonzales had a substantial risk of respiratory distress, a serious condition requiring medical aid. The circumstantial evidence also shows that Edmunds actually drew that inference when he placed Gonzales in a boat in the dayroom of the Anasazi C-pod so that he could more easily monitor Gonzales' breathing at least every 15 minutes. Plaintiff has, therefore, shown that Edmunds subjectively knew that Gonzales faced a substantial risk of respiratory distress, a condition which can obviously lead to death.

Finally, viewing the evidence in the light most favorable to Plaintiff, Ortega knew that Gonzales had been previously hospitalized for a heroin overdose and that his duties that night included monitoring Gonzales' breathing at least every 15 minutes. From this circumstantial

evidence, Ortega could draw the inference that a substantial risk of respiratory distress, a serious condition that necessitates medical attention, existed. The circumstantial evidence further shows that Ortega actually drew that inference by, in fact, monitoring Gonzales' breathing at least every 15 minutes. Accordingly, Plaintiff has shown that Ortega subjectively knew that Gonzales faced a substantial risk of respiratory distress, a condition which can obviously threaten one's life.

### (2) *Conscious Disregard of Substantial Risks of Respiratory Distress and Death*

Once the plaintiff shows that the defendant subjectively knew of a substantial risk of the claimed harm, the plaintiff must demonstrate that the defendant subjectively or consciously disregarded the claimed harm. *Martinez*, 563 F.3d at 1089-90 (observing that "defendants must subjectively disregard the risk of Ginn's claimed harm—death and heart attack—and not merely the risks of intoxication."); *Self*, 439 F.3d at 1231 ("person must 'consciously disregard' a substantial risk of serious harm.") (quoting *Farmer*, 511 U.S. at 839). However, "if an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability." *Silverstein v. Fed. Bureau of Prisons*, 559 Fed. Appx. 739, 754 (10th Cir. 2014)). On the other hand, "[a]n official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly [or] recklessly declined to act." *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008). "Even a brief delay [in providing medical aid] may be unconstitutional." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005). Moreover, "reliance on a medical professional's opinion does not foreclose a finding of deliberate indifference to a prisoner's serious medical needs in all circumstances." *Vega v. Davis*, 673 F. App'x 885, 890–91 (10th Cir. 2016). Ultimately, simple negligence does not amount to a constitutional violation. *Self*, 439 F.3d at 1235 (holding it would be speculation to find culpable state of mind from negligence).

With regard to Valencia, the question is whether Valencia made reasonable efforts to avoid or alleviate Gonzales' respiratory distress when Gonzales was not exhibiting problems breathing at the time he spoke with Valencia and when she went to sleep. Although it appears that requiring Edmunds and Ortega to monitor Gonzales' breathing was a reasonable and appropriate action, when one views the evidence in the light most favorable to Plaintiff, Valencia's actions are more than merely negligent and are, instead, unreasonable and reckless under the circumstances.

Once Valencia learned that Nurse Archuleta requested staff to monitor Gonzales' breathing, Valencia had several choices in response to the substantial risk of respiratory distress. First, Valencia knew he could ask Nurse Archuleta to examine Gonzales. Second, Valencia knew he could call for an ambulance to take Gonzales to the hospital for monitoring by health professionals who could quickly abate any respiratory distress. Finally, Valencia knew he could keep Gonzales in a boat in a dayroom where non-medical staff could monitor Gonzales' breathing. Valencia deliberately chose the latter course of action.

Under that latter course of action, Valencia would expect Edmunds and Ortega to perform CPR if Gonzales became unresponsive. Valencia also would have obviously known that, if Gonzales stopped breathing, an ambulance would be called, which would cause a delay in providing Gonzales with adequate medical aid. Furthermore, Valencia was aware of the policy of calling for medical assistance for residents who are under the influence of drugs or having trouble breathing, a policy that necessarily recognizes that special medical or hospital care, which non-medical YDP staff cannot provide, is required to care for those residents who may suffer from life threatening conditions like respiratory distress. Deliberately choosing the third option, which does not involve medical personnel, Valencia deliberately chose not to take

actions which would reasonably avoid or alleviate Gonzales' substantial risk of respiratory distress, and, ultimately, death. Plaintiff has demonstrated that Valencia's knowing and reckless decision not to put Gonzales in the hands of medical personnel consciously disregarded the substantial risk of respiratory distress and death.

As to Edmunds, the facts seen in the light most favorable to Plaintiff show that after Gonzales went to sleep around 11:15 p.m., Edmunds noticed "unusual breathing," "breathing difficulties," and gasping with cessation of breathing. Despite Edmunds' admission that difficulty breathing is a serious condition requiring that he call medical personnel, the evidence when viewed in the light most favorable to Plaintiff shows that Edmunds, in fact, chose not to call medical personnel and, instead, deliberately chose, for at least the next 2.5 hours, to continue checking on Gonzales at least every 15 minutes and shaking her, until she finally ceased breathing. Those actions do not constitute reasonable efforts to avoid or alleviate a substantial risk of respiratory distress. Faced with a resident who was obviously in respiratory distress, Plaintiff has shown that Edmunds' knowing and reckless decision not to call medical personnel consciously disregarded Gonzales' substantial risk of respiratory distress, an admittedly serious condition, which can lead to death.

With respect to Ortega, the evidence, when viewed in the light most favorable to Plaintiff, shows that as early as 12:30 a.m., Ortega noticed Gonzales' "awkward breathing" in that she would take deep breaths and then not breathe. Despite knowing medical personnel should be called when a resident has difficulty breathing, Ortega deliberately decided not to call medical personnel and, in the alternative, chose to continue observing Gonzales' breathing for the next hour and 15 minutes, asking her two to four times if she was okay without getting a verbal response, and shining a flashlight in Gonzales' face sometime prior to 1:15 a.m., which

evoked one verbal response. Those measures are not reasonable measures to avoid or alleviate Gonzales' substantial risk of respiratory distress. Ortega knowingly and recklessly chose not to call medical personnel despite observing Gonzales' "awkward" and gasping breathing. Hence, Plaintiff has demonstrated that Ortega consciously disregarded Gonzales' substantial risk of respiratory distress, an undeniably serious and life-threatening condition.

For the foregoing reasons, Plaintiff meets the first prong of the qualified immunity analysis by showing that Defendants were deliberately indifferent to Gonzales' serious medical needs, a violation of the United States Constitution. The second qualified immunity prong inquires whether Gonzales' constitutional right was clearly established at the time of the incident. Although it is generally recognized that "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right," more recent case law emphasizes "that the clearly-established inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Garcia*, 678 Fed. Appx. at 654 (quoting *Mullenix*, 136 S.Ct. at 308); *Mata*, 427 F.3d at 749. Plaintiff has not cited any federal case law which directly addresses the specific conduct at issue in this case. Nonetheless, the Court determines that Defendants' conduct was "so obviously improper that any reasonable [prison official] would know it was illegal." *Garcia*, 678 Fed. Appx. at 654 (quoting *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)). Consequently, the clearly established prong of the qualified immunity analysis is met. In sum, Plaintiff has carried her burden of demonstrating that Defendants are not entitled to qualified immunity.

The burden then shifts to Defendants to demonstrate that no genuine questions of material fact exist as to the constitutional claims. Clearly, however, a genuine question of

material fact exists as to whether Gonzales' breathing could be characterized as snoring or as sufficiently abnormal that a lay person would realize that Gonzales needed medical attention. Summary judgment is, therefore, inappropriate on the Section 1983 deliberate indifference claims.[9]

### b. New Mexico Constitutional Claims

The parties do not specifically address the New Mexico Constitutional claims against Defendants. Even so, the Court finds it appropriate to *sua sponte* address whether to grant summary judgment as to the New Mexico Constitutional claims, because the issue of whether Plaintiff can bring New Mexico Constitutional claims that mirror her Section 1983 claims is a purely legal matter.[10]

The Court recognizes that, in New Mexico, when courts analyze "a state constitutional provision with a federal analogue," courts apply an "interstitial approach." *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19, 376 P.3d 836. Under this approach, courts "first examine whether an asserted [state constitutional] right is protected under an equivalent provision of the United States Constitution." *Id.* "If the right is protected, then, under the New Mexico Constitution, the claim is not reached." *Id.*

---

[9] The Court notes that the question of whether the deliberate indifference claim is properly brought under the Fourteenth or Eighth Amendment remains unresolved.

[10] "After giving notice and a reasonable time to respond, the court may … consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f). Indeed, courts have held that it is appropriate under Rule 56(f) to *sua sponte* grant summary judgment as to a strictly a legal matter. *See, e.g., Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004) (holding that "exception to the notice requirement in the case of *sua sponte* summary judgment" includes "a decision based on a purely legal issue…."); *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201–02 (11th Cir. 2003) (acknowledging that no formal notice is necessary when "legal issue has been fully developed, and the evidentiary record is complete….").

In this case, there is a federal analogue to the cruel and unusual punishment provision of Section II, Article 13 of the New Mexico Constitution, i.e., the Eighth and Fourteenth Amendments of the United States Constitution. In fact, the analysis of Gonzales' rights under the New Mexico Constitution does not differ from the analysis under the Eighth and Fourteenth Amendments. *See Glover v. Gartman*, 899 F. Supp. 2d 1115, 1154 (D.N.M. 2012) (noting that New Mexico courts would probably follow federal analysis of inmate and detainee medical indifference claims); *State v. Dwyer*, No. 33,234, ¶ 10, 2013 WL 1187656, at *3 (N.M.) ("Article II, Section 13 of the New Mexico Constitution is nearly identical to the Eighth Amendment to the United States Constitution…."). Accordingly, Plaintiff's claims against Defendants under Section II, Article 13 of the New Mexico Constitution are redundant of her claims under the Eighth and Fourteenth Amendments to the United States Constitution. *See Kellum v. Bernalillo Cty.,* 2015 WL 12861360, at *4 (D.N.M.) ("Plaintiff's claims under Section II, Article 13 of the New Mexico Constitutional are redundant of her claims under the Eighth Amendment to the United States Constitution."). Therefore, for that reason, the New Mexico Constitutional claims against Defendants are subject to summary judgment as a matter of law.

2. *Count Three: NMTCA Negligence and Wrongful Death Claims*

Defendants contend that Plaintiff cannot recover against them under Section 41-4-12, which provides waiver of immunity for law enforcement officers who violate the United States or New Mexico constitutions, on the mere allegation that Defendants were negligent by providing Gonzales with inadequate medical care. It is well-established in New Mexico "that under Section 41-4-12, 'immunity is not waived for negligence standing alone.'" *Lessen v. City of Albuquerque*, 2008-NMCA-085, ¶ 35, 144 N.M. 314 (citation omitted). Rather, to proceed under Section 41-4-12, a plaintiff must allege that negligence caused a specified tort or violation

of rights enumerated in Section 41-4-12. *Id.* ("[T]he negligence complained of must cause a specified tort or violation of rights.") (quoting *Caillouette v. Hercules, Inc.*, 1992-NMCA-008, ¶ 18, 113 N.M. 492).

Plaintiff, however, argues that New Mexico Supreme Court cases *Methola v. Eddy Cty.* and *Bober v. New Mexico State Fair*, and a Tenth Circuit case, *Quezada v. County of Bernalillo*, have held that negligence alone suffices to bring a Section 41-4-12 claim. In *Methola¸* the New Mexico Supreme Court concluded that "the Legislature intended 'caused by' in Section 41-4-12 to include those acts enumerated in that section which were caused by the negligence of law enforcement officers while acting within the scope of their duties." 1980-NMSC-145, ¶ 24, 95 N.M. 329. In other words, to waive immunity, a law enforcement officer's negligence must have caused an act enumerated in Section 41-4-12, which includes constitutional violations. Similar to *Methola*, the New Mexico Supreme Court in *Bober* observed that it "has held that a law enforcement officer or agency may be held liable under Section 41–4–12 for negligently causing infliction of one of the predicate torts." 1991-NMSC-031, ¶ 32, 111 N.M. 644. The Tenth Circuit in *Quezada* merely held that a deputy's negligent actions were "wrongful" and thus satisfied an element of a battery claim under Section 41-4-12. *Quezada v. Cty. of Bernalillo*, 944 F.2d 710, 720 n. 5 (10th Cir. 1991) *abrogated on other grounds by Saucier*, 533 U.S. 194 (2001)). Otherwise, the Tenth Circuit cites *Ortiz v. New Mexico State Police* in which the New Mexico Court of Appeals acknowledged that "*Methola* and its progeny hold that immunity is waived when a law enforcement officer causes the commission of certain listed torts...." *Id.* at 719 (citing *Ortiz v. New Mexico State Police*, 1991-NMCA-031, ¶ 4, 112 N.M. 249, *cause dismissed and remanded,* 113 N.M. 352 (1992) ("It suffices that the law enforcement officer, while acting within the scope of duty, negligently or intentionally causes the commission of a

listed tort….")).  These cases do not support Plaintiff's contention that negligence alone is

sufficient to waive immunity under Section 41-4-12.

Plaintiff further argues that it is enough under Section 41-4-12 that Defendants owed

Gonzales a duty of reasonable care and that Defendants breached that duty.  The New Mexico

Supreme Court in *Methola*, indeed, noted a common law duty for a custodian, like a jailer, "to

exercise reasonable and ordinary care for the protection of the life and health of the person in

custody."  1980-NMSC-145, at ¶ 23 (quoting *City of Belen v. Harrell*, 1979-NMSC-081, ¶ 15, 93

N.M. 601 (1979)).  The New Mexico Supreme Court then stated that the NMTCA is in

derogation of such common law rights to sue for negligence and so the NMTCA must be

construed strictly.  *Id.*  Considering that the NMTCA is in derogation of the common law and

considering the legislative intent behind the 1977 amendments to the NMTCA,[11] the New

Mexico Supreme Court in *Methola* concluded, as quoted above, "that the Legislature intended

'caused by' in Section 41-4-12 to include those acts enumerated in that section which were

caused by the negligence of law enforcement officers while acting within the scope of their

duties."  1980-NMSC-145, at ¶ 24.  Accordingly, as stated previously, negligence alone, i.e.,

Plaintiff's alleged breach of a duty of care and the allegation in Count Three that Defendants

"were negligent when they failed to provide adequate care," does not suffice to waive immunity

under Section 41-4-12.

Finally, Plaintiff argues that because she pled a waiver of immunity under Section 41-4-

6, negligent operation of a building, with respect to Defendants Santa Fe County and Mark

Gallegos, that waiver of immunity also applies to Defendants.  *See* (Doc. 1) at 15, ¶ 83.  Plaintiff

---

[11] "The 1977 amendments, under Section 41-4-12 removed immunity of law enforcement
officers for 'personal injury ... caused by (them)' …."  *Methola*, 1980-NMSC-145, at ¶ 13.

contends that since Defendants were Santa Fe County employees they were necessarily on notice that Plaintiff asserts negligent operation of building claims against them. Plaintiff cites a New Mexico Supreme Court case, *Zamora v. St. Vincent Hosp.*, in support of this contention. 2014-NMSC-035, 335 P.3d 1243.

These arguments in support of a Section 41-4-6 waiver of immunity are flawed for two reasons. First, Fed. R. Civ. P. 81(c) specifically states that the Federal Rules of Civil Procedure "apply to a civil action after it is removed from a state court." Hence, Fed. R. Civ. P. 8 notice pleading standards, not New Mexico notice pleading standards, apply to the Complaint. *See, e.g., Simmerman v. Ace Bayou Corp.*, 304 F.R.D. 516, 519 (E.D. Ky. 2015) ("Rule 8 pleading standards apply to all district court proceedings, including those that originated in state courts.").

Second, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). To meet this notice requirement, a complaint must "list or clearly articulate any causes of action." *Polovino v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 2015 WL 4716543, at *4 (N.D. Okla.), *appeal dismissed* (Dec. 23, 2015) (citing *Mann v. Boatright*, 477 F.3d 1140, 1147-48 (10th Cir. 2007)). The Court is not "obligated to construct a cause of action from allegations in a complaint filed by a party who was unwilling or unable to plead the cause of action himself." *Glenn v. First Nat'l Bank in Grand Junction,* 868 F.2d 368, 372 (10th Cir.1989). "The responsibility for ensuring that one's claims are properly presented lies with the litigant, not the court." *Norton v. The City Of Marietta, OK*, 432 F.3d 1145, 1151 (10th Cir. 2005).

In this case, Plaintiff's allegation of negligent operation of a building is explicitly directed to Santa Fe County and Gallegos, not to Defendants. Consequently, Defendants did not have notice Plaintiff was also bringing the negligent operation of a building claim against them. It is further outside the Court's purview to expand this cause of action to include Defendants. If Plaintiff wishes to bring this cause of action against Defendants, the proper course is to file a motion to amend. *Id.* at 1151-52 ("If plaintiff was concerned that some of his constitutional claims were omitted from the Amended Complaint, the proper course would have been to file a motion to amend …."). In sum, Defendants are entitled to summary judgment as to Count Three.

IT IS ORDERED that

1. the Motion for Summary Judgment of Defendants Gabriel Valencia, Matthew Edmunds and John Ortega (Doc. 166) is granted in part;

2. summary judgment will be granted in favor of Gabriel Valencia, Matthew Edmunds, and John Ortega on the Count One New Mexico Constitutional claims and on Count Three; and

3. those claims will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE