IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal
Representative of the Estate of Desiree
Gonzales, deceased,

     Plaintiff,

vs.                                            Civ. No. 15-73 KG/SCY

SANTA FE COUNTY, GABRIEL VALENCIA,
Youth Development Administrator, Individually,
MATTHEW EDMUNDS, Corrections Officer,
individually, JOHN ORTEGA, Corrections Officer,
MOLLY ARCHULETA, Corrections Nurse,
Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

     Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon Defendant Santa Fe County's Motion for
Summary Judgment (Motion for Summary Judgment), filed April 15, 2016. (Doc. 163).
Plaintiff filed a response on May 17, 2016, and filed exhibits on May 19, 2016. (Docs. 181 and
186). Defendant Santa Fe County (County) filed a reply on June 22, 2016. (Doc. 205). Having
considered the Motion for Summary Judgment, accompanying briefing, and relevant evidence,
the Court grants the Motion for Summary Judgment.

*A. Background*

This case involves, in part, whether Desiree Gonzales received adequate medical care
while incarcerated at the Santa Fe Youth Development Program (YDP), a program operated by
the County. Just prior to Gonzales' incarceration at the YDP on the night of May 7, 2014,
Gonzales was treated for a heroin overdose at St. Vincent Hospital and medically cleared for

incarceration. It is undisputed that no nurse was present at the YDP that night and that several hours later Gonzales stopped breathing. It is also undisputed that when Gonzales stopped breathing and became nonresponsive non-medical YDP staff began CPR and called 911. Several hours later, Gonzales died at St. Vincent Hospital. The Office of the Medical Investigator determined that the cause of death was "Toxic effects of heroin." (Doc. 145-4) at 1.

*1. The Complaint for Wrongful Death (Complaint) (Doc. 1) at 4-19*

In Count Two of the Complaint, Plaintiff brings 42 U.S.C. § 1983 claims against the County for violations of Gonzales' rights under the Fourteenth and Eighth Amendments. (Doc. 1) at 14-15, ¶¶ 73-78. Plaintiff clarifies in her response to the Motion for Summary Judgment that the County adopted the following unconstitutional custom or practice: "After hours, when nurses were not on shift, residents suspected of intoxication or withdrawal were not appropriately screened pursuant to the receiving screening policy, were not appropriately evaluated pursuant to the intoxication and withdrawal policy, and instead, were allowed to 'sleep it off' under the watch of untrained eyes as long as they had a medical clearance from a doctor or hospital." (Doc. 181) at 30. Plaintiff further alleges that the County did not implement its medical receiving screening policy, and failed to train its YDP officers on (1) the receiving screening policy, (2) recognizing the signs and symptoms of heroin intoxication and withdrawal, and (3) monitoring residents for signs and symptoms of heroin intoxication and withdrawal. *Id.* at 29, ¶ 14.

In Count Three of the Complaint, Plaintiff alleges two New Mexico Tort Claims Act (NMTCA) claims against the County. First, Plaintiff alleges that the County, through its employees, was negligent by failing to provide adequate medical care to Gonzales. (Doc. 1) at 15, ¶ 82. Plaintiff cites NMSA 1978, § 41-4-12 of the NMTCA which provides waiver of

immunity "when law enforcement officers cause wrongful death through the deprivation of rights, privileges and immunities secured by the U.S. Constitution or New Mexico Constitution." *Id.* at 15, ¶ 80. Second, Plaintiff alleges that the County was negligent in the manner it operated the YDP. *Id.* at 15, ¶ 83.

The County moves for summary judgment on all claims against it. Plaintiff opposes the Motion for Summary Judgment in its entirety.

2. *Facts Relevant to the Motion for Summary Judgment*[1]

  a. *Summary of Facts Related to Gonzales' Incarceration at the YDP*

Gonzales received care for a heroin overdose at St. Vincent Hospital, which included the administration of naloxone, "a short acting antagonist of the effects of heroin," and lorazepam, a central nervous system depressant like heroin. (Doc. 163-14) at 2. As a central nervous system depressant, lorazepam has an additive effect to heroin. *Id.* In fact, "the co-administration of lorazepam … changes the opioid treatment scenario complicating treatment and adding pharmacologic risk." *Id.* at 4.

Gonzales was discharged from St. Vincent Hospital at 9:52 p.m. with a medical clearance noting "No further cares [sic]." (Doc. 166-1); (Doc. 166) at 2. Gonzales arrived at the YDP at 10:35 p.m. (Doc. 166) at 2. Defendant Gabriel Valencia (Valencia) and YDP staff member Esmeralda Coronado (Coronado) interacted with Gonzales in the booking process. Coronado indicated on Gonzales' Intake Checklist that a medical screening form was completed and placed in the medical box so that a nurse could review it in the morning. (Doc. 186-5) at 3. No medical

---

[1] Unless otherwise noted, the factual summary reflects the evidence viewed in the light most favorable to Plaintiff.

screening form, however, was completed and staff, instead, relied on the medical clearance to accept Gonzales.  *Id.*

    While Gonzales was alert, oriented, and coherent during the booking process, she was also nauseous, "a little fogy," and tired.  (Doc. 67-13) ; (Doc. 166-2) at 3, depo. at 34-35; (Doc. 166-3) at 2, depo. at 31-32; (Doc. 166-4); (Doc. 185-6) at 5, depo. at 151.  After Coronado dressed Gonzales out and finger printed her, Gonzales was added "to board and count at 10:55 pm and escorted … to the Anasazi C-pod living unit …."  (Doc. 166-4).  Once at the Anasazi C-pod, Gonzales telephoned her mother and spoke with her for about five minutes.  *Id.*

    About that same time, Defendant Matthew Edmunds (Edmunds) arrived at the Anasazi C-pod to accept Gonzales.  *Id.*  Edmunds "immediately" concluded that Gonzales "was not in a normal state of mind," had "groggy" looking eyes, and had slurred speech.  (Doc. 166-6). Because no nurse was on duty at the YDP during the night, Edmunds called Defendant Nurse Molly Archuleta (Nurse Archuleta) to advise her of Gonzales' "state" and ask questions about the medical clearance.  *Id.*  Nurse Archuleta told Edmunds "to keep an [sic] very close eye on [Gonzales] and to notify her of any changes."  *Id.*  Nurse Archuleta specifically told Edmunds to monitor Gonzales' breathing.  (Doc. 145-1) at 1; (Doc. 185-7) at 4, depo. at 90.  Nurse Archuleta later acknowledged that not being in a normal state of mind, having groggy eyes, and slurring speech would have been "red flags" to her.  (Doc. 176-5) at 3, transcript at 37.

    Based on the telephone conversation with Nurse Archuleta, Edmunds and Valencia placed Gonzales in a "boat" or bed in the dayroom of the Anasazi C-pod.  (Doc. 166-4).  To comply with Nurse Archuleta's instruction to monitor Gonzales' breathing, Edmunds and Defendant John Ortega (Ortega), who arrived at the Anasazi C-pod at 11:40 p.m., conducted 15 minute checks on Gonzales, including "extra checks."  (Doc. 166-6); (Doc. 166-8).  The checks

"were conducted through the window of the dayroom, and horseshoe," which placed Edmunds and Ortega 2 to 3 feet from Gonzales. *Id.*; (Doc. 185-4) at 4, depo. at 68. Edmunds kept a door unsecured because of Gonzales' "unusual breathing." (Doc. 166-6). The checks included shaking Gonzales, shining a light in her eyes once,[2] and asking her if she was okay, without getting a verbal response. (Doc. 185-2) at 6, transcript at 33; (Doc. 206-6) at 3-4, depo. at 55-57.

Valencia evidently left the Anasazi C-pod around the time Gonzales went to sleep at about 11:15 p.m., and checked on her at least one other time at about 11:55 p.m. (Doc. 166-2) at 3, depo. at 37; (Doc. 185-2) at 6, transcript at 33; (Doc. 171) at 23:55:35 to 23:56:09. After Plaintiff went to sleep, Edmunds and Ortega noted "unusual breathing," "breathing difficulties," "awkward" breathing, and "gasping" by taking "deep breaths follow[ed] by extended period [sic] of no breathing repeatedly."[3] (Doc. 145-3); (Docs. 166-6, 166-7, and 166-8).

Valencia at some point went to clean the front lobby. (Doc. 166-4). At about 1:52 a.m., Edmunds radioed Valencia to inform him that Gonzales stopped breathing. *Id.* Edmunds and Ortega then began CPR while Valencia called the Interim Youth Service Administrator at 1:54 a.m. and then called 911 at 1:55 a.m. *Id.* Emergency personnel arrived at 2:05 a.m. *Id.* Edmunds went with Gonzales to St. Vincent Hospital, where she died several hours later. (Doc. 166-7).

---

[2] Gonzales only verbally responded, briefly, when Ortega shone a light in her eyes. (Doc. 206-6) at 3, depo. at 55-56.

[3] Edmunds later characterized Gonzales' breathing as "snoring." (Doc. 166-5) at 2, depo. at 37. Ortega subsequently stated that the "awkward" breathing began later, at 1:00 a.m., and characterized the breathing as "real loud snoring." (Doc. 166-8); (Doc. 185-2) at 3, transcript at 23.

### b. The County's Policies

In 2014, the County had policies which it adopted from the 2011 "Standards for Health Services in Juvenile Detention and Confinement Facilities," authored by the National Commission on Correctional Health Care. (Docs. 163-1 and 163-2). The policies covered subjects like health training for staff, receiving screening, health assessments, emergency services, nursing assessment protocols, intoxication and withdrawal, and alcohol and other drug problems. *Id.* (Policy numbers Y-C-04, Y-E-02, Y-E-04, Y-E-08, Y-E-11, Y-G-06, and Y-G-08).

The County's receiving screening policy required that nursing personnel perform the receiving screening and that they document the screening on a form. (Doc. 186-4) at 2. That policy, however, indicated that residents referred to St. Vincent Hospital who return to the YDP "are accepted if there is a written medical clearance…." *Id.* If someone other than a nurse performs the receiving screening, "[a] [n]urse will review the completed receiving screening form and the resident within 12-hours of the resident's admission to" the YDP. *Id.* at 3. Another policy, the intoxication and withdrawal policy, required "constant observation when severe withdrawal symptoms are observed." (Doc. 186-3) at 2.

### c. The County's Training

The New Mexico Administrative Code § 8.14.14.10, as amended in 2011, requires that New Mexico juvenile detention centers certified by the Children, Youth, and Families Department provide training in first aid, CPR, and "intake criteria/and reporting." NMAC § 8.14.14.10 (D) (13) and (16). The County had a policy establishing minimum staff training requirements. (Doc. 186-13). The policy included training on first aid, CPR, and policies. *Id.*

The County provided evidence that, prior to Gonzales' death, Valencia, Edmunds, Ortega, Coronado, and Nurse Archuleta received various trainings including basic academy trainings, basic orientation trainings, in-service trainings, training in medical emergencies/urgencies, instruction on narcotics, and training on CPR, first aid, and on the use of automated external defibrillators (AED). *See* (Doc. 163-3) at 8-9; (Doc. 163-5) at 1-2, and 5; (Doc. 163-6) at 6-7 and10; (Doc. 163-7) at 1and 9; (Doc. 163-8) at 1 and 7; (Doc. 163-9) at 1, 3, and 7-8; (Doc. 163-10) at 2, 5, and 6; (Doc. 163-12) at 6; (Doc. 205-7) at 1-3, 5-9, 13-16, and 18-19.

An objective of the medical emergencies/urgencies training was to "[r]ecognize some signs and symptoms of illnesses or injuries that require immediate and urgent medical attention." (Doc. 205-4) at 1. The training reviewed checking for breathing which includes asking whether the resident is on drugs or withdrawing from drugs. *Id.* at 2. The training noted that there was a separate course on opiate and drug overdoses, but directed activation of the incident management system if staff suspects an opiate or drug overdose, and that staff watch respiratory rates and watch for "difficulty in arousing" the resident. *Id.* at 3.

Two other County trainings were entitled, "Alcohol, Drugs, and Narcotics" and "NMCD Addiction Services." (Doc. 205-5); (Doc. 163-15). The trainings listed as an objective identifying or recognizing "the primary symptoms associated with the use of various drugs/substances." (Doc. 205-5) at 1; (Doc. 163-15) at 8. The trainings also listed the physiological effects of narcotic use like nausea, "Mental Fogginess," "Blurred vision," and "Reduced physical activity." (Doc. 205-5) at 2; (Doc. 205-3) at 3. These trainings further listed heroin or opiate withdrawal symptoms. (Doc. 205-5) at 3; (Doc. 205-3) at 3.

County lesson plans created prior to Gonzales' death included those on medical urgencies, narcotics recognition, substance abuse, drugs and narcotics, and policies. (Doc. 205-6) at 1-4, and 7-8. The County also had a "Basic Book" entitled "Drug Use and Recognition." (Doc. 163-15) at 9.

Furthermore, Nurse Archuleta trained life skills staff on signs and symptoms of opioid intoxication. (Doc. 204-1) at 4, depo. at 54. That training included monitoring the person's breathing by watching the chest rise and fall. *Id.* at 4, depo. at 54-56. It is unclear, however, whether this training occurred prior to Gonzales' death.

### d. Evidence From YDP Staff Concerning Customary Practices and Training

#### (1) Valencia

Valencia testified at his deposition that when a resident arrived at the YDP after hours and no nurse was present, staff would determine whether the resident was coherent and able to understand questions before accepting them into the YDP. (Doc. 186-6) at 3, depo. at 24-25. If the resident was under the influence of drugs, i.e., not coherent, that resident would be taken to the hospital. *Id.* at 3, depo. at 24. Valencia stated in his deposition testimony that even if a resident had a medical clearance, he would make sure that the resident was coherent before accepting the resident and that, if called for, he would not accept a resident even if the resident had a medical clearance. (Doc. 205-1) at 3, depo. at 26-27.

Valencia understood that the shift supervisor should call 911 if the shift supervisor believes a resident is under the influence of drugs or unable to breathe, and that a shift supervisor should call Nurse Archuleta if a staff member reports that a resident is having trouble breathing. (Doc. 185-7) at 3, depo. at 22; (Doc. 206) at 11-12. Valencia also knew that a heroin overdose can result in difficulty breathing. (Doc. 185-7) at 4, depo. at 90. Valencia, however, did not

have any training on the symptoms of drug intoxication or withdrawal.  (Doc. 186-6) at 2, depo. at 18.  He agreed that neither a shift supervisor nor a life skills worker is qualified to perform medical assessments.  *Id.* at 2, depo. at 19.

*(2)  Edmunds*

Edmunds knew that when nursing personnel was not present at night, the nurse would conduct a medical assessment in the morning.  (Doc. 186-2) at 2, depo. at 7-9.  Edmunds noted in his deposition testimony that it was the custom at the YDP to let residents "sleep off" drugs or alcohol if they had been medically cleared, and to call the nurse if there was a concern.  *Id.* at 4-5, depo. at 141-42.  Edmunds also noted a marked increase in the number of residents with heroin addiction.  *Id.* at 6, depo. at 161.

Edmunds knew that a difficulty breathing is a serious condition and that medical personnel should be called immediately in that situation.  (Doc. 185-6) at 2, depo. at 55-56.  Edmunds was trained to call the on-call nurse when a resident had a health need, any time a resident had a medical clearance, or if there was a question of whether a resident was under the influence of drugs.  (Doc. 186-2) at 2, depo. at 7-8.  On the other hand, Edmunds stated in his deposition testimony that he was not trained on the symptoms of a heroin overdose.  (Doc. 186-2) at 3, depo. at 111 and 112.  Edmunds was also not trained in conducting medical assessments, but he testified that he was trained to watch for potential issues that may involve the medical condition of a resident.  *Id.* at 2, depo. at 9; (Doc. 205-10) at 3, depo. at 5-6.

*(3)  Ortega*

Ortega indicated that it was the practice, when a nurse was not present at the YDP at night, to accept an alert and functioning resident with a medical clearance, place the resident in a day room to sleep in a boat, check on the resident every 15 minutes through the night, and then

have medical personnel check on the resident in the morning. (Doc. 186-12) at 3-4, depo. at 26-30. If the resident was intoxicated, then the YDP would not accept the resident. *Id.* at 3, depo. at 26.

Ortega, likewise, knew that difficulty breathing is a serious condition and that one should immediately call medical personnel or 911 if a resident has breathing difficulties. (Doc. 185-4) at 2, depo. at 20-21. Ortega also knew that in monitoring Gonzales, he was monitoring her breathing. *Id.* at 3, depo. at 63. Even so, Ortega testified at his deposition that he did not have training on opioid or heroin overdose signs and symptoms, or training on how to monitor a resident who recently experienced a heroin overdose. (Doc. 186-12) at 2, depo. at 18. Ortega, however, was trained not to accept residents who, if intoxicated, are not coherent, and he was to trained to know that signs of being under the influence of drugs and alcohol include slurred speech, not being mentally alert, and being unable to stay awake. (Doc. 205-8) at 3-4, depo. at 16-17. Ortega further knew that medical personnel should be called when a resident exhibits signs and symptoms of being under the influence of drugs. *Id.*

### (4) Coronado

Coronado testified at her deposition that if a resident is incoherent, she should notify her supervisor, who would call medical personnel. (Doc. 186-7) at 2, depo. at 11. Coronado stated she was trained on intake to look at a resident's speech and mobility, but she was not trained on drug intoxication symptoms or on how to help a resident who was intoxicated. *Id.* at 2, depo. at 12-13. Nonetheless, Coronado testified at her deposition that with her first aid training she could recognize the physical condition of a resident and determine whether that person should be accepted at the YDP. (Doc. 205-9) at 2, depo. at 63-64. There is no documentation that Coronado received any training on the receiving screening policy. (Doc. 186-5) at 4.

*(5) Archuleta*

At her deposition, Nurse Archuleta testified that she recognized that drug withdrawal can be a problem at a youth detention center and that residents under the effects of drugs, even if they can walk and talk, should be sent to a hospital. (Doc. 186-1) at 2, depo. at 38 and 41. Nurse Archuleta also agreed that there was a policy of constant observation when a resident is at risk of progressing to a more severe level of withdrawal or intoxication. (Doc. 186-1) at 3-4, depo. at 97-98. Nurse Archuleta testified at her deposition that, because Gonzales was medically cleared, she did not feel that staff should keep Gonzales under constant observation, nor did she feel that Gonzales needed an immediate assessment. *Id.* at 4, depo. at 98-99, 101.

*B. Standard of Review*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

*C. Discussion*

*1. Count Two: Section 1983 Claims*

Government or municipal liability under Section 1983 attaches only to the actions "for which the municipality is actually responsible," i.e., municipal liability does not encompass liability under the doctrine of *respondeat superior*. *Schneider*, 717 F.3d at 770 (citation omitted). For a governmental entity to be subject to liability under Section 1983, a plaintiff must show "three elements: (1) official policy or custom, (2) causation, and (3) state of mind." *Id.* at 769.

*a. The "Sleep it Off" Custom*

Plaintiff argues that the County did not implement its receiving screening policy during the night when a nurse was not present at the YDP. Rather, Plaintiff asserts that the County's actions

> all culminated into an unconstitutionally dangerous policy, custom, and practice at the facility wherein inmates suspected of intoxication or withdrawal were not appropriately screened pursuant to the receiving screening policy, were not appropriately evaluated pursuant to the intoxication and withdrawal policy, and instead, were allowed to 'sleep it off' under the watch of untrained eyes so long as they had a medical clearance from a doctor or hospital.

(Doc. 181) at 21. Plaintiff maintains that this unconstitutional custom caused the County's employees to violate Gonzales' rights under the Fourteenth and Eighth Amendments, and that the County's custom reflected deliberate indifference on the part of the County.

The first element of municipal liability, an official policy or custom, includes "a well-settled custom or practice." *Schneider*, 717 F.3d at 770. A municipality's inaction, like failing to implement a policy, can constitute a custom. *Triplett v. District of Columbia,* 108 F.3d 1450, 1453 (D.C.Cir.1997) (noting "inaction giving rise to or endorsing a custom" can be basis of Section 1983 liability); *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985) (finding that

sufficient evidence supported jury's conclusion that despite policy statements county had unconstitutional custom on medical care). A custom is an act that "has such widespread practice as to have the force of law." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008). "In order to establish a custom, the actions of the municipal employees must be 'continuing, persistent and widespread.'" *Id.* (citation omitted). Most commonly, plaintiffs demonstrate the existence of a "continuing, persistent and widespread custom" by "offer[ing] evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Id.*

The evidence, even when viewed in the light most favorable to Plaintiff, shows three YDP staff members testified at depositions that the custom at the YDP in receiving residents at night when a nurse was not present was to (1) determine whether the resident had a medical clearance, (2) determine, nonetheless, whether the resident was coherent and mobile, (3) if the resident had a medical clearance and was coherent and mobile, place the resident in a boat in a day room where staff could check on the resident every 15 minutes as the resident slept, and (4) ensure a nurse would check on the resident in the morning. From this evidence, a reasonable jury could possibly find that the "sleeping it off" custom was "continuing, persistent and widespread." Plaintiff, however, has not presented evidence from which a reasonable jury could find that the custom necessarily had "the force of law."

Assuming that Plaintiff has established such a custom, the next inquiry is whether Plaintiff has shown that the "sleeping it off" custom violated the Fourteenth or Eighth Amendments, which prohibit deliberate indifference to a prisoner's serious medical needs.[4] The

---

[4] Plaintiff does not specify in the Complaint if she considered Gonzales a pre-trial detainee or a post-conviction inmate. The County and Plaintiff, however, only refer to the Eighth Amendment in the Motion for Summary Judgment and accompanying briefing. Whether Plaintiff brings the

Court notes that if a plaintiff alleges that a custom is unconstitutional on its face, as Plaintiff seems to allege here, causation and state of mind are shown by "simply proving the existence of the unlawful policy." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

Plaintiff cites *Garcia v. Salt Lake Cty.* as an analogous case wherein the Tenth Circuit upheld the jury's finding that the county's custom violated a prisoner's Eighth Amendment right to adequate medical care. 768 F.2d at 307 (holding that sufficient evidence existed to support jury's finding that county's "practice on medical care violated the established constitutional standard"). In *Garcia*, the county sheriff had a written policy of not allowing deputies to take semi-conscious or unconscious prisoners to the jail. *Id.* at 306 . Despite this written policy, there was a custom of taking semi-conscious or unconscious persons suspected of being intoxicated to the jail. *Id.* 306-07 ("there was proof that the Salt Lake County jail personnel implemented the policy or custom of admitting to the jail persons in an unconscious condition who were suspected of being intoxicated …."). The Tenth Circuit concluded that the custom itself was unconstitutional under the Eighth Amendment. *Id.* at 307.

In making the Eighth Amendment deliberate indifference determination, the Tenth Circuit relied on the following facts. First, "there was no physician present at the jail most of the time," "[a] nurse was at the jail 'four to five hours five days a week,'" and "[a] medical technician was on duty from 5 a.m. until 1 p.m. and from 1 p.m. until 9 p.m." *Garcia*, 768 F.2d at 308. Second, when the jail was full, it could house "[a]s many as 400 inmates." *Id.* Third,

---

Section 1983 claim under the Fourteenth or Eighth Amendment, the same deliberate indifference standard applies. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (holding that deliberate indifference standard applies to pre-trial detainees under Fourteenth Amendment); *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (holding that deliberate indifference standard applies to post-conviction inmates under Eighth Amendment).

officers found Garcia semi-conscious outside a hospital. *Id.* at 305. Fourth, the doctor at the

hospital released Garcia to officers when they said the jail staff could observe him. *Id.* Fifth,

when Garcia was booked into the jail, the medical technician instructed that Garcia be checked

every 15-20 minutes. *Id.* at 308. Sixth, Garcia was only actually checked on about every 30

minutes by a "search and print officer" and once by the medical technician. *Id.* Finally, "[n]o

medical personnel were present in the" jail when Garcia stopped breathing approximately six

hours after having been booked into the jail. *Id.*

> The Tenth Circuit concluded that
>
> the jury's finding against the County is supported by sufficient evidence of gross
> deficiencies and deliberate indifference in staffing and procedures to monitor persons
> admitted to the jail in an unconscious condition who are suspected of being intoxicated.
> The record supports the conclusion that the County's policy of admitting to jail
> unconscious persons suspected of being intoxicated, carried out with the described
> deficiencies and indifference, caused a violation of Garcia's constitutional rights.

The Tenth Circuit further noted a single incident of unconstitutional activity arising from an

unconstitutional custom, like in *Garcia*, is sufficient to show municipal liability if the

unconstitutional custom caused the incident and the unconstitutional custom can be attributed to

a municipal policy maker. *Id.* at 308 n. 4 ("Proof of a single incident of unconstitutional activity

is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that

it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to

a municipal policymaker.") (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24

(1985)). The Tenth Circuit determined that the unconstitutional custom at issue in *Garcia* could

be attributed to the county sheriff, a chief elected county official who was in charge of the jail,

and who, therefore, was a municipal policy maker. *Id.*

 *Garcia* is factually distinguishable from this case in several ways. The custom in *Garcia*

was to book semi-conscious or unconscious prisoners, a custom easily reflecting deliberate

indifference to the serious medical needs of prisoners. In this case, the custom was to accept residents who were at least coherent and mobile at the time of booking. Also, there is no evidence in this case suggesting that the number of residents housed at the YDP at any one time came close to as many as 400. Additionally, the medical clearance in this case noted that no further care was required while in *Garcia* the prisoner was released from the hospital with the understanding that the jail staff would observe him. Finally, the evidence here indicates that Edmunds and Ortega, in fact, checked on Gonzales every 15 minutes, unlike the staff in *Garcia*.

Moreover, considering that Plaintiff relies on a single incident to demonstrate municipal liability based on an unconstitutional custom, Plaintiff has failed to come forward with any evidence to show that the "sleep it off" custom can be attributed to a municipal policymaker, like an YDP administrator or warden. For this reason alone, a reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could not find, even if there was a "sleep it off" custom, that liability could be assigned to the County on the basis of that custom. Accordingly, the County is entitled to summary judgment on the Section 1983 municipal liability claim premised on the "sleep it off" custom.

### b. Failure to Train

Plaintiff argues that the County's failure to train officers on the receiving screening policy, how to recognize the signs and symptoms of heroin intoxication and withdrawal, and how to monitor residents for signs and symptoms of heroin intoxication and withdrawal directly caused Gonzales' respiratory distress and subsequent death. The first element of municipal liability, an official policy or custom, includes either inadequate training or failure to train. *Schneider*, 717 F.3d at 770 (observing that official policy or custom element of municipal

encompasses "deliberately indifferent training."). The Court will, thus, address the causation and state of mind elements related to Plaintiff's failure to train claims.

### (1) Causation

When municipal liability is based on inadequate training, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (citation omitted). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program," like negligent administration of "an otherwise sound program…." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989). "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick v. Thompson*, 563 U.S. 51, 68 (2011). Additionally, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Canton*, 489 U.S. at 391.

With respect to training on the receiving screening policy, a reasonable jury viewing the evidence in the light most favorable to Plaintiff could find that, despite trainings on "policies," it is unclear from that label whether training included the receiving screening policy. Specifically, Gonzales' Intake Checklist indicates that a medical screening form was completed and placed in the medical box so that a nurse could review it in the morning. This fact demonstrates that staff was trained to follow the receiving screening policy's provision regarding how to proceed when a nurse is unavailable to complete a screening at the time of booking. Moreover, a reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could infer that despite knowing she should complete medical screening forms, Coronado failed to complete Gonzales's

medical screening form.  Such a mistake, however, "says little about the training program or the legal basis for holding the city liable," especially since Gonzales had a medical clearance, which was enough to book Gonzales under the receiving screening policy.  *Canton*, 489 U.S. at 391.

Next, with respect to training on the recognition of signs and symptoms of heroin intoxication and withdrawal and training on monitoring residents for signs and symptoms of heroin intoxication and withdrawal, it is undisputed that the County provided Valencia, Edmunds, Ortega, and Coronado training on narcotics recognition, substance abuse, and medical emergencies/urgencies.  The training included recognizing narcotic/opiate symptoms like nausea, "mental fogginess," "blurred vision," and "reduced physical activity."  (Doc. 205-3) at 3; (Doc. 205-5) at 2.  Consistent with this training, Ortega testified at his deposition that he was trained that signs of drug use include slurred speech, not being mentally alert, and being unable to stay awake.  The training further described symptoms associated with heroin or opiate withdrawal. (Doc. 205-3) at 3; (Doc. 205-5) at 3.  Additionally, the training recognized that drug use or withdrawal can lead to breathing issues which require staff to monitor breathing, including watching respiratory rates, and monitoring for "difficulty in arousing" the resident.  (Doc. 205-4) at 2-3.  Valencia verified this training when he testified at his deposition that he knew that a heroin overdose can result in difficulty breathing.[5]

---

[5] The deposition testimony refers at times to "training" the deponents received and at other times it refers to what the deponents "knew," like Valencia knowing that a heroin overdose can result in difficulty breathing, knowledge which would be consistent with training on narcotic overdoses.  Plaintiff does not assert that this kind of knowledge was not obtained through training, although Plaintiff has the burden of showing that training was inadequate.  *See Barney*, 143 F.3d at 1308 (holding that plaintiff must "come forward with evidence pertaining to the adequacy of the instruction" received in training and that without that evidence courts "have no reason to conclude that [a defendant] received constitutionally deficient training").  As such, the Court will construe "knowledge" deposition testimony as knowledge gained through training.

Despite this training, Valencia, Edmunds, Ortega, and Coronado stated in their respective depositions that they were not trained on the signs and symptoms of a heroin overdose or withdrawal. This contradictory deposition testimony shows that these particular YDP staff members were perhaps unsatisfactorily trained, could have used additional training, or were adequately trained but simply made mistakes the night Gonzales was incarcerated at the YDP. Such situations alone are insufficient to establish municipal liability.

Even if one assumed that Valencia, Edmunds, Ortega, and Coronado did not receive any training on the signs and symptoms of a heroin overdose or withdrawal or on monitoring for signs and symptoms of a heroin overdose or withdrawal, Valencia, Edmunds, and Ortega, nevertheless, all admitted that if a resident exhibited difficulty breathing, whatever the cause, they knew to call 911 or medical personnel, which they eventually did. Coronado further testified at her deposition that she had sufficient first aid training to recognize the physical condition of a resident and to determine whether that person should be accepted at the YDP. She also testified that she was trained on intake to examine a resident's speech and mobility, and to call a supervisor if a resident is incoherent. Valencia testified at his deposition that if a resident was under the influence of drugs, i.e., incoherent, he would not accept the resident and, instead, send the resident to the hospital, regardless of a medical clearance. Edmunds testified at his deposition that he was trained to call the nurse if a resident has a health need, if a resident has a medical clearance, and if he has questions about whether a resident was under the influence of drugs. Edmunds further testified that he was trained to watch for potential issues associated with the medical condition of a resident. In addition, Ortega knew to call medical personnel when a resident exhibited signs and symptoms of being under the influence of drugs and he was trained not to accept incoherent residents. Ortega testified at his deposition that staff would monitor

residents every 15 minutes through the night if they had been accepted with a medical clearance and that he knew that in monitoring Gonzales he was checking on her breathing.

Based on this evidence, a reasonable jury, having viewed the evidence in the light most favorable to Plaintiff, could not find that the County inadequately trained or failed to train YDP staff when to seek medical attention if a resident appeared to be in physical distress, and could not find that the County did not adequately train or failed to train YDP staff to monitor residents every 15 minutes if they are accepted with a medical clearance. Under the circumstances of this case, had YDP staff heeded their training regarding residents in physical distress, Gonzales would not have become unresponsive while in their care. In other words, YDP staff's failure to follow this training caused harm to Gonzales, not any lack of training specific to recognizing the signs and symptoms of heroin overdose and withdrawal, or monitoring a resident for signs and symptoms of heroin overdose and withdrawal.

In sum, applying a rigorous causation standard, a reasonable jury viewing the evidence in the light most favorable to Plaintiff could not find that the County's alleged inadequate training or lack of training caused harm to Gonzales. Nevertheless, assuming *arguendo* that Plaintiff has shown the requisite causation, the Court will address the deliberate indifference requirement of Plaintiff's failure to train claims.

### *(2) Deliberate Indifference*

The third element, state of mind, requires that when the theory of municipal liability, like failure to train, relies on a "facially lawful" policy, like a training policy, a plaintiff must demonstrate that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (citation omitted). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice

that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* at 771 (citation omitted). Although notice can usually "be established by proving the existence of a pattern of tortious conduct," in some "narrow range of circumstances, … deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]" *Id.* (citation omitted). In the case of a failure to train claim, "even a showing of gross negligence by the municipality is inadequate to meet the state-of-mind requirement." *Blueberry v. Comanche Cty. Facilities Auth.*, 672 F. App'x 814, 817 (10th Cir. 2016).

Specific or extensive training may not be necessary, however, for a jailer to know that certain conduct is inappropriate. Sexual assault is a clear example of conduct that a jailer would know is unlawful, regardless of training. *Barney*, 143 F.3d at 1308 ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."). Furthermore, although failure to recall training "may reflect upon the quality of the training, deficiencies in the training of particular officers" do not put the municipality "on notice of the need for better training." *Johnson v. Dixon*, 666 F. App'x 828, 831 (11th Cir. 2016).

In this case, Plaintiff does not provide evidence of a "pattern of tortious conduct" to establish notice on the part of the County. Plaintiff argues, instead, that the violation of Gonzales' federal rights was "a highly predictable or plainly obvious consequence of" the County's failure to train. Indeed, Plaintiff presents general evidence that juveniles in detention centers who are under the influence of narcotics and who may be suffering from narcotic withdrawal is a recurring problem that is highly predictable. Plaintiff argues that "despite

recognizing the obvious potential that its offices would routinely encounter young persons intoxicated with or withdrawing from heroin, YDP did not prepare its officers for those encounters." (Doc. 181) at 37. To support this argument, Plaintiff cites several cases wherein courts found either no training on a mental health condition, superficial training on alcohol withdrawal signs and symptoms, or inadequate training inferred from the wrongful conduct of jail staff. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1319 (10th Cir. 2002) (finding that appellant alleged facts that "County manifested deliberate indifference by failing to train its jail's prebooking officers to recognize [obsessive compulsive disorder (OCD)] and handle sufferers appropriately"); *Trujillo v. Management and Training Corporation, et al.*, Civ. No. 15-544 WJ/SMV, (Doc. 56) at 16, filed April 15, 2016 (stating that reasonable juror could infer that failure to correctly fill out health care request form was result of inadequate training); *M.H. v. City of Alameda*, 62 F.Supp. 3d 1049, 1083-84 (N.D. Cal. 2014) (finding that plaintiff produced evidence of cursory or no training on alcohol withdrawal signs and symptoms including training logs that did not describe training content).

The cases Plaintiff cites, however, are distinguishable from this case and so lack persuasive authority. Indeed, Plaintiff concedes that in *Olsen*, the "officers 'received absolutely no training on OCD….'" (Doc. 181) at 37. Here, the undisputed evidence shows, at the very least, that YDP staff received some training on drug intoxication and withdrawal as well as on monitoring. Plaintiff admits that in *Trujillo* Judge Johnson made his ruling "based solely on the wrongful conduct of the jail officers" without "specifically consider[ing] the jail's training policies or evidence regarding same." *Id.* at 35. Evidence regarding YDP's training policies is, in fact, a subject of this Motion for Summary Judgment. The plaintiff in *M. H.* produced evidence from an officer "designated the County's person most knowledgeable" about training

who characterized training on alcohol withdrawal signs and symptoms as "very little" and "cursory," as well as evidence from a staff member who was unable to recall such training and from training logs that did "not describe their content." 62 F.Supp.3d at 1083-84. In this case, there is no evidence from a "knowledgeable" County official regarding the training at issue, let alone a County official describing the training as somehow cursory. Moreover, the County has provided evidence of the content of the various trainings reported in the training logs and certificates.

Notwithstanding these cases, Plaintiff fails to present evidence, pertinent to this case, from which a reasonable jury could find that it is "highly predictable and plainly obvious" that receiving residents with medical clearances after being treated for heroin overdoses will result in denying those residents of the right to adequate medical services. Indeed, in this case, the administration of lorazepam, a drug that complicates opioid treatment and adds pharmacologic risk, could have altered the typical situation faced by YDP staff when a resident arrives with a medical clearance that requires no further care. Nonetheless, a reasonable jury, considering the evidence in the light most favorable to Plaintiff, could not find that specific or extensive training is necessary for YDP staff to know that medical personnel should be called when a resident is nauseous, not in a right state of mind, groggy eyed, slurring speech, tired, and having difficulty breathing. Furthermore, the failure by three particular YDP staff members to recall training on the signs and symptoms of heroin overdose and withdrawal does not necessarily indicate that the County was on notice of a need for better overall training.

In this case, it is undisputed that YDP staff knew, presumably through relevant trainings, whether formal or informal, to accept residents with medical clearances, to turn away residents who are not coherent and mobile, to monitor residents with medical clearances every 15 minutes

through the night until a nurse assesses them in the morning, and to call for medical assistance if a resident is generally in physical distress or is having difficulty breathing. Considering the above evidence even in the light most favorable to Plaintiff and considering the rigorous standard of culpability to be employed in the failure to train context, a reasonable jury could not find that the County's alleged failure to train amounted to deliberate indifference to the constitutional right to adequate medical care. Hence, the County is entitled to summary judgment on the failure to train claims. In sum, the Count Two claims against the County will be dismissed with prejudice.

> 2. *Count Three: NMTCA Claims*

The County argues that it is also entitled to summary judgment on the NMTCA negligent failure to provide adequate medical care claim, brought under Section 41-4-12 of the NMTCA, and the negligent operation of a building claim, brought under Section 41-4-6 of the NMTCA. The County specifically argues, with respect to Section 41-4-12, the NMTCA provision waiving immunity for law enforcement officers who violate a person's constitutional rights, that Plaintiff has not shown that negligence by the County caused YDP staff members to violate Gonzales' constitutional right to receive adequate medical care. As discussed above, a reasonable jury could not find that the County's actions or inactions caused a County employee to violate Gonzales' constitutional right to receive adequate medical care.

Even so, Plaintiff contends that simple negligence by the County, acting through its employees, in providing adequate medical care waives immunity for law enforcement officers. However, it is well-established in New Mexico "that under Section 41-4-12, 'immunity is not waived for negligence standing alone.'" *Lessen v. City of Albuquerque*, 2008-NMCA-085, ¶ 35, 144 N.M. 314 (citation omitted). Rather, to proceed under Section 41-4-12, a plaintiff must

allege that negligence caused a specified tort or violation of rights enumerated in Section 41-4-12. *Id.* ("[T]he negligence complained of must cause a specified tort or violation of rights.") (quoting *Caillouette v. Hercules, Inc.*, 1992-NMCA-008, ¶ 18, 113 N.M. 492).

Plaintiff further contends that negligence alone is enough under Section 41-4-12 if a duty is owed. The New Mexico Supreme Court in *Methola v. Eddy Cty.*, indeed, noted a common law duty for a custodian, like a jailer, "to exercise reasonable and ordinary care for the protection of the life and health of the person in custody." 1980-NMSC-145, ¶ 23, 95 N.M. 329 (quoting *City of Belen v. Harrell*, 1979-NMSC-081, ¶ 15, 93 N.M. 601 (1979)). The New Mexico Supreme Court then stated that the NMTCA is in derogation of such common law rights to sue for negligence and so the NMTCA must be construed strictly. *Id.* Considering that the NMTCA is in derogation of the common law and considering the legislative intent behind the 1977 amendments to the NMTCA,[6] the New Mexico Supreme Court in *Methola* concluded "that the Legislature intended 'caused by' in Section 41-4-12 to include those acts enumerated in that section which were caused by the negligence of law enforcement officers while acting within the scope of their duties." 1980-NMSC-145, at ¶ 24. Accordingly, negligence alone, i.e., Plaintiff's allegation that the County was negligent by failing to provide adequate medical care, does not suffice to waive immunity under Section 41-4-12. The County, thus, is entitled to summary judgment on the Count Three claim brought under Section 41-4-12.

Regarding waiver of immunity for negligent operation of a building, the New Mexico Supreme Court has ruled that the waiver extends to "dangerous conditions created by the negligence of public employees in the 'operation or maintenance' of public buildings," including

---

[6] "The 1977 amendments, under Section 41-4-12 removed immunity of law enforcement officers for 'personal injury ... caused by (them)' ...." *Methola*, 1980-NMSC-145, at ¶ 13.

"safety policies necessary to protect the people who use the building." *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 9, 140 N.M. 205, *as revised* (Sept. 12, 2006). A single discrete administrative decision affecting only one inmate does not fall within the Section 41-4-6 waiver. *Id.* at ¶ 20 (observing that Section 41-4-6 waiver applies where "dangerous condition based on more than just a single administrative decision affecting only one inmate…."). The question, then, is whether the County, through its employees, made "a single, discrete administrative decision affecting only a single person, as opposed to a dangerous condition affecting the general" population at the YDP. *Id.* at ¶ 17.

Plaintiff contends that the County's actions or inactions pertained to the provision of medical care which affects all residents at the YDP. However, even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that the "sleep it off" custom is attributable to the County and that the County failed to provide adequate medical/narcotics training. Hence, a reasonable jury could not find that the County's actions or inactions adversely affected the health of the general population at the YDP. Instead, the decisions of the YDP staff in this case occurred on one occasion affecting only one resident, Gonzales. Consequently, Section 41-4-6 does not provide waiver of immunity regarding Plaintiff's allegation that the County negligently operated the YDP building. The County, therefore, is entitled to summary judgment on the Section 41-4-6 claim brought under Count Three. For the foregoing reasons, Count Three will be dismissed with prejudice as it relates to the County.

IT IS ORDERED that

1. Defendant Santa Fe County's Motion for Summary Judgment (Doc. 163) is granted;

2. summary judgment will be entered in the County's favor on all claims brought by Plaintiff; and

3. those claims will be dismissed with prejudice, thereby terminating the County as a

Defendant in this matter.

_____
UNITED STATES DISTRICT JUDGE