IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal
Representative of the Estate of Desiree
Gonzales, deceased,

    Plaintiff,

vs.                                                                                    Civ. No. 15-73 KG/SCY

GABRIEL VALENCIA, Youth Development
Administrator, Individually, MATTHEW EDMUNDS,
Corrections Officer, Individually, JOHN ORTEGA,
Corrections Officer, Individually, MOLLY ARCHULETA,
Corrections Nurse, Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon St. Vincent Hospital's Motion for Summary Judgment and Memorandum in Support (Motion for Summary Judgment), filed February 12, 2016. (Doc. 132). Plaintiff filed a response on March 8, 2016, and Defendant St. Vincent Hospital (Hospital) filed a reply on March 25, 2016. (Docs. 142 and 151). Having considered the Motion for Summary Judgment, the accompanying briefing, and relevant evidence, the Court grants the Motion for Summary Judgment.

*A. Background*

This case involves, in part, whether the Hospital was negligent on May 7, 2014, in prematurely discharging Desiree Gonzales after Defendant Dr. Nathan Paul Unkefer treated her for a heroin overdose with both naloxone and Ativan.[1] Upon discharge from the Hospital and

---

[1] Naloxone is also known as Narcan while Ativan is also known as lorazepam.

having been medically cleared by Dr. Unkefer for incarceration, police took Gonzales from the Hospital to the Santa Fe Youth Development Program (YDP) for incarceration. It is undisputed that no nurse was present at the YDP that night and that several hours later Gonzales stopped breathing. It is also undisputed that when Gonzales stopped breathing and became nonresponsive non-medical YDP staff began CPR and called 911. Several hours later, Gonzales died at the Hospital. The Office of the Medical Investigator determined that the cause of death was "Toxic effects of heroin." (Doc. 145-4) at 1.

   1. *Count Four of the Complaint for Wrongful Death (Complaint) (Doc. 1)*

Plaintiff brings negligence claims against the Hospital in Count Four of the Complaint. Plaintiff clarifies in her response to the Motion for Summary Judgment that she alleges the Hospital was negligent by (1) not having a policy related to the treatment of heroin overdose patients, (2) failing to have adequate discharge instructions, and (3) not obtaining informed consent from Gonzales to administer Ativan, a drug that "can potentiate any narcotic that is still in the body." (Doc. 142) at 9-12 (quoting (Doc. 142-4) at 2, depo. at 78). Plaintiff also seeks punitive damages against the Hospital.

The Hospital moves for summary judgment only on Plaintiff's direct negligence claims, including the claim for punitive damages. The Hospital does not move for summary judgment on any vicarious liability claims. Plaintiff opposes the Motion for Summary Judgment in its entirety.

*2. Facts Relevant to the Motion for Summary Judgment[2]*

    *a. Failure to Have a Hospital Policy on Treating Heroin Overdose Patients*

In his written expert report, Dr. Robert Henry opined that the

> Dr. Unkefer's and St. Vincent Hospital's care was below the standard of care when Desiree Gonzales was discharged after monitoring her condition for an inadequate amount of time given Ms. Gonzales' condition, her symptoms and the treatment provided to her in the hospital. A longer observation period was required and would have prevented her death.

(Doc. 132) at 22. Dr. Henry further opined that the

> St. Vincent Hospital failed in its obligation to provide appropriate policies and procedures. According to testimony and the records that I have received, St. Vincent Hospital did not have a policy on the observation period of post-naloxone patients. Had St. Vincent had a reasonable policy, it is likely that Ms. Gonzales would have been kept in the hospital longer and her condition would have been treated before it caused her death.

*Id.* at 22-23.

At his deposition, Dr. Henry clarified that he had only one opinion regarding the Hospital: the Hospital was negligent by not having a policy on the treatment of heroin overdose patients. (Doc. 132) at 27, depo. at 128-29. Dr. Henry testified that the Hospital breached "the standard of care of a reasonably well-qualified hospital" by not having such a policy. *Id.* at 29, depo. at 133. Dr. Henry, however, explained that it is speculation to suggest that a Hospital policy would result in keeping an heroin overdose patient in the Hospital longer because a doctor can exercise "his own independent medical judgment" to discharge the patient. *Id.* at 28, depo. at 130. Dr. Henry further testified that it was speculation on his part to opine that such a policy would have "likely" kept Gonzales at the Hospital for a longer period of time. *Id.* at 29, depo. at

---

[2] Unless otherwise noted, the factual summary reflects the evidence viewed in the light most favorable to Plaintiff.

3

136. Dr. Henry concluded that he could not say to a reasonable medical probability that such a Hospital policy would have resulted in a different outcome in this case. *Id.*

Another expert, Dr. Don Fisher, opined to a reasonable degree of medical probability that had Gonzales "been kept in the hospital on May 7, 2014, then she would most likely have survived her heroin overdose." (Doc. 142-11) at ¶ 5. Dr. Teresa Prock, a physician who cared for Gonzales after she returned to the Hospital from the YDP, opined that "Gonzales' death was most likely preventible [sic] with timely intervention…." (Doc. 142-13) at 2, depo. at 68.

A Hospital nurse, Anne Marie Munger (Nurse Munger), testified at her deposition that the Hospital now has a protocol to (1) monitor post-naxolone patients for two hours in the emergency department prior to discharge, and (2) have those patients breathe room air at an oxygen saturation level of above 90% for 30 minutes before discharge. (Doc. 142-12) at 2, depo. at 31. According to Plaintiff, Gonzales would have been monitored at least an additional 19 minutes before being discharged had this protocol been in place. (Doc. 142) at 11.

### b. Failure to Have Adequate Discharge Instructions

The medical clearance form for arrested persons indicated that no further care was recommended.[3] (Doc. 142-2) at 5. In addition to the medical clearance form, there were separate written discharge instructions. Nurse Munger discussed the written discharge instructions with Gonzales and a police officer,[4] who was present at the Hospital to escort Gonzales to the YDP. (Doc. 151-1) at 2-3, depo. at 81-84. At the time of her deposition, Nurse Munger stated that she did not totally recall what she said to Gonzales and the police officer. *Id.*

---

[3] In spite of this recommendation, a police officer told Dr. Unkefer that Gonzales would be checked every 15 minutes at the YDP. (Doc. 142-4) at 2, depo. at 80-81.

[4] Although Nurse Munger testified at her deposition that she also spoke about the discharge instructions to Gonzales' mother, who was with Gonzales at the Hospital, Gonzales' mother testified at her own deposition that she never talked to a nurse. (Doc. 142-3) at 3, depo. at 34; (Doc. 151-1) at 2-3, depo. at 81-82.

at 3, depo. at 84. Nevertheless, Nurse Munger gave the written discharge instructions and the medical clearance form to the police officer. *Id.* at 4, depo. at 87.

The written discharge instructions included not to use drugs and to come back to the Hospital "if symptoms worsen or do not improve." (Doc. 151-2) at 2-3. The written discharge instructions further included a "Heroin Abuse and Withdrawal" section which described respiratory depression progressing to cessation of breathing as a sign and symptom of heroin use, and described shallow breathing as a symptom of a heroin overdose. *Id.* at 5-6. The written discharge instructions indicated that Gonzales received the "Heroin Abuse and Withdrawal" section and had a "verbalized understanding…." *Id.* at 8.

Dr. Henry opined that the written "discharge instructions were unreasonable." (Doc. 132) at 21. Dr. Henry explained that the discharge instructions were "unhelpful," "sarcastic," and "disregard[ed] … the critical nature of [Gonzales'] true medical condition." *Id.*

### c. Lack of Informed Consent

Dr. Henry opined that Dr. Unkefer's "decision to give IV Ativan was a decision that required consent and it was a decision that changed Desiree Gonzales from a 'normal' heroin overdose patient to a patient with multiple central nervous system depressants in her system." (Doc. 132) at 20. According to Dr. Henry, this situation required Gonzales "to be monitored longer than one hour after the last dose of Ativan." *Id.*

### B. *Summary Judgment Standard*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing

that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

C. Discussion

   1. Negligence

For the Hospital to be negligent under New Mexico law, Plaintiff must establish that (1) the Hospital owed Gonzales "a duty recognized by law;" (2) the Hospital breached that duty; and (3) the breach of the duty proximately caused Gonzales' injuries, namely, respiratory distress and subsequent death.[5] *Holley v. Evangelical Lutheran Good Samaritan Soc.*, 588 Fed. Appx. 792, 794 (10th Cir. 2014) (citing *Alberts v. Schultz*, 1999-NMSC-015, ¶ 17, 126 N.M. 807). New Mexico medical malpractice law, however, does not require a health provider "to guarantee a particular beneficial result" and "[a] poor medical outcome is not necessarily evidence of any wrongdoing." *Alberts*, 1999-NMC-015, at ¶ 19.

When a medical malpractice action involves "'technical and specialized subject matter' … that is not within the 'common knowledge ordinarily possessed by an average person,'" New

---

[5] Plaintiff argues that causation of a medical condition or worsening of a medical condition is not the issue in this case. Instead, Plaintiff contends that the causation issue is whether keeping Gonzales in the Hospital longer "would have resulted in a full recovery from the heroin overdose." (Doc. 142) at 13. Plaintiff does not cite any legal authority for this contention. On the other hand, New Mexico law is clear that "[i]n any medical malpractice action, the plaintiff has the burden of proving that ... [the defendant's] actions complained of were the proximate cause of [the] plaintiff's injuries," which in this case was respiratory distress leading to death. *Schmidt v. St. Joseph's Hosp.*, 1987–NMCA–046, ¶ 8, 105 N.M. 681.

6

Mexico law requires a plaintiff to utilize expert testimony to establish "all three negligence elements: 'to establish a standard of care, to assess the [healthcare provider's] performance in light of the standard, and to prove causation.'" *Holley*, 588 Fed. Appx. at 795 (citations omitted). Such "expert testimony must be stated 'to a reasonable degree of medical probability,'" which "connote[s] proof that … is more probable than not." *Id.* at n. 4. Because this case involves a "technical and specialized subject matter," i.e., appropriate treatment for a heroin overdose, Plaintiff must use expert testimony to demonstrate negligence by the Hospital.

*a. Failure to Have a Policy on Treatment of Heroin Overdose Patients*

Generally, "in New Mexico … a hospital owes an independent duty of care to patients at the hospital." *Diaz v. Feil*, 1994-NMCA-108, ¶ 13, 118 N.M. 385. Here, Dr. Henry opined specifically that the "Hospital failed in its obligation to provide appropriate policies and procedures." (Doc. 132) at 22. Dr. Henry further affirmed at his deposition that it is his opinion that the Hospital's failure to have a policy on the treatment of heroin overdose patients breached "the standard of care of a reasonably well-qualified hospital." (Doc. 132) at 29, depo. at 133. Dr. Henry, however, indicated at the deposition that he could not state, to a reasonable degree of medical probability, that a policy on treating heroin overdose patients would have resulted in a different outcome in this case. (Doc. 132) at 29, depo. at 136. In fact, Dr. Henry admitted that it was speculation on his part to opine that such a policy would have "likely" kept Gonzales at the Hospital for a longer period of time. *Id.* A reasonable jury viewing this evidence from Dr. Henry in the light most favorable to Plaintiff could not find that Dr. Henry provided evidence, to a reasonable degree of medical probability, that the Hospital's lack of a policy on the treatment of heroin overdose patients proximately caused the harm Gonzales suffered.

Nonetheless, Plaintiff presented evidence from Drs. Henry, Fisher, and Prock that had Gonzales stayed at the Hospital for a longer period of time she would have "likely" survived. (Doc. 132) at 22; (Doc. 142-11) at ¶ 5; (Doc. 142-13) at 2, depo. at 68. That evidence, however, does not address the specific question of whether a "policy" on the treatment of heroin overdose patients would have prevented the harm Gonzales suffered. To answer that question, Plaintiff suggests that if a policy similar to the Hospital's current policy had been in place in May 2014, then Gonzales would have been observed for an additional 19 minutes and would not have died. This suggestion though is purely speculative and not supported by any expert evidence. Plaintiff has simply not come forward with expert testimony stating, to a reasonable degree of medical probability, i.e., it was more probable than not, that the Hospital's failure to have a policy on treating heroin overdose patients proximately caused the harm suffered by Gonzales. Hence, a reasonable jury, even viewing the evidence in the light most favorable to Plaintiff, could not find that the Hospital was negligent by failing to have a policy on treating heroin overdose patients.

### b. *Failure to Have Adequate Discharge Instructions*

Plaintiff notes that Dr. Henry opined that "[t]he discharge instructions were unreasonable." (Doc. 132) at 21. Plaintiff also asserts that both Dr. Unkefer and the Hospital's staff "jointly shared responsibility" for the written discharge instructions and that the nursing staff provided the written discharge instructions to Gonzales. (Doc. 142) at 12. Additionally, Plaintiff notes that neither Dr. Unkefer nor the nursing staff provided any discharge information to Gonzales, the police officer, or to Gonzales' mother. Finally, Plaintiff argues that "[r]easonable instructions would have included the signs and symptoms to watch for, types of complaints that meant Desiree needed further medical attention and any signs of serious problems for Ms. Gonzales." *Id.*

Although Dr. Henry opined that "[t]he discharge instructions were unreasonable," he stated that the Hospital was only negligent for not having a "policy" regarding the treatment of heroin overdose patients. In other words, Dr. Henry did not opine that the Hospital was negligent in providing unreasonable discharge instructions. Moreover, contrary to Plaintiff's assertions, the undisputed evidence shows that Nurse Munger discussed, at least to some extent, the discharge instructions with Gonzales and a police officer.

Aside from whatever Nurse Munger may have told Gonzales and the police officer, it is undisputed that the police officer received written discharge instructions stating that if Gonzales' symptoms worsened or did not improve she should return to the Hospital, and that the signs and symptoms of heroin use and overdose include respiratory issues. Under the circumstances of this case, that information was sufficiently adequate that, if heeded, it could have altered the progression of Gonzales' condition. Indeed, other than an opinion that the discharge instructions were "unreasonable," there is no expert opinion on what the standard of care is with respect to discharge instructions. Furthermore, no expert opined to a medical degree of probability that the written discharge instructions proximately caused harm to Gonzales. Viewing the above evidence in the light most favorable to Plaintiff, a reasonable jury could not find that the Hospital was negligent in providing inadequate discharge instructions.

        *c. Lack of Informed Consent*

Although Dr. Henry opined that the decision to administer Ativan required informed consent, under New Mexico law the doctor, not the hospital, has a duty to obtain informed consent. Rule 13-1104A, NMRA 1998 ("A doctor has a duty to obtain the patient's informed consent"). Moreover, Dr. Henry did not opine that the Hospital was negligent in failing to obtain informed consent for the administration of Ativan; Dr. Henry opined that the Hospital was only

9

negligent in failing to have a policy on the treatment of heroin overdose patients. A reasonable jury viewing this evidence in the light most favorable to Plaintiff could not find that the Hospital breached a duty to obtain informed consent and, thus, could not find the Hospital was negligent for not obtaining informed consent for the administration of Ativan. In sum, the Hospital is entitled to summary judgment on Plaintiff's direct negligence claims as asserted in Count Four of the Complaint.

  *2. Punitive Damages*

  Because the Hospital is entitled to summary judgment on the negligence claims, the claim for punitive damages necessarily fails. *See Sanchez v. Clayton*, 1994-NMSC-064, ¶ 13, 117 N.M. 761 (holding that before punitive damages can be awarded plaintiff must establish cause of action) (citation omitted). Accordingly, the Hospital is entitled to summary judgment on the punitive damages claim as a matter of law.

  IT IS ORDERED that St. Vincent Hospital's Motion for Summary Judgment and Memorandum in Support (Doc. 132) is granted and summary judgment will be entered in favor of the Hospital on Plaintiff's direct negligence claims, including the claim for punitive damages.

_____<br>
UNITED STATES DISTRICT JUDGE