IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AIMEE BEVAN, as Personal
Representative of the Estate of Desiree
Gonzales, deceased,

    Plaintiff,

vs.                                                                  Civ. No. 15-73 KG/SCY

GABRIEL VALENCIA, Youth Development
Administrator, Individually, MATTHEW EDMUNDS,
Corrections Officer, Individually, JOHN ORTEGA,
Corrections Officer, Individually, MOLLY ARCHULETA,
Corrections Nurse, Individually, ST. VINCENT HOSPITAL, and
NATHAN PAUL UNKEFER, M.D.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Nathan Paul Unkefer, M.D.'s Motion for Partial Summary Judgment on the Issue of Punitive Damages and Supporting Memorandum (Motion for Partial Summary Judgment), filed April 15, 2016. (Doc. 165). Plaintiff filed a response on May 17, 2016, and filed her supporting exhibits on May 19, 2016. (Docs. 182 and 187). Defendant Nathan Paul Unkefer, M.D. (Dr. Unkefer) filed a reply on June 2, 2016. (Doc. 192). Having considered the Motion for Partial Summary Judgment, the accompanying briefs, and the relevant evidence, the Court grants the Motion for Partial Summary Judgment.

*A. Background*

This case involves, in part, whether Dr. Unkefer was negligent on May 7, 2014, by prematurely discharging Desiree Gonzales from St. Vincent Hospital after having treated her for

a heroin overdose with both Narcan and Ativan.[1]  Upon discharge from St. Vincent Hospital and having been medically cleared by Dr. Unkefer for incarceration, police took Gonzales from St. Vincent Hospital to the Santa Fe Youth Development Program (YDP) for incarceration.  It is undisputed that no nurse was present at the YDP that night and that several hours later Gonzales stopped breathing.  It is also undisputed that when Gonzales stopped breathing and became nonresponsive non-medical YDP staff performed CPR and called 911.  Several hours later, Gonzales died at St. Vincent Hospital.  The Office of the Medical Investigator determined that the cause of death was "Toxic effects of heroin."  (Doc. 145-4) at 1.

     *1. Count Four of the Complaint for Wrongful Death (Complaint) (Doc. 1)*

     Plaintiff brings negligence claims against Dr. Unkefer in Count Four of the Complaint.  Plaintiff alleges that Dr. Unkefer prematurely discharged Gonzales from St. Vincent Hospital, failed to appropriately monitor her condition, failed to provide appropriate monitoring instructions to YDP staff and police, and failed to obtain informed consent for Gonzales' discharge.  In addition, Plaintiff alleges that had Gonzales "been in the hospital when her condition worsened, she would have survived."  (Doc. 1) at 17, ¶ 95.  Plaintiff further alleges that she is entitled to punitive damages based on Dr. Unkefer's "reckless, wanton or willful" conduct in discharging Gonzales considering what "was known to the medical providers" and considering "her fragile state was clear …."  *Id.* at 17, ¶ 98.  Dr. Unkefer now moves for partial summary judgment on the punitive damages claim.  Plaintiff opposes the Motion for Partial Summary Judgment.

---

[1] Narcan is also known as naloxone while Ativan is known as lorazepam.

*2. Facts Relevant to the Motion for Partial Summary Judgment*[2]

*a. Gonzales' Care and Treatment*

On May 7, 2014, at 7:34 p.m., emergency medical technicians (EMTs) arrived on scene to treat Gonzales for a heroin overdose.[3] (Doc. 165-2) at 1. The EMTs reported that Gonzales was unconscious and "not breathing," but a CAD Call Information sheet noted that Gonzales was breathing. *Id.* at 3; (Doc. 192-6) at 1. The EMTs initially administered Narcan nasally. (Doc. 165-2) at 2. When Gonzales did not respond to the initial Narcan dose, the EMTs administered Narcan intravenously at 7:38 p.m., after which Gonzales awoke within a minute. *Id.* at 3. When Gonzales awoke, she was alert and called her mother to inform her that she was going to the hospital. *Id.* at 2-3. The EMTs then transported Gonzales to St. Vincent Hospital.

When Gonzales arrived at the emergency department of St. Vincent Hospital at 8:40 p.m., Gonzales was talking although "[s]he vomited quite a bit." (Doc. 165-5) at 1; (Doc. 165-3) at 2, depo. at 32-33. While the initial triage nurse, Kerri Craddock, was triaging Gonzales, Gonzales "was very agitated," was "very tearful," "did not want to be there," "was uncooperative, and had ripped out her IV," and tried to get off the bed. (Doc. 165-3) at 3-4, depo. at 34-35, and 49. Dr. Unkefer was present during the triage and saw Gonzales yelling, crying, looking anxious, not wanting the blood pressure cuff on, and refusing to give her name. *Id.* at 3, depo. at 35; (Doc. 192-1) at 3-4, depo. at 48-49, 75. At 8:40 p.m., Dr. Unkefer ordered that Ativan be administered to Gonzales to calm her down. (Doc. 165-3) at 5, depo. at 50-52. Dr. Unkefer, in fact, noted in the Emergency Physician Record that he gave Gonzales Ativan

---

[2] Unless otherwise noted, the factual summary reflects the evidence viewed in the light most favorable to Plaintiff.

[3] A CAD Call Information sheet shows that the EMTs arrived slightly earlier, at 7:28 p.m. (Doc. 192-6) at 2.

because she was agitated. (Doc. 165-5) at 2. Dr. Unkefer also noted in the Emergency Physician Record that Gonzales was "slightly anxious." *Id.* at 1. Additionally, Dr. Unkefer gave Gonzales Zofran for the vomiting. (Doc. 165-6) at 3, depo. at 84.

At 8:48 p.m., Craddock recorded Gonzales' vital signs which included an oxygen saturation rate of 89% on room air and a pulse rate of 128 beats per minute (bpm). (Doc. 142-2) at 3. Dr. Unkefer believed that Gonzales did not need to be put on oxygen despite an 89% oxygen saturation level because her lung sounds were clear, her respiratory rate seemed normal, and she was not complaining that she could not breathe. (Doc. 192-1) at 3, depo. at 46. Gonzales was put on oxygen as a matter of course. *Id.* at 3, depo. at 46-47.

At about 9:15 p.m., another nurse, Marie Munger, became involved in Gonzales' care as her primary nurse. (Doc. 165-8) at 2, depo. at 51-53. Craddock and another staff member reported to Munger that Gonzales was alert, oriented, and angry, but, otherwise, had no problems. *Id.* at 2, depo. at 52. Munger observed that Gonzales "was on and off the cell phone, and angry that she was going to jail…." *Id.* at 3, depo. at 57. Gonzales, otherwise, answered Munger's questions, was no longer vomiting, and was doing as Munger requested. *Id.* at 4, depo. at 58-60. At that point, Gonzales' mother was with Gonzales. *Id.* at 3, depo. at 57. Munger observed Gonzales yelling at her mother once or twice. *Id.*

Gonzales' mother noted that at about 9:30 p.m. Gonzales stated that it hurt to breathe and that she was holding her chest. (Doc. 142-3) at 2, depo. at 31. Gonzales' mother also noted that Gonzales had a "hard time standing" and seemed "out of it." *Id.* at 2, depo. at 31, 33. Only two police officers and Gonzales' mother were with Gonzales at that time. *Id.* at 2, depo. at 31. Despite her concerns, Gonzales' mother did not try to talk to a doctor or nurse about Gonzales' condition. (Doc. 192-5) at 3, depo. at 34.

4

Munger removed Gonzales' nasal cannula at about 9:35 p.m. so that Gonzales could adjust to breathing room air. (Doc. 142-2) at 3; (Doc. 187-10) at 2, depo. at 33. Then, at 9:48 p.m., Munger recorded that Gonzales' oxygen saturation level at room air was 93% and that her pulse rate had lowered to 99 bpm. (Doc. 142-2) at 3.

Prior to discharge at 9:52 p.m., Dr. Unkefer listened to Gonzales' lungs to check for any respiratory problems, found no problem with her breathing, and saw that her vital signs were normal. (Doc. 165-5) at 2; (Doc. 192-1) at 4, depo. at 76-7; (Doc. 192-2) at 1-2, depo. at 81-2. A 93% oxygen saturation level and 99 bpm pulse rate were recorded as Gonzales' discharge vital signs. (Doc. 142-2) at 4. Dr. Unkefer noted in the Emergency Physician Record that Gonzales was observed for two hours after the last dose of Narcan. (Doc. 165-5) at 2. Dr. Unkefer detected "[n]o [r]e-overdose" and that Gonzales was "wide awake, talking to officers," and walking. *Id.* Dr. Unkefer also noted that Gonzales was discharged to a "[j]ail where she can continue to be watched." *Id.*

Dr. Unkefer further filled out a medical clearance form for arrested or incarcerated patients. Dr. Unkefer noted in that form that Gonzales' vital signs, physical exam, and mental status were normal. (Doc. 142-2) at 5. He also noted that Gonzales was observed for two hours and was still alert and oriented. *Id.* Dr. Unkefer recommended "No further cares." *Id.*

Munger went over the discharge instructions with Gonzales and provided the police officer present at the hospital with the written discharge instructions and with the medical clearance form. (Doc. 165-8) at 5, depo. at 86-87. The discharge instructions were also given to YDP staff. (Doc. 183) at 3 and 28-29. The discharge instructions stated that one must watch for worsening symptoms and respiratory depression. *Id.*; (Doc. 187-2) at 14-15, depo. at 185-86.

5

*b. Dr. Unkefer's Deposition Testimony and Testimony Before the Medical-Legal Review Panel*

Dr. Unkefer testified at his deposition that he believed that when the EMTs first found Gonzales she was suffering from a severe overdose and was breathing very slowly despite the EMT report that Gonzales was not breathing. (Doc. 187-2) at 5, depo. at 33. Dr. Unkefer explained that if Gonzales had actually stopped breathing she would not have survived unless she had stopped breathing within minutes of the EMTs' arrival. *Id.* at 6, depo. at 36. He also explained that Gonzales was probably breathing slowly because she still had a blood pressure, a pulse, and a low oxygen saturation level. (Doc. 192-1) at 2, depo. at 35. Whether Gonzales had stopped breathing or was breathing very slowly, inadequate oxygenation would, according to Dr. Unkefer, cause harm over time. (Doc. 187-2) at 6, depo. at 37.

Dr. Unkefer further testified that to determine whether Narcan is wearing off while the heroin still is effective, i.e., re-toxicity, one observes if the patient is able to maintain adequate oxygenation on room air. *Id.* at 7, depo. at 41. According to Plaintiff's expert, Dr. Don Fisher, the effects of heroin and lorazepam (Ativan) last longer than the effect of naloxone (Narcan). (Doc. 165-4) at 2. Dr. Fisher stated that the effective duration of heroin is 1.3 to 6.7 hours while the effective duration of lorazepam is 9 to 16 hours and the effective duration for naloxone is .5 to 1.5 hours. *Id.* at 2-3.

Dr. Unkefer testified that it takes about ten minutes to see if a patient is able to maintain adequate oxygenation on room air. (Doc. 187-2) at 7, depo. at 39. If a patient presents with an acute heroin overdose and is not able to maintain adequate oxygenation, Dr. Unkefer would give that patient oxygen. *Id.* at 7, depo. at 41. Dr. Unkefer testified that with respect to Gonzales he was concerned about re-toxicity which results in respiratory depression. *Id.* at 8, depo. at 50-51.

Dr. Unkefer also testified that if a patient's oxygen saturation level is at or below 90% that patient should arguably remain in the hospital. *Id.* at 4, depo. at 26-27. However, that level of oxygen saturation does not reflect factors such as altitude and the condition of the individual patient. *Id.* at 4, depo. at 27-29.

Dr. Unkefer admitted that a pulse rate of 99 bpm could be classified as borderline. (Doc. 187-3) at 3, transcript at 81. In fact, abnormally rapid pulse rates begin at 100 bpm. (Doc. 187-7) at 3, depo. at 90. A pulse rate of 99 bpm did not concern Dr. Unkefer because elevated pulse rates are not associated with opiate use. (Doc. 187-3) at 3, transcript. at 81. Moreover, Dr. Unkefer would not make a discharge decision solely on the patient's vital signs. (Doc. 187-2) at 4-5, depo. at 29-30.

Dr. Unkefer testified that he understood that Ativan has an additive effect to heroin. *Id.* at 10, depo. at 88. Consequently, Dr. Unkefer understood that by adding Ativan there was risk of respiratory depression. *Id.* at 11, depo. at 90. Dr. Unkefer's position was that if two hours post-administration of Narcan the patient has not shown signs of re-overdose and respiratory complications, then the patient is safe to be discharged. *Id.* at 11, depo. at 92-93. Dr. Unkefer explained that at the two-hour mark all the Narcan has worn off and that the Narcan has been gone for the last 30 minutes of that two-hour period. (Doc. 192-2) at 4, depo. at 133. Consequently, Dr. Unkefer testified that in that last 30 minute timeframe the physician will know whether the patient is re-overdosing or if other drugs are influencing breathing. *Id.*; (Doc. 192-3) at 1, depo. at 134. Because the Narcan was gone in the last 30 minutes of the two-hour period and Ativan adds to the effect of a heroin overdose, Dr. Unkefer believed he would have seen signs of a re-overdose during that 30-minute timeframe, but he did not. (Doc. 192-3) at 2, depo. at 153.

7

Furthermore, Dr. Unkefer noted 25% of Narcan reversals require observation longer than two hours if the patient needs another dose of Narcan or has a respiratory complication. (Doc. 187-2) at 14, depo. at 185. Dr. Unkefer conceded that he was not required to discharge Gonzales when he did and so could have decided to keep her for another hour. *Id.* at 12, depo. at 98.

From speaking with a police officer present at the hospital to escort Gonzales to the YDP, Dr. Unkefer expected that jail personnel would check on Gonzales every 15 minutes, watch Gonzales' breathing, and call 911, if necessary. (Doc. 165-6) at 4, depo. at 136. Dr. Unkefer did not anticipate that any problems that could later occur would happen immediately, so a delay in an ambulance responding to a 911 call would not be a problem. (Doc. 165-6) at 4, depo. at 136-37. The fact that Dr. Unkefer understood that Gonzales would be watched at the YDP played a part in his decision to discharge Gonzales. (Doc. 187-2) at 12, depo. at 101.

Dr. Unkefer understood that YDP personnel would rely on the medical clearance form in believing that Gonzales had overcome the heroin overdose. (Doc. 187-2) at 15, depo. at 187. Nonetheless, YDP shift supervisor Defendant Gabriel Valencia did not accept residents who have a medical clearance if they appear in need of medical services. (Doc. 192-7) at 2, depo. at 26-27.

   c. *Expert Opinions*[4]

Dr. Fisher stated that Gonzales "was discharged into police custody with her vital signs just within normal ranges when she was released." (Doc. 165-4) at 2. Dr. Fisher further stated that during Gonzales' course of treatment at St. Vincent Hospital she "exhibited signs of opioid

---

[4] In addition to expert opinions, the parties make reference to and discuss medical articles related to how long to observe an opioid overdose patient. Those articles do not shed any light on Dr. Unkefer's state of mind, the central issue to a punitive damages claim, and, at most, are relevant to the alleged negligence claims, claims not addressed in the Motion for Partial Summary Judgment. Consequently, the Court does not consider those articles in the context of this Motion for Partial Summary Judgment.

withdrawal consistent with the expected effects of naloxone" which include "anxiety, agitation and vomiting." *Id.*

Another of Plaintiff's experts, Dr. Robert Henry, agreed that there was no record of respiratory distress during Gonzales' first visit to St. Vincent Hospital. (Doc. 165-7) at 3, depo. at 54. If Narcan alone is administered, Dr. Henry noted that patients should be kept at the hospital emergency department for two to three hours after the administration of Narcan. *Id.* at 5, depo. at 93. Dr. Henry further noted that when Narcan and another central nervous system depressant, like Ativan, is administered to patients physicians must use their clinical judgment to determine how long to observe those patients, but the observation time period should be more than two to three hours. *Id.* at 5-6, depo. at 94-95, 108; (Doc. 187-7) at 5, depo. at 97. Dr. Henry also opined that Dr. Unkefer should have "monitored [Gonzales] longer than one hour after the last dose of Ativan." (Doc. 165-10) at 4. Additionally, Dr. Henry opined that "[a] single recording of a heart rate one beat shy of being abnormal is not sufficient to safely discharge a patient" who had suffered respiratory arrest, overdosed on heroin, and was given Ativan. (Doc. 187-7) at 3, depo. at 90. Dr. Henry, furthermore, opined that a physician should not discharge a patient like Gonzales to a juvenile detention center where non-medical staff would be watching her every 15 minutes. *Id.* at 5, depo. at 97-8.

B. *Standard of Review*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717

F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

*C. Discussion*

"In New Mexico, proof of gross negligence resulting in injury is a valid basis to support an award of punitive damages." *Sutherlin v. Fenenga*, 1991-NMCA-011, ¶ 9, 111 N.M. 767. With respect to "medical malpractice, gross negligence must rise to the level of 'reckless indifference'" in order to demonstrate the requisite culpable state of mind to impose punitive damages. *Id. See also Gonzales v. Sansoy*, 1984-NMCA-133, ¶ 8, 103 N.M. 127 ("As punitive damages are in the nature of punishment, it is necessary that there be some evidence of a culpable mental state, whether recklessness or 'utter indifference.'"). Consequently, "mere negligence or inadvertence" cannot support an award of punitive damages. *Id.* at ¶ 6. In other words, simply incompletely examining, testing, treating, and diagnosing a patient does not amount to reckless indifference. *Id.* at ¶ 9 (finding physician entitled to directed verdict on issue of punitive damages when "Plaintiff cannot and does not dispute that Dr. Sansoy did the things that doctors ordinarily do: examine, test, treat and diagnose; plaintiff's complaint is that he did these things incompletely"). The requisite mental state for an award of punitive damages requires knowing of a dangerous risk and consciously disregarding that risk or acting "with utter indifference to the [patient's] welfare." *Id.* at ¶ 10.

Although Plaintiff relies on Dr. Henry's opinion that Dr. Unkefer should have kept Gonzales at the hospital longer as evidence that Dr. Unkefer acted with reckless indifference, Dr.

10

Henry's opinions concern whether Dr. Unkefer was negligent, not whether Dr. Unkefer had the requisite state of mind necessary to support a claim for punitive damages. As one court articulated, an expert's "testimony as to what conduct would comply with accepted standards in a specific situation is significantly different from describing the mental state of the actor." *Bruner-McMahon v. Sedgwick Cty. Bd. of Comm'rs*, 2012 WL 33837, at *7 (D. Kan.). *See also Powell v. Shah*, 618 F. App'x 292, 296 (7th Cir. 2015) (holding that "the only issue in this case was whether the doctors had a 'sufficiently culpable state of mind' … which the court accurately recognized as a subjective inquiry that did not require an expert….") (citations omitted). Dr. Henry's opinion is, therefore, not helpful in establishing Dr. Unkefer's state of mind for the purpose of determining if summary judgment is appropriate on the punitive damages claim.

Nonetheless, the undisputed evidence shows that Dr. Unkefer was aware of the risk of respiratory depression due to re-toxicity and the administration of Ativan. The issue, then, is whether the evidence, when viewed in the light most favorable to Plaintiff, shows that Dr. Unkefer consciously disregarded the risk of respiratory depression.

To begin with, when Gonzales arrived at the emergency department, she had clear lung sounds, had a normal respiratory rate, and did not complain about breathing difficulties, but was, nonetheless, placed on oxygen. Contrary to Gonzales' mother's observation that, at about 9:30 p.m., it was painful for Gonzales to breathe, Gonzales had trouble standing, and Gonzales looked out of it, Plaintiff does not dispute that her own expert, Dr. Henry, found that Gonzales did not exhibit any signs or symptoms of respiratory distress while at the emergency department. At the time of discharge, Gonzales had been on room air for more than ten minutes, an adequate amount of time according to Dr. Unkefer, and Gonzales' vital signs were within the normal range. Prior to discharge, Dr. Unkefer checked Gonzales' lungs for any respiratory issues and found none.

11

Gonzales was also talking, walking, alert, and oriented during her stay at St. Vincent Hospital and at the time of discharge. Even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that Dr. Unkefer consciously disregarded any risk of respiratory distress while Gonzales was at St. Vincent Hospital or at the time of discharge.

Next, the intravenous Narcan should have worn off about 9:10 p.m., or 1.5 hours after the EMTs administered it at 7:38 p.m., while both the heroin and Ativan would have remained effective at the time of discharge, which was at 9:52 p.m. Considering the additive effect of Ativan, respiratory issues should have arisen beginning 1.5 hours after the administration of the intravenous Narcan or at 9:10 p.m. However, Dr. Unkefer did not observe any respiratory issues when he discharged Gonzales two hours after the EMTs administered the intravenous Narcan and while the Ativan and heroin were still in effect. A reasonable jury, viewing this evidence in the light most favorable to Plaintiff, could not find that Dr. Unkefer consciously disregarded the additive effect of the Ativan he gave Gonzales by discharging her when he did.

Finally, even though the medical clearance for incarceration indicated no further care, police at the hospital informed Dr. Unkefer that jail staff would check on Gonzales' condition every 15 minutes. Dr. Unkefer expected staff would call 911 if there was a problem. This expected monitoring contributed to Dr. Unkefer's decision to discharge Gonzales. Furthermore, YDP staff need not rely on a medical clearance if it appears that a resident requires medical assistance. Additionally, the discharge instructions provided to the police officer at the hospital and to YDP staff stated that one must watch for respiratory depression and a worsening of the patient's condition. Although Dr. Unkefer could have kept Gonzales at the hospital longer, he saw that Gonzales' condition was stable and knew that further monitoring would occur at the YDP, so he decided it was appropriate to release her to the YDP. Viewing this evidence in the

light most favorable to Plaintiff, a reasonable jury could not find that Dr. Unkefer consciously disregarded Gonzales' post-discharge care at the time he discharged her.

For all of the aforementioned reasons, a reasonable jury could not find that Dr. Unkefer consciously disregarded the risk of respiratory depression or was utterly indifferent to Gonzales' welfare by discharging Gonzales into the custody of the YDP. A reasonable jury, therefore, could not find that Dr. Unkefer's actions amounted to gross negligence sufficient to support a punitive damages claim. Hence, Dr. Unkefer is entitled to summary judgment on that claim.

IT IS ORDERED that

1. Defendant Nathan Paul Unkefer, M.D.'s Motion for Partial Summary Judgment on the Issue of Punitive Damages and Supporting (Doc. 165) is granted; and

2. summary judgment will be entered in favor of Dr. Unkefer on the Count Four punitive damages claim.

_____
UNITED STATES DISTRICT JUDGE