**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

AIMEE BEVAN, as Personal Representative
 of the Estate of Desiree Gonzales, deceased,

      Plaintiff,

v.                                 Case No. 1:15-CV-00073-KG-SCY

GABRIEL VALENCIA, Youth Development
Administrator, Individually, MATTHEW
EDMUNDS, Corrections Officer, Individually,
JOHN ORTEGA, Corrections Officer,
Individually, MOLLY ARCHULETA, Corrections
Nurse, Individually, ST. VINCENT HOSPITAL,
and NATHAN PAUL UNKEFER, M.D.,

      Defendants.

## <u>PRETRIAL ORDER</u>

      THIS MATTER is before the Court pursuant to Fed. R. Civ. P. 16.  The parties conferred

and submit the following Pretrial Order:[1]

## <u>I.  APPEARANCES</u>

Attorneys who will try the action:

For Plaintiffs:                                 Lee R. Hunt, Esq.
                                          Stephen R. Marshall, Esq.
                                        518 Old Santa Fe Trail, #501
                                        Santa Fe, New Mexico 87505
                                        P: (505) 954-4868
                                        F: (505) 819-0022
                                        lee@huntandmarshall.com
                                        steve@huntandmarshall.com

---

[1] This Amended Proposed Pretrial Order supersedes the parties' previous proposed Pretrial Order, Doc. 198, filed 6/9/16.

| | |
|---|---|
| For Defendants Santa Fe County,<br>Gabriel Valencia, Matthew Edmunds,<br>John Ortega, Mark Gallegos and<br>Molly Archuleta (the County Defendants): | Mark E. Komer, Esq.<br>LONG, KOMER & ASSOCIATES, P.A.<br>P. O. Box 5098<br>Santa Fe, NM 87502-5098<br>Phone:  (505) 982-8405<br>mkomer@longkomer.com<br>email@longkomer.com |
| | Jonlyn M. Martinez<br>Law Office of Jonlyn M. Martinez, LLC<br>P. O. Box 1805<br>Albuquerque, NM 87103-1805<br>Phone:  (505) 247-9488<br>jonlyn@jmartinezlaw.net |
| | *Attorneys for the County Defendants* |
| For Defendant Molly Archuleta: | Steven Gonzales, Esq.<br>GONZALES LAW FIRM, LLC<br>3840 Masthead St., NE<br>Albuquerque, NM 87109-4479<br>Phone: (505) 417-3898<br>steve@nmbusinesslaw.com |
| For Defendant Nathan Paul Unkefer, M.D.: | Thomas R. Mack, Esq.<br>Jason T. Yamato, Esq.<br>MILLER STRATVERT PA<br>500 Marquette Avenue, NW<br>Albuquerque, NM 87102<br>Phone: (505) 842-1950<br>tmack@mstlaw.com<br>jyamato@mstlaw.com |

## II. JURISDICTION AND RELIEF SOUGHT

**A. Subject Matter Jurisdiction.**

**1. Was this action removed or transferred from another forum?**  __X__ Yes ____ No.

If yes, was the action removed or transferred?

 __X__  Removed  _____ Transferred

State of New Mexico First Judicial District Court - Original forum

**2. Is subject matter jurisdiction of this Court contested?**

 __X__  Uncontested _____ Contested

**3. Asserted basis for jurisdiction.**

 __X__ Federal Question  _____ Diversity  ___X_ Other

Statutory Provision(s) Invoked:   42 U.S.C. § 1983   and Supplemental Jurisdiction

pursuant to 28 U.S.C. § 1367

**B. Personal Jurisdiction and Venue.**

**1. Is personal jurisdiction contested?**

 __X__  Uncontested _____ Contested

**2. Is venue contested?**

 _____ Uncontested  __X__Contested

Plaintiff filed a motion requesting that the jury trial in this matter occur in Santa Fe,

New Mexico.  The Defendants opposed the motion. The Court ruled to hold the trial in

Albuquerque, New Mexico.  (Doc. 232, filed 11/16/17)

**C. Are the proper parties before the Court?**

 __X__  Uncontested _____Contested

**D. Identify the affirmative relief sought in this action.**

    **1.**     **Plaintiff** seeks damages as allowed under New Mexico law and 42 U.S.C § 1983, including:

        a)    The pain and suffering that Desiree Gonzales suffered in her dying moments.

        b)    The lost value of Desiree Gonzales's life apart from the economic value of her life. Such value includes lost enjoyment of life.

        c)    Damages from the aggravating circumstances of the wrongful death.

        d)    Punitive damages as permitted under relevant federal law.

    **2.**     **Nathan Paul Unkefer, M.D.** does not seek affirmative relief in this action but seeks dismissal with prejudice or judgment in his favor plus recoverable costs. Dr. Unkefer does not claim that any party acted improperly or caused Ms. Gonzales' death, but Dr. Unkefer asserts alternative claims for comparative fault of other parties and nonparties, stated as an alternative defense only.

    **3.**     **The County Defendants** seek dismissal of this action with prejudice and an award of their recoverable costs.

    The parties agree that the Pretrial Order will not be referenced to or referenced before the jury.

### III. BRIEF DESCRIPTION OF NATURE OF CLAIMS/DEFENSES

**A.**     **Plaintiff's claims:**     On May 7, 2014, Nathan Paul Unkefer, M.D. released Desiree Gonzales into the custody of the Santa Fe County Youth Development Program ("YDP"). Desiree was released after one-hour and twelve minutes in the hospital and was released despite the fact that she had been given drugs in the hospital that were known to interact with the opiates that were in her system from an overdose of heroin earlier in the night. Dr. Unkefer released

Desiree with no instructions on her care. She was rushed out of the hospital, even though she was at high risk for the reemergence of the depressant effect of heroin and respiratory depression. The care provided to Gonzales by Dr. Unkefer fell below the standard of care.

When Desiree arrived at the YDP she could not stay awake, could not complete simple tasks and repeatedly retched. The YDP officers recognized that she was weak, lethargic and out of it during the booking process. The YDP had no medical personnel present and performed no assessment of Desiree. Despite staff raising concerns and despite signs of distress, Defendant Valencia accepted Desiree into the YDP.

After Desiree was admitted to YDP, she was taken to her cell area. Defendant Matthew Edmunds immediately recognized that she was not in a normal state of mind, was slurring her speech and had groggy eyes. He called Defendant Archuleta and informed her of his observations. YDP Nurse Archuleta failed to come see Desiree and failed to tell the corrections officers to call 911 or refuse to accept her. Instead, the nurse told the officers to watch Desiree's breathing and to advise her immediately of any concerns. Under these circumstances, the fact that Nurse Archuleta did not make any effort to evaluate Desiree or ensure that she received necessary and critical medical treatment demonstrates that she was unconstitutionally deliberately indifferent to Desiree's serious medical needs.

Desiree eventually went to sleep shortly after 11:15 p.m. Over the next two and a half hours, the clear signs of Desiree's distress escalated. Defendant Edmunds and Ortega observed Desiree having difficulty or trouble breathing, gasping for air, making gurgling noises when she would breathe and periods where she would stop breathing and then gasp for air. None of the guards contacted medical staff, none attempted to provide medical care and no one called 911. Instead, Desiree remained in the holding area until she was found not breathing and with no

pulse.  Such conduct demonstrates that Defendants Valencia, Edmunds and Ortega were deliberately indifferent to Desiree's serious medical needs.

Desiree Gonzales was found lifeless at approximately 1:50 a.m.  Instead of immediately calling 911, the YDP staff called Supervisors to find out what steps to take.  Desiree Gonzales was taken to the hospital where she was pronounced dead in the early morning hours of May 8.  According to the Office of the Medical Investigator, Desiree Gonzales died due to the "Toxic Effects of Heroin".

**B.    Defendants' defenses:**

**1.    Defendant Nathan P. Unkefer, M.D.** is a board-certified emergency medicine physician who has been practicing emergency medicine in Santa Fe since 2007.  Dr. Unkefer provided care and treatment to Ms. Gonzales at Christus St. Vincent Regional Medical Center in Santa Fe.

Dr. Unkefer denies the allegations stated against him, denies allegations of medical malpractice, denies allegations of medical negligence and denies that he caused or contributed to cause any injury or death to Ms. Gonzales.  Dr. Unkefer affirmatively states that at all times relevant he did possess and apply the knowledge and did use the skill and care of a reasonably well-qualified emergency medicine physician practicing in Santa Fe, New Mexico.

Dr. Unkefer encountered Desiree Gonzales in the emergency department at St. Vincent Hospital on May 7, 2014.  Ms. Desiree Gonzales presented having overdosed herself from injecting heroin at an apartment in Santa Fe.  [She was first attended to by her acquaintances at the apartment where she overdosed.  After a 911 call, Ms. Gonzales received care and treatment at the apartment by Santa Fe Fire Department emergency medicine technicians/paramedics who cared for her and transported her to the hospital after reviving her with several doses of Narcan,

also known as Naloxone.]  Narcan doses were given at approximately 1936, 1939 and 1944. After Ms. Gonzales responded to the Narcan the paramedics observed her for a short period of time, and transported to Christus St. Vincent Hospital conscious, alert, oriented and in improved condition.

Upon her arrival at St. Vincent Hospital at approximately 2030, Ms. Gonzales was awake, alert, oriented, angry and agitated.  Narcan reverses the effects of heroin, and its metabolites, and causes heroin users to immediately feel the impact of withdrawal symptoms. Ms. Gonzales was agitated, nauseous, and retching, all consistent with withdrawal symptoms. She was properly attended to and triaged by the nurses in the emergency department, including Nurse Craddock, Nurse Munger and also by Dr. Unkefer who first met Ms. Gonzales in the emergency department at approximately 2040.  He evaluated and examined Ms. Gonzales, initiated a plan of care, and provided care and treatment, all of which was consistent with the requirements of reasonable emergency medicine practice and the standard of care of emergency medicine physicians.  His plan of care included addressing her withdrawal symptoms, including administration of one milligram of Lorazepam (Ativan) for her agitation, administration of Ondansetron (Zofran) for nausea, and noting that the nurses had already provided supplemental oxygen for Ms. Gonzales.  Ms. Gonzales did not require other specific medical interventions in the emergency department but she was observed by Dr. Unkefer and the nurses in the emergency department until her discharge at approximately 2157.

Prior to evaluating Ms. Gonzales for discharge from the emergency department, Dr. Unkefer waited an appropriate period of time to allow the Narcan medication to wear off, and no longer have its effects.  Once the Narcan medication wears off, then the opiates that may remain in Ms. Gonzales' system would no longer be reversed by or blocked by the Narcan and

Ms. Gonzales would reveal if any medications in her system would cause her to need additional medical care and treatment, either in the emergency department or as a patient admitted to the hospital. After the effects of the Narcan wore off Dr. Unkefer was able to fully evaluate his patient to determine if her condition had improved, to determine if she was stable, and if she should be considered for discharge from the emergency department. Dr. Unkefer found that Ms. Gonzales was improved in her condition, she was stable, and she met appropriate criteria for discharge from the emergency department as she no longer required any medical care and treatment in the emergency department and she did not require any other immediate medical care or treatment. She was ready to be discharged according to her condition and according to the applicable standard of care. Ms. Gonzales was alert, oriented, conversational, able to use her cell phone, able to make reasonable decisions about her current wellbeing and met the proper criteria for discharge from the emergency department. She was not suffering from any signs or symptoms of respiratory depression or respiratory distress at the time of discharge.

Discharge from the emergency department was to a Santa Fe police officer because Ms. Gonzales had to be transferred to the Youth Detention Center as instructed by her juvenile probation officer.

Dr. Unkefer discharged his patient into the care of the Santa Fe Police Department officer who in turn transported Ms. Gonzales to the Youth Detention Center. Ms. Gonzales' condition was improved, she was stable for this discharge and stable for this plan of care. She was discharged in the care and custody first of the police officer and later of the officials from the Youth Detention Center. At some point, Ms. Gonzales' condition changed and deteriorated rapidly, unrelated to her overdose of heroin - as she had metabolized the heroin and its metabolites. She developed sepsis from a toxic bronchopneumonia and this illness caused

respiratory depression, cardiac dysrhythmias and she arrested. From the bronchopneumonia and cardiac arrest, she sustained damage to her lungs, her kidney, her liver, and her brain. Ms. Gonzales was attended to by the officials from the Youth Detention Center and a 911 call was made. Santa Fe Fire Department EMS/paramedics arrived and attended to Ms. Gonzales' emergency needs and she was transferred to St. Vincent Hospital at approximately 0237 on May 8. Ms. Gonzales did not regain consciousness, her condition was untreatable as she had sustained an anoxic brain injury due to her respiratory arrest and cardiac arrest. Ms. Gonzales unfortunately and untimely passed away at 0603 on May 8, 2014.

Dr. Unkefer denies any allegations of negligence against him and denies any allegation that he caused or contributed to cause any harm to Ms. Desiree Gonzales. Dr. Unkefer provided proper treatment and care to Ms. Gonzales and she died from a rapidly progressing and aggressive illness in her lungs that took her life unexpectedly and relatively speaking without warning.

Dr. Unkefer takes the position that no individual was negligent or otherwise at fault in attending to Ms. Gonzales' needs, which applies both to her original heroin overdose, treatment at St. Vincent emergency department, and related to her custody at the Youth Detention Center. In the alternative, in the event that other individuals or entities are found to have acted negligently or improperly with such actions causing injury or damages, the claims against Dr. Unkefer should be barred or limited.

2. **The County Defendants** generally deny the plaintiff's allegations of liability under 42 U.S.C. §1983 for deliberate indifference to serious medical needs under the Eighth and Fourteenth Amendments of the United States Constitution. Each County Defendant re-invokes qualified immunity as a complete affirmative defense.

With respect to the deliberate indifference elements, the County Defendants concur that a risk of death satisfies the objective component. The County Defendants maintain and incorporate their previous opposition to plaintiff's claim of the symptom of respiratory distress as distinct objective harm as inconsistent with clearly established law. (*See generally* Doc. 145, filed 4/8/16) The County Defendants further object to multiple claims of objective harm all related to the same underlying medical condition as not recognized by established law. Further, plaintiff conflates the concepts of respiratory depression based on opioid intoxication with respiratory distress, which is an entirely different symptom than respiratory depression and infrequently encountered in the context of an opioid overdose.

As to the subjective component of the deliberate indifference test, each defendant denies that there are facts sufficient to support an inference that any of them could have or in fact did draw an inference that Gonzales was at an obvious risk of immediate death or respiratory distress from complications of drugs that she took or received on May 7, 2018. The exact mechanism of Gonzales death cannot be determined; however, plaintiff's expert claims that her death occurred due to toxic effects of heroin use and that lorazepam was a contributing factor. The County defendants received a medical clearance from an emergency room doctor which contained a recommendation for no further cares. There was no request for medical care by Ms. Gonzales or anyone on her behalf. There is no evidence that any of the individual defendants knew that Gonzales might or did become re-intoxicated from heroin and lorazepam after discharge from the hospital so many hours after the overdose. There is no evidence that any of the individual defendants knew that Gonzales might or did develop respiratory depression or distress from heroin and lorazepam after discharge from the hospital so many hours after the overdose. The County Defendants did not perceive that Gonzales required emergent medical care until she was

found unresponsive at approximately 1:43 am on May 8, 2014, and there was no medical need that would have been obvious to a layperson before that time.

Further, to the extent that plaintiff claims in hindsight that Gonzales exhibited certain symptoms that might be consistent with intoxication from central nervous system depressants such as heroin and lorazepam, such a showing is insufficient as a matter of clearly established law. Under the law in this Circuit, the plaintiff has the burden of showing the defendant knew and disregarded an imminent risk of death and not merely that the detainee was intoxicated. *Martinez v. Beggs*, 563 F.3d 1082, 1089 (2009); *see also Cox v. Glantz*, 800 F.3d 1231, 1250-1252 (10th Cir. 2015) (for purpose of the qualified immunity analysis, plaintiff mush show that each defendant knew of the particularized risk of harm). The fact that a detainee's "symptoms could have also pointed to other, more serious conditions fails 'to create an inference of deliberate indifference'" on the part of the prison medical provider. *Spencer v. Abbott*, 2017 U.S. App. LEXIS 24668 at *32 (citation omitted).

Plaintiff is required to present evidence—not conjecture or speculation—that each of the County Defendants displayed a "conscious disregard of a substantial risk of serious harm." *Spencer* at*33-34. It is undisputed that each of the County Defendants participated in providing for additional precautions for monitoring that Desiree Gonzales during the short time she was at the YDP. Such conduct is inconsistent with deliberate indifference under clearly established law. Each Defendant reasserts their contentions in support of qualified immunity and summary judgment. (Docs. 164, 166, 204, 206)

Finally, the County Defendants further deny that any alleged civil rights violation caused Desiree Gonzales' death and further claim that the conduct of others, including the decedent's, set in motion the events leading her demise. The County Defendants deny that Gonzales

experienced any conscious pain and suffering as alleged by plaintiff. The County Defendants intend to introduce evidence concerning Desiree Gonzales medical and developmental history on the issue of claimed damages.

### IV.  FACTUAL CONTENTIONS UNDERLYING CLAIMS/DEFENSES

**A.      Stipulated Factual Contentions.**

The parties agree to the following facts listed separately below:

The parties stipulate to personal jurisdiction and subject matter jurisdiction as stated herein.

Plaintiff Aimee Bevan is personal representative of the wrongful death estate of Desiree Gonzales. Janel Gonzales, Julian Baca and Waldo Anaya contend that they are beneficiaries under the New Mexico Wrongful Death Act.

Dr. Unkefer owed a duty to care for and treat Ms. Gonzales in the emergency department at the Christus St. Vincent emergency department.

Dr. Unkefer is a qualified medical provider under the Medical Malpractice Act.

Janel Gonzales is Desiree Gonzales' mother.

Julian Baca helped raise Desiree Gonzales.

Waldo Anaya is the biological father of Desiree Gonzales.

Desiree Gonzales was a minor at the time of her death.

Desiree Gonzales' date of birth was April 14, 1997 and she was 17 years old at the time of her death.

The parties stipulated to the authenticity and admissibility of Desiree Gonzales' medical records, subject to the pending motions in limine.

The parties stipulate that Gabriel Valencia, Matthew Edmunds, John Ortega and Molly

Archuleta were Santa Fe County employees, acting under color of law.

**B.      Contested Material Facts.**

**Plaintiff's Contentions:**

**Dr. Unkefer was aware of Desiree's serious medical condition but did not provide her with appropriate treatment and, instead, rushed her out of the ER.**

1.    On May 7, 2014, the Santa Fe Fire Department and Police Department responded to a 911 call relating to 17-year-old Desiree Gonzales.

2.    Desiree had taken heroin and was given Narcan (a drug that reverses the effects of heroin) by the EMTs to counteract the effects of the overdose.  After the fourth dose, Desiree woke up.  The final Narcan dose was given at 7:44 p.m. according to the EMT records.

3.    After Desiree was stabilized, she was transported to Christus St. Vincent Regional Medical Center.  Desiree was first seen in the Emergency Department at 8:40 p.m. Her ER doctor was Defendant Nathan Paul Unkefer, M.D.

4.    In the initial presentation, she was noted to have nausea and vomiting and she was slightly anxious.

5.    Dr. Unkefer prescribed Desiree various medications, including Ativan or lorazepam.

6.    Lorazepam is a benzodiazepine with central nervous system depressant effects.

7.    At various times during her observation, Ms. Gonzales exhibited unstable vital signs, including a high pulse and below-normal oxygen saturation levels.

8.    Due to her low oxygen levels, Desiree was placed on supplemental oxygen.

9.    Desiree Gonzales was observed to have difficulty breathing and chest pain in the hospital.

10.   Desiree was kept in the Emergency Department from 8:40 p.m. to 9:52 p.m. – a total of one hour and twelve minutes.

11.   At discharge, vitals were barely at a level considered normal, including a 99 pulse -- 100 is considered abnormal.  Additionally, at discharge, Desiree had been on room air oxygen for approximately 11 minutes.

12.   At 9:52 p.m., Ms. Gonzales was discharged from St. Vincent to police custody.  In the medical clearance form, Dr. Unkefer wrote that Desiree's recommended

treatment was "no further cares".

13. In his discharge instructions to Desiree Gonzales, Dr. Unkefer wrote, "don't do drugs."

14. As Ms. Gonzales's doctor, Dr. Unkefer could have made the decision to monitor her in the emergency room for longer than 2 hours. However, instead, he admits that he "cut it close" and monitored Ms. Gonzales for the minimum amount of time possible (according to his standard of care).

15. Dr. Unkefer "cut it close" despite the fact that: (a) Ms. Gonzales' overdose "was rather a severe overdose," (b) Ms. Gonzales was "comatose" and "near death" immediately after her overdose, (c) Ms. Gonzales was described as "not breathing" and had an oxygen saturation of 7% when she was first seen by emergency responders, (d) the period of time that Ms. Gonzales was not breathing after her overdose could have caused damage to her organs and brain, (e) his "big concerns" during Ms. Gonzales' admission were "[r]espiratory difficulties [and] re-toxicity," and (f) the only set of vital signs that were taken during the admission that showed that Ms. Gonzales' vitals were within the normal range were the vital signs taken at 2148 (4 minutes before discharge).

16. In addition, Dr. Unkefer discharged Ms. Gonzales: (a) after he ordered Ativan (a/k/a lorazepam) for Ms. Gonzales at the time of admission, (b) he understood that lorazepam could add to the effect of the morphine and potentiate any narcotic still in the body, (c) he understood that Narcran did not have an effect on lorazepam, (d) he understood that lorazepam can depress the respiratory system, and (e) he was aware that a risk of adding lorazepam to her system was "ongoing respiratory depression."

17. At 9:52 p.m., Ms. Gonzales was discharged from St. Vincent to police custody. Desiree's recommended treatment included instructions on the signs of distress and when to bring Gonzales back to the hospital. The instructions were provided to the YDP, specifically Defendant Valencia and are included in the jail records. The instructions read:

    - Return to the ED at any time if symptoms worsen or do not improve.
    - The signs and symptoms of heroin use include:
      drowsiness
      Respiratory depression (which can progress until breathing stops.)

**Desiree should not have been accepted at YDP and instead should have been sent back to the hospital.**

18. Desiree arrived at the Santa Fe Youth Development Program and was booked in at 10:35 p.m.

19.    Defendant Valencia and Esmeralda Coronado were the YDP staff who participated in Desiree's booking.

20.    Ms. Gonzales dry heaved or retched numerous times during the 30 minutes that she was in the booking area.

21.    According to Ms. Coronado, "Intake Gonzales was responsive, however, was nodding in and out of sleep: she seemed very tired and weak."

22.    Officer Coronado documented on her Incident Statement that Desiree attempted to sign the intake documents and "was not able to stay awake long enough to write her name".

23.    Desiree did not complete the normal paperwork required of YDP intakes and was unable to sign her name or initial *any* of the paperwork.

24.    Santa Fe County Public Safety Director Pablo Sedillo confirmed with Ms. Coronado that the staff "had some concerns" and that Desiree Gonzales "couldn't even sign a document."

25.    In her Deposition, Coronado admitted that: (a) no medical screening was done, (b) the facility medical screening form was not used, and (c) the medical clearance from the hospital replaced the on-site medical screening.  In addition, Ms. Gonzales was not placed under constant observation pursuant to the YDP intoxication and withdrawal policy, which states, "Juveniles who are at risk for progression to a more severe level of intoxication or withdrawal are kept under constant observation when severe withdrawal symptoms are observed."

26.    After leaving the intake area, Desiree came into contact with Defendant Edmunds.

27.    Defendant Edmunds wrote in his Incident Statement that he "immediately came to the conclusion" that Ms. Gonzales was "not in a normal state of mind.  Her eyes looked groggy and her speech was slurred."

28.    Due to his concerns about a new intake who had just come from the hospital after a severe heroin overdose and who was in distress, Defendant Edmunds called the YDP Nurse – Defendant Archuleta.

29.    Defendant Edmunds informed Defendant Archuleta of Gonzales's "state", i.e., not in a normal state of mind, slurring her speech and groggy eyes.

30. Nurse Archuleta instructed Defendant Edmunds to "keep a very close eye on her during the night, monitor her breathing and let me know immediately if you have any concerns."

31. Defendant Edmunds discussed with Defendant Ortega and Defendant Valencia that they were to closely monitor Desiree Gonzales's breathing and were to "immediately" notify medical personnel with any concerns or any changes.

32. Desiree was placed in a bed on the floor of the Anasazi Pod – the bed is called a "boat".

33. Desiree laid down to go to sleep shortly after 11:15 p.m.

34. Defendants Edmunds and Ortega conducted 15-minute checks on the residents in the C-Pod. For the four residents in the C-Pod, the "checks" averaged less than 45 seconds. During many of the checks, Defendants did not even look at Gonzales.

35. YDP Warden Gallegos sharply criticized the ineffectiveness of the checks stating, "I looked at the logs and you're telling me you did the whole facility in one minute. That means you went to every single door to see living, breathing, flesh rising up and down, okay, and that took one minute, all right, for the whole facility. That's a no-go."

**Defendant Edmunds observed clear signs of Desiree Gonzales's serious medical condition and her declining health**

36. During a debriefing on the day Desiree died, Matthew Edmunds stated "Desiree Gonzales was having trouble breathing but resident never made statement that she was unable to breathe".

37. In his Incident Statement, Edmunds documented that he observed "Unusual breathing."

38. Matthew Edmunds went to the hospital with Desiree Gonzales after she was found unresponsive. While at the hospital, he spoke with Emergency Room personnel, including, Dr. Best. The hospital records document Matthew Edmunds's statement as follows:

    Per jail: Pt arrived @ 2235 and booked. Pt. was "out of it" and would stop breathing and gasp for air since 2300.

Pt was noted to have "trouble breathing" where she would stop breathing then have a gasping, respiration @ approx. 11p, by Jail Staff Matthew Edmunds. Dr. B confirmed per guard.

(Edmunds) noted that (Gonzales) was having difficulty breathing, at times gasping for air and making gurgling noises. He states that he notified his supervisor, however did not notify any medical personnel.

39. Edmunds later spoke to Dr. Prock, the intensive care doctor who was attempting to save Desiree Gonzales's life.

40. Dr. Prock spoke with Defendant Edmunds to understand Desiree Gonzales's situation so that she "could best take care of her." Further, Dr. Prock testified that this conversation was part of her diagnosis and treatment of Desiree Gonzales.

41. Dr. Prock testified that Defendant Edmunds:

they had put her in her cell at around 11:00 at night. He told me that at some point shortly thereafter, the exact time he did not say, that he noted that she was having difficulty breathing. And I remember asking him, "Okay, describe that for me. What was going on?"

And he used the words "gurgling and gasping for air." I asked him if he had notified anybody about that, and he said he had notified his supervisor. I asked if he had notified any medical personnel or called 911, and he said, No."

42. Edmunds informed the investigating officer from the Santa Fe Police Department that Desiree appeared to be having breathing difficulties so he kept checking on her.

43. Despite the observations of difficulty breathing, Defendant Edmunds failed to ever wake Desiree up or check to see if she was coherent.

44. Defendant Edmunds, despite having concerns about Desiree's difficulty breathing and despite being told by Nurse Archuleta to call medical if he observed any change in Desiree's breathing, failed to call medical personnel.

**Defendant Ortega was aware of Desiree Gonzales's struggle to breathe**

45. Defendant Ortega filled out an original witness statement and wrote that Desiree "was gasping for air around 12:30 a.m."

46. Defendant Ortega was questioned about what he did in response to finding Desiree breathing awkwardly. He was specifically asked whether he tried to talk to her to see if she was responsive. Defendant Ortega told supervisors that she was not responsive to questions and there was no dialogue.

47. Instead of waking Desiree or checking on her health and safety, Defendant Ortega stated that "He (Edmunds) shook her once."

48. Defendant Ortega understood that the YDP staff had been instructed by medical staff to keep close observation of Desiree.

49. Defendant Ortega testified that he understood that difficulty breathing was a serious condition and it was one that required him to call medical personnel or 911.

**Defendant Valencia, as supervisor, failed to respond to clear signs of Desiree Gonzales's medical emergency**

50. Defendant Valencia was the supervisor in charge on May 7-8. Defendant Valencia was present during the booking process and was the person who authorized Desiree to stay at the YDP.

51. During the time that Defendant Valencia was in the booking area, he was aware of Desiree's condition, including her inability to stay awake and the fact that she had nausea and was heaving or retching into a trash can on multiple occasions.

52. Defendant Valencia was asked by Ms. Coronado whether it was safe to keep Desiree at the YDP. Ms. Coronado had concerns that she expressed to Valencia.

53. Defendant Valencia instructed Ms. Coronado to stop the intake process after Desiree Gonzales could not sign the required paperwork.

54. Defendant Valencia was present at Desiree's bedside during the time between her last communication with the guards when she went to sleep and when she was found lifeless.

55. At 23:55:38, all three guards, Mr. Valencia, Mr. Edmunds and Mr. Ortega, walked directly to Desiree. Because she is off camera, she is difficult to see. The only real measure that can be seen is it appears that they shake Desiree.

56. Defendant Valencia knew that heroin overdose could cause difficulty breathing and specifically was aware that Desiree was at risk due to breathing difficulty.

57. Defendant Valencia was required to call 911 if a resident was observed to have *any* effects of drugs or alcohol.

58. Defendant Valencia testified that he knew his response was to call medical if anyone reported that a resident had trouble breathing.

59. Defendant Valencia was told that Desiree Gonzales was found not breathing. Instead of immediately calling 911, Mr. Valencia called the YDP director Renee Fernandez. Only after Fernandez authorized Mr. Valencia to call 911 did he actually make the necessary call for medical services.

**Desiree Gonzales was found lifeless three and a half hours after arriving at the YDP**

60. At 1:43, Defendant Edmunds found Gonzales not breathing. Rather than immediately call 911, Defendant Edmunds left an unresponsive resident and finished his unit check.

61. Five minutes after Desiree was found unresponsive and not breathing, Defendant Edmunds returns and calls for help.

62. At approximately 1:52, Desiree was found unresponsive, not breathing and had no pulse.

63. During Ms. Gonzales's second hospitalization, many different measures were attempted to revive and maintain blood pressure and normal breathing. Despite multiple rounds of CPR and multiple attempts to maintain Ms. Gonzales's pulse, she died. She was pronounced dead at 6:03 a.m. on May 8, 2014.

64. An autopsy was performed and the Office of Medical Investigator determined that the cause of death was "toxic effects of heroin."

65. In addition, the OMI wrote:

> It appeared based on statements from the involved staff at the Santa Fe County Youth Development Center, that *the decedent was exhibiting features of central nervous system depression during and after her intake into the facility.* This likely represented recurrent central nervous system depression after the reversal effects of the Narcan had worn off.

66. Desiree Gonzales would have survived if she had remained in the hospital on May 7, 2014.

67.   Desiree Gonzales would have survived if she had been returned to the hospital when she was found to initially exhibit the signs of decreased mental acuity; she also would have survived if she had been returned after exhibiting the initial signs of respiratory distress.

68.   Defendant Nathan Paul Unkefer was negligent in the treatment of Desiree Gonzales. The negligence included, but is not limited to, inadequate monitoring, failure to obtain informed consent, inadequate policies and procedures, inappropriate discharge and failure to adequately advise regarding discharge instructions.

69.   Defendants Edmunds, Valencia, Ortega, and Archuleta were deliberately indifferent to the risks to Desiree Gonzales health and safety. All defendants knew the potential risk to health caused by the effects of heroin and all were indifferent to the signs and symptoms demonstrated by Gonzales. The deliberate indifference resulted in an unconstitutional delay in medical care that caused Desiree Gonzales's death.

70.   The conduct of the individual defendants rises to the level of malicious, oppressive or in reckless disregard of the Desiree Gonzales's rights, thereby entitling Plaintiff to punitive damages.

**Defendant Nathan Unkefer. M.D.'s Contentions:**

1.     Dr. Unkefer provided care and treatment of the patient only during the time that she was in the Christus St. Vincent emergency department on May 7, 2014;

2.     Dr. Unkefer's medical decision making including his evaluation, assessment, plan of care, and treatment provided to Ms. Gonzales meets or exceeds the requirements of the standard of care for an emergency medicine physician in this context and Dr. Unkefer did not breach the standard of care;

3.     Dr. Unkefer did not cause or contribute to cause any injury or death to Ms. Gonzales;

4.     Plaintiff's statutory beneficiaries have entered into a bargained for exchange to distribute the proceeds with this lawsuit;

5.      The contract between Plaintiff's statutory beneficiaries and parents is at least potentially contrary to New Mexico law which may need to be addressed post trial, although not during trial;

6.      Desiree Gonzales failed to exercise ordinary care for her own health and safety on May 7, 2014;

7.      Janel Gonzales, Waldo Anaya or Julian Baca were negligent in their duties to Desiree Gonzales and such negligence was a cause of the claimed injuries and damages asserted in this case;

8.      Whether any co-defendant was negligent in regard to any duty such co-defendant owed to Desiree Gonzales, and whether such negligence was a cause of the claimed injuries and damages asserted in this case;

9.      Desiree Gonzales failed to mitigate her damages; and

10.     If any co-defendant was negligent, the percentage of their respective comparative fault.

Dr. Unkefer further incorporates herein all his claims and defenses and factual contentions set forth in the pleadings he has filed in this matter, including, but not limited to his Answer and briefing in relation to Motions for Summary Judgment.

**County Defendants' Contentions:**

Shortly after 10:00 p.m. on May 7, 2014, Desiree Gonzales arrived in the custody of the City of Santa Fe Police Department to the Santa Fe Youth Development Program (YDP) to be detained pursuant to a judicial warrant issued for a probation violation. She had previously been arrested in February 2014 for violating probation by "going on the run" for several months and was facing a commitment at the YDDC. In March 2014, the Santa Fe Detention Center referred

her to the Desert Hill Residential Program, and she absconded on April 12, 2014. Her whereabouts over the next three weeks are unknown although she did have contact with Waldo Anaya during this time. She apparently overdosed on IV heroin sometime around 7:00 p.m. on May 7, 2014, and police officers and medical personnel were summoned and took her to Christus St. Vincent's Hospital.

Following discharge from the Hospital, the police officers transported her to the YDP and presented YDP staff with a medical clearance from St. Vincent's Hospital indicating that Ms. Gonzales had overdosed on heroin earlier in the evening, that she had received evaluation and medical treatment and that she was medically fit for admission into the YDP. In the section entitled Recommended Treatment and Medication, the clearance stated "No further cares." Based on the information provided, YDP staff understood that any medical needs of Ms. Gonzales had been evaluated and accounted for during her admission to the hospital. At no time did Ms. Gonzales, her probation officer or parents request any medical care or medical attention on her behalf.

Ms. Gonzales was formally booked into the facility at 10:35 p.m. on May 7, 2014. From the time of booking, she remained in the facility for approximately 3 hours and 10 minutes when, at approximately 1:45 a.m., YDP staff determined that she was unresponsive and required immediate medical assistance. YDP staff called 911, and EMTs from the Santa Fe County Fire Department provided emergency care on the scene and ultimately transported her back to St. Vincent's Hospital a little after 2:00 a.m. in the early morning of May 8, 2014.

During the 3 hours that Gonzales was at the YDP, the individual YDP staff defendants encountered her at different times under different circumstances. There is video evidence depicting Gonzales at various times. Defendant Gabriel Valencia encountered her during the

initial booking process. He had several cogent discussions with Ms. Gonzales, including a conversation about Gonzales' concern over a YDDC commitment. He observed that she was able to walk, talk, follow his directions and was oriented to time and place. Valencia discerned that Gonzales appeared exhausted from earlier events in the day, which is not an uncommon occurrence with juveniles admitted to the YDP. To accommodate her, he agreed for her to finish the intake booking paperwork in the morning. He also concurred with arrangements for special precautions for monitoring her at the YDP that evening, including placing her in a portable bed in the immediate vicinity of 2 on-duty YDP staff members who could monitor her continuously. At no point did Valencia determine that Ms. Gonzales was at risk of imminent death or harm, nor was he deliberately indifferent to her medical needs.

Nurse Molly Archuleta had no direct interaction with Gonzales. At approximately 11:09 p.m., while Gonzales was on the telephone conversing with her mother Janel Gonzales, Defendant Matthew Edmunds called Nurse Archuleta, advising that Gonzales arrived at the YDP directly from St. Vincent's hospital, that she had overdosed on heroin and received Narcan. Edmunds told her that Gonzales had a medical clearance from St. Vincent's hospital, signed by a doctor, that indicated that Gonzales was "medically cleared" for jail. Nurse Archuleta asked Edmunds to read the hospital clearance to her, and Edmunds complied. The clearance stated Gonzales' vital signs, physical exam and mental status were all "Normal". The clearance further indicated that Gonzales was "observed x2 hrs, still A&O". Edmunds asked what "A&O" meant. Nurse Archuleta said it means alert and oriented. She asked Edmunds if Gonzales was alerted and oriented, and he responded "yes" she was. Edmunds further read that a section of the hospital clearance entitled "Recommended Treatments &/or Medications", the doctor wrote "No further cares" for Gonzales. The clearance did not state that Gonzales had been administered the

Ativan (lorazepam) that Plaintiff contends potentiated opiates in Gonzales' body. Edmunds did not tell Nurse Archuleta that Gonzales had any difficulty with respiratory function, and at that time, Edmunds had not made any observations about Gonzales' breathing. During Gonzales' brief interaction with Edmunds prior to his call to Nurse Archuleta, Gonzales did not communicate to Edmunds that she did not feel well. Nurse Archuleta denies that she received any information that led her to believe that Gonzales was at imminent risk of death or harm. Mr. Edmunds did not request any medical care by Nurse Archuleta or ask her to come into the facility. Further, Nurse Archuleta understood that Gonzales's medical needs had been assessed and provided for at the hospital by a doctor shortly before she arrived at the YDP. Nurse Archuleta participated in the decision to have Gonzales sleep in a bed near YDP staff members for monitoring and accordingly made special arrangements to provide for her observation and care that evening. Nurse Archuleta was not deliberately indifferent to Gonzales's medical needs.

Defendant Matthew Edmunds encountered Gonzales at approximately 11:00 p.m. that evening shortly before his telephone call to Nurse Archuleta. Edmunds was aware from the medical clearance that Gonzales had overdosed on heroin. Edmunds understood that Gonzales's medical needs had been assessed and addressed by providers at St. Vincent Hospital and that she had been medically cleared. He had no information that suggested that Gonzales was at imminent risk of death or harm. Edmunds attended to Gonzales' needs in multiple ways by contacting Nurse Archuleta to ask questions about terms on the medical release and then participating in the decision to take special precautions to monitor her condition that evening. Edmunds arranged from Gonzales to sleep on a portable bed, known as a boat, in the Anazai dayroom as opposed to a cell with a closed door. The boat was placed near the desk and window to facilitate close observation; also the door was left open to the dayroom so that Edmunds and

other staff members could hear into the dayroom.

Gonzales went to bed shortly before 11:30pm. Edmunds and his worker John Ortega conducted regular 15-minute unit checks in the facility and more frequent checks of Gonzales as they could readily observe her from his location at the desk. Edmunds was able to hear her breathing in the portable bed. She appeared to be sleeping. Based on his training, Edmunds watched Gonzales' breathing to ensure that her chest was rising and falling. He perceived that she was snoring loudly. He did not perceive that her breathing was a medical emergency. He did not perceive that she had an imminent risk of death or harm. He was not deliberately indifferent to her medical needs.

At approximately 1:43 a.m., Edmunds discerned that Gonzales had become unresponsive, and he made appropriate arrangements to summon 911 and resuscitate her. There is no evidence that any of Edmunds' conduct after approximately 1:43 in the morning would have made any difference to Ms. Gonzales's outcome.

Defendant John Ortega was a YDP staff member present with Edmunds during the evening. He had limited interaction with Gonzales and did not discern a medical emergency or that she was somehow at risk from imminent death or harm. Ortega participated in the decision of monitoring of Gonzales and participated in the initial resuscitation attempt. There is no evidence that he was aware of and indifferent to any serious medical need before Gonzales became unresponsive.

In relation to the plaintiff's damages claims, Desiree Gonzales' medical and development records, particularly from ages 10 through 17, confirm a significant history of delinquency, repeatedly breaking the law, truancy, absconding from home and treatment facilities. She regularly used various addictive drugs including heroin, methamphetamine, alcohol, suboxone

and had previously overdosed on heroin. The developmental history indicates that her parents Janel Gonzales as well as Julian Baca and Waldo Anaya significantly contributed to and enabled Gonzales's behaviors. The medical and developmental history is relevant and probative on plaintiff's claims for damages.

## V.  APPLICABLE LAW

**A.    Do the parties agree which law controls the action?**

   **X**   Yes      _____   No

**If yes, identify the applicable law.**  As to the claims against the County Defendants 42 U.S.C. § 1983, the Eighth Amendment and the Fourteenth Amendment to the United States Constitution.  As to the claims against Dr. Unkefer, the New Mexico Medical Malpractice Act and New Mexico common law.

## VI.  CONTESTED ISSUES OF LAW

**Identify the specific issues of law which are contested.**

**1.**    Plaintiff – The main issues of contested law include the issues previously set forth in the various motions for summary judgment.  Additionally, motions *in limine* have been filed.

**2.**    Defendant Nathan Paul Unkefer, M.D. claims that to the extent that any of the individual County Defendants are found to have violated Ms. Gonzales' civil rights – which is something that Dr. Unkefer does not assert or believe happened – such a finding would bar the claims against Dr. Unkefer as a matter of law and in the alternative such a finding would bar or limit the claims against Dr. Unkefer, according to the doctrine of comparative fault.

**3.**    The County Defendants contend that they are entitled to qualified immunity as a matter of law, and that the plaintiff lacks sufficient evidence to show deliberate indifference on the part of each of them. The County Defendants reserve their tender of expert Cheryl Wills,

M.D.

# VII.  MOTIONS

**A.** **Pending Motions (indicate the date filed):**

**1.** **Plaintiff**

- Motion in Lime to Exclude Cumulative Expert Testimony (7/13/18) (No. 273)

- Motion in Limine to Exclude Evidence and Argument Re D. Gonzales's Parents Actions After Her Death (7/13/18) (No. 274)

- Motion in Limine to Limit Testimony of G. Vilke (7/13/18) (No. 275)

- Motion in Limine to Exclude Unkefer's Testimony on Cause of Death (7/13/18) (No. 276)

- Motion in Limine Re Defendant Santa Fe County's Expert Witness (7/13/18) (No. 277)

- Motion in Limine to Exclude Identification of Beneficiaries (7/15/18) (No. 281)

- Motion in Limine to Exclude Evidence of D. Gonzales Alleged Abuse (7/15/18) (No. 282)

**2.** **Defendants**

**Defendant Nathan Paul Unkefer, M.D.:**

Dr. Unkefer's Motion *in Limine* to Bar Testimony Regarding Video Surveillance, filed 7/10/18 [DOC 261];

Dr. Unkefer's Motion *in Limine* Regarding Questions to Dr. Unkefer Related to Subsequent Events, filed 7/10/18 [DOC 260];

Dr. Unkefer's Motion *in Limine* to Bar Questions of Dr. Unkefer Regarding Learned Treatises, filed 7/10/18 [DOC 259];

Dr. Unkefer's Motion *in Limine* to Bar Testimony and Evidence Related to Hospital Policies and Procedures, filed 7/10/18 [DOC 258];

Dr. Unkefer's Motion *in Limine* to Preclude Duplicative and Cumulative Expert Witness Testimony, filed 7/10/18 [DOC 257];

Dr. Unkefer's -Motion for Withdrawal and Substitution of Counsel, filed 5/1/18 [DOC 250].

**County Defendants:**

> Motion *in Limine* to Exclude Testimony of Plaintiff's Proffered Liability Experts Wiseman and Cohen, filed 7/13/18 [Doc. 280];
>
> Motion *in Limine* Concerning Expert Testimony About Video Evidence, filed 7/13/18 [Doc 279];
>
> Motion for Clarification Concerning Cheryl Wills, filed 8/1/18 [Doc 293].

**B.    Motions which may be filed: None at this time**

## VIII.  DISCOVERY

**A.    Has discovery been completed?        X      Yes _____  No**

## IX.  ANTICIPATED WITNESSES

*Each party is under a continuing duty to supplement this list and the description of anticipated testimony.  This does not, however, apply to a rebuttal witness.  Indicate if the witness will testify in person or by deposition and include a brief description of the anticipated testimony.  If the testimony is by deposition, identify the deposition by page number and line number.  A witness who has not been identified and whose testimony has not been disclosed may not testify at trial unless good cause is shown.*

**A.    Plaintiff's Witnesses:**

Plaintiff will or may call or have available at trial the following witnesses:

**Gabriel Valencia (Will Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Mr. Valencia may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during his deposition.

**Matthew Edmunds (Will Call)**
**c/o Mark E. Komer**
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Mr. Edmunds may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during his deposition.

**John Ortega (Will Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Mr. Ortega may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during his deposition.

**Molly Archuleta (Will Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Ms. Archuleta may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during her deposition.

**Esmeralda Coronado (Will Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Ms. Coronado may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during her deposition.

**Renee Fernandez (May Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Ms. Fernandez may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during her deposition.

**Mark Gallegos (May Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405

Mr. Gallegos may testify to the events relevant to the allegations giving rise to the Complaint. The witness may also testify to the issues covered during his deposition.

**Pablo Sedillo (May Call)**
c/o Mark E. Komer
Long, Komer & Associates, P.A.
P. O. Box 5098
Santa Fe, NM 87502-5098
(505) 982-8405
Mr. Sedillo may testify to the events relevant to the allegations giving rise to the Complaint.

**Office of Medical Investigators (May Call)**
**Sam Andrews, M.D.**
1 University of New Mexico
Albuquerque, NM 87131-0001
(505) 272-3053

Dr. Andrews performed the autopsy on Desiree Gonzales and will testify consistent with the OMI Autopsy Report.

**Dr. Meher Best (May Call)**
455 St. Michaels Dr.
Santa Fe, NM 87505

Dr. Best may testify to his treatment of Desiree Gonzales and his interactions with YDP staff during his treatment.

**Dr. Nathan Unkefer (May Call)**
c/o Thomas R. Mack, Esq.
Miller Stratvert P.A.
PO Box 25687
Albuquerque, NM  87125

Dr. Unkefer may testify to his treatment of Desiree Gonzales.  Dr. Unkefer will also

testify regarding the issues covered during his deposition.

**Ann Munger, RN (May Call)**

Ms. Munger may testify to her interactions with and treatment of Desiree Gonzales and her interactions with YDP staff during treatment. The witness may also testify to the issues covered during her deposition.

**Dr. Terasa Prock (May Call)**
National Jewish Health
1400 Jackson Street
Denver, CO 80206
603-667-8630

Dr. Prock may testify to her interactions with and treatment of Desiree Gonzales and her interactions with YDP staff during treatment. The witness may also testify to the issues covered during her deposition.

**Robert Henry, M.D. (Will Call)**
5 Satellite Court
Tijeras, NM 87059

Dr. Henry will testify consistent regarding the issues covered in his Expert Witness Report and deposition.

**Michael D. Cohen, M.D. (Will Call)**
160 Spring Street
Saratoga Springs, NY 12866

Dr. Cohen will testify consistent regarding the issues covered in his Expert Witness Report and deposition.

**Don C. Fisher, M.D., M.S. (May Call)**
5600 Wyoming Blvd., NE, Suite 210-B
Albuquerque, NM 87109

Dr. Fisher will testify consistent regarding the issues covered in his Expert Witness Report and deposition.

**Andrea Weisman, Ph.D. (May Call)**
Juvenile and Correctional Mental Health Consultant
DOJ Certified PREA Auditor
3920 Livingston Street, N.W.
Washington, DC 20015

Dr. Weisman will testify consistent regarding the issues covered in his Expert Witness Report and deposition.

**Santa Fe Police Department Officers: Maria Tena; Ricky Chavez; Isaiah Bryce; Debora Anaya; and Nick Chavez.**

2515 Camino Entrada
Santa Fe, NM 87507

Maria Tena, Ricky Chavez, Isaiah Bryce, Debora Anaya and Nick Chavez are expected to testify regarding their knowledge of their interactions and observations of Ms. Gonzales on May 7 and 8, 2014, and any prior knowledge or interactions they may have had regarding Desiree Gonzales.

**Kerri Craddock, RN (May Call)**

Ms. Craddock may testify to her interactions with and treatment of Desiree Gonzales and her interactions with YDP staff during treatment. The witness may also testify to the issues covered during her deposition.

**Janel Gonzales (Will Call)**
c/o Lee Hunt
Hunt & Marshall
518 Old Santa Fe Trail, #501
Santa Fe, NM 87505
(505) 954-4868

Ms. Gonzales may testify regarding who Desiree Gonzales was as a person and her interactions on May 7-8, 2014, including interactions at the hospital and with the YDP.

**Julian Baca (May Call)**
c/o Lee Hunt
Hunt & Marshall
518 Old Santa Fe Trail, #501
Santa Fe, NM 87505
(505) 954-4868

Mr. Baca may testify regarding who Desiree Gonzales was as a person.

**Stephanie Anaya (May Call)**
Address and phone number to be provided

Ms. Anaya may testify regarding who Desiree Gonzales was as a person and her relationship with Desiree.

**Rebuttal Witnesses as needed.**

**Any witness necessary to establish the authenticity or admissibility of any exhibit.**

**B.    Defendants' Witnesses:**

**Defendant Nathan Paul Unkefer, M.D., will call or have available at trial the**

following witnesses:

**Nathan Paul Unkefer, M.D.,** who may testify in person about his care and treatment of Ms. Gonzales, along with information about his background and training.

**Christian Sloane, M.D.,** who may testify in person about his expert review and expert opinions.

**Steven Pike, M.D.,** who may testify in person about his expert review and expert opinion.

**The County Defendants may call:**

**Roy T. Gravette**
126 Playfair Drive
Lafayette, Louisiana 70503
361-742-2500

Mr. Gravette will testify consistent with the substance of his expert report and CV.

**Lori Roscoe, Ph.D., MSN**
Correctional Healthcare Consultants
3990 Bullard Road
Monticello, GA 31064
(706) 468-1578

Dr. Roscoe will testify consistent with the substance of her expert report, CV and deposition.

**Gary M. Vilke, M.D., FACEP, FAAEM**
11279 Breckenridge Way
San Diego, CA 92131.

Dr. Vilke will testify consistent with facts and opinions in his expert report, CV and deposition

**Cheryl D. Wills, M.D.**
4247 Wilson Mills Road, #452
Cleveland, OH 44143.

The County Defendants may formally tender Dr. Wills in the absence of the jury for an in

person or written offer of proof concerning her expert testimony. In the alternative, the County Defendants tender Dr. Wills as a factual summary witness concerning her review of Desiree Gonzales Medical, Treatment and Development records; the summary is generally set forth in the Case Summary section of her report.

**Any of the Defendants in this matter may call any of the following witnesses:**

**Any of the witnesses that the plaintiff has listed above.**

**Ms. Gonzales's healthcare providers from St. Vincent Hospital, including, but not limited to, Gina Robey, RN; Andrea Freeland-Divan, RN; Russel LeFevre, RN; and Suzanne Scharn, RN.**

c/o Jennifer Anderson
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Post Office Box 2168
Albuquerque, NM 87103-2168

These healthcare providers are expected to testify regarding their care and treatment of Ms. Gonzales, and their knowledge of Ms. Gonzales's condition at all times they were treating her, and the records they maintained for Mrs. Gonzales.

**Santa Fe Police Department Officers: Maria Tena; Ricky Chavez; Isaiah Bryce; Amanda Esquibel; Debora Anaya; and Nick Chavez.**

Maria Tena, Ricky Chavez, Isaiah Bryce, Debora Anaya and Nick Chavez are expected to testify regarding their knowledge of their interactions and observations of Ms. Gonzales on May 7 and 8, 2014, and any prior knowledge or interactions they may have had regarding Desiree Gonzales, Janel Gonzales, Waldo Anaya or Julian Baca. Amanda Esquibel may testify regarding the events identified in her report of July 12, 2012 and facts related thereto, including Desiree Gonzales' actions, words and conduct and that of Janel Gonzales, Waldo Anaya and Julian Baca.

**City of Santa Fe Fire Department EMS Providers: Michael Martinez, EMT-P; Jeremy Martinez, EMT-B; Adam or Adan Lopez, EMT-P; Danny Maldonado, EMT-B; Dham Khalsa; Dustin Ballew; Scott Ouderkirk ; Brian Kennedy; Ross Haney**

Santa Fire Department Headquarters
PO Box 909
Santa Fe, NM 87504

These healthcare providers are expected to testify regarding their care and treatment of Ms. Gonzales, and their knowledge of Ms. Gonzales's condition at all times they were treating her, and the records they maintained for Mrs. Gonzales.

**Danielle Mares**
1419 Zepol Road #305
Santa Fe, NM

Ms. Mares may testify regarding her knowledge of the events leading up to Desiree Gonzales' overdose and the arrival of police and EMS, as well as her knowledge of Ms. Gonzales as it pertains to Plaintiff's claims for damages.

**Anissa Griego Quintana**
Juvenile Probation and Parole
1920 5th St.
Santa Fe, NM 87505

Ms. Quintana may testify regarding her interactions with Desiree Gonzales, Janel Gonzales, Julian Baca and Waldo Anaya, as well as her knowledge of Ms. Gonzales' criminal and probation history.

**Todd Bibiani**
Principal at Edgewood Middle School
17 Venus Rd.
Edgewood, NM

Mr. Bibiani may testify regarding his interactions with and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca while he was Principal at Capshaw Middle School, including those events identified in the Police Report of May 12, 2012.

**Sarah Meadows**
Protective Services Worker
Children Youth & Families Department
1920 Fifth Street
Santa Fe, NM 87505.

Ms. Meadows may testify regarding her interactions with and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca.

**Yvette and Wayne Salazar**
520 Angel Loop
Las Lunas, NM 87031

The Salazars may testify regarding their interactions with, evaluation of and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca.

**Caregivers and staff at New Day Shelter Group Home**
2820 Ridgecrest Dr., SE
Albuquerque, NM 87124.

These individuals may testify regarding their interactions with, evaluation of and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca.

**Counselors, physicians, providers and staff at Desert Hills and Family Works, Inc.**
5310 Sequoia Road N.W.
Albuquerque, NM 87120.

These individuals may testify regarding their interactions with, evaluation of and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca as reflected in the records of the facility, including but not limited to the 4/22/14 Discharge Summary, 3/21/14 Psychiatric Evaluation, 3/24/14 Health and Physical and 3/11/14 Admission Assessment. Such individuals may include, but may not be limited to:

- **Katherine Canfield, MD**
- **Lynn DeVelder, LMSW**
- **Kathy Lopez-Bushnell, CNP**
- **Sarah Penn, LMHC**
- **Theresa C. Baca, LMHC**
- **Emily Fleming, LMHC**
- **Tanya Miller, MS, LMFT**
- **Lisa Perea, LPN**

**Counselors, physicians, providers, caregivers and staff at Agave Health, Inc**.
541 Quantum Rd NE
Rio Rancho, NM 87124

These individuals may testify regarding their interactions with, evaluation of and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca as reflected in the records of the facility, including by not limed to the 2/12/14 Enhanced Psychosocial Assessment. Such individuals may include, but may not be limited to:

- **Johanna Reznicek, MA, LPCC**
- **Alicia Justus, PhD**

**Maria McMahon, CFNP**
La Familia Medical Center
1035 Alto St.
Santa Fe, NM 87501

Ms. McMahon may testify regarding her discussions with, evaluations of and treatment of Desiree Gonzales.

**Yolanda Padilla, LMSW**
5312 Jaguar Dr.
Santa Fe, NM 87507

Ms. Padilla may testify regarding her written 6/21/13 Psychosocial Assessment of Desiree Gonzales, as well as regarding her interactions with Desiree Gonzales, Janel Gonzales, Julian Baca and Waldo Anaya.

**Susan ("Sue") Shaffer, LPCC, TBCS**
1601 Saint Michaels D., Ste A
Santa Fe, NM 87505

Ms. Shaffer may testify regarding her written 8/9/12 Psychosocial Assessment of Desiree Gonzales, as well as regarding her interactions with Desiree Gonzales, Janel Gonzales, Julian Baca and Waldo Anaya.

**Dr. Gonzales and others who provided care and treatment to Desiree Gonzales at New Mexico Solutions**
707 Broadway Blvd NE #500
Albuquerque, NM  87102

Dr. Gonzales and other providers may testify regarding their discussions with, evaluations of and treatment of Desiree Gonzales.

**Counselors, physicians, providers and staff at the Peak Behavioral Health Services**
5055 McNutt Rd.
Santa Teresa, NM 88008

These individuals may testify regarding their interactions with, evaluation of and knowledge of Desiree Gonzales, Waldo Anaya, Janel Gonzales and Julian Baca as reflected in the records including but not limited the 12/6/12 Discharge Summary, 9/111/12 Psychiatric Evaluation and 9/10/12 History and Physical. Such individuals may include, but may not be limited to:

- **James W. Martin, M.D.**
- **C.W. Thornburg, D.O.**

**Janel Gonzales**
P.O. Box 31651
Santa Fe, NM, 87507
(505) 570-7726

It is anticipated Ms. Gonzales may testify regarding her knowledge of the events at issue in the Complaint including any knowledge she has of the events on May 7 and 8, 2014; her relationship and interactions with Desiree Gonzales, Julian Baca and Waldo Anaya;

Desiree Gonzales' living, educational, social and economic status prior to the events at issue and the reasons therefor; her agreement with Julian Baca and/or Waldo Anaya in regard to this lawsuit and/or the proceeds thereof; and any other matters addressed during her deposition.

**Julian Baca**
P.O. Box 31651
Santa Fe, NM, 87507
(505) 920-1060

It is anticipated Mr. Baca may testify regarding his knowledge of the events at issue in the Complaint; his relationship and interactions with Desiree Gonzales, Janel Gonzales and Waldo Anaya; Desiree Gonzales' living, educational, social and economic status prior to the events at issue and the reasons therefor; his agreement with Janel Gonzales and/or Waldo Anaya in regard to this lawsuit and/or the proceeds thereof; and any other matters addressed during his deposition.

**Waldo Anaya**
511 Cortez Street
Santa Fe, NM

Mr. Anaya may testify regarding his knowledge of the events at issue in the Complaint; his relationship and interactions with Desiree Gonzales, Janel Gonzales and Julian Baca; Desiree Gonzales' living, educational, social and economic status prior to the events at issue and the reasons therefor; his agreement with Janel Gonzales and/or Julian Baca in regard to this lawsuit and/or the proceeds thereof; and any other matters addressed during his deposition.

**Aimee Bevan**
c/o Lee Hunt
Hunt & Marshall
518 Old Santa Fe Trail, #501
Santa Fe, NM 87505
(505) 954-4868

**Records Custodians if necessary to establish authenticity and foundation for medical, treatment and developmental records**

**Rebuttal Witnesses as needed.**

**Any other individual disclosed in discovery.**

# X. TRIAL PREPARATION

A.      **Exhibits.**

The parties must confer over all trial exhibits.  This does not apply to rebuttal exhibits that cannot be anticipated before trial.  The parties must file an original plus three (3) copies of the parties' "consolidated exhibit list identifying all exhibits that the parties have stipulated are admissible" and a "consolidated exhibit list identifying all exhibits the parties have stipulated to be authentic, but to which there are other objections" no later than August 17, 2018.[2]

For those exhibits on which a stipulation could not be reached, the offering party must file a separate "contested exhibit list" no later than 20 calendar days before trial.  An original plus three (3) copies of each party's contested exhibit list must be filed on the date identified in the preceding paragraph.  In addition, two courtesy copies of the contested and uncontested exhibit list must be delivered to the judge's chambers.

All exhibits must be marked before trial.  Exhibits must be marked numerically and identify the party offering the exhibit.  The identification number or letter will remain the same whether the exhibit is admitted or not.

B.      **Witness Lists.**

An original and three (3) copies of a party's trial witness list must be filed with the Clerk and served on all parties on August 17, 2018.  Indicate whether the witness is testifying by deposition or in person.  The parties shall exchange proffered deposition designations within 7 days of service of the witness list.  The parties may then exchange counter-designations within 14 days of service of the witness lists.  Objections to use of the designated deposition testimony

---

[2] The Court's Scheduling Order previously set various deadlines for 30 days from trial.  Because the trial starts on September 17, 2018, the parties are using September 17 as the date from which to calculate pretrial deadlines.

are due within fourteen (14) calendar days of service of the witness list. The objecting party must highlight those portions of the requested deposition testimony to which the party objects. Plaintiff must use a yellow highlighter and defendant must use a blue highlighter. The parties must confer

about any disputes and, if unable to resolve any differences, must notify the Court in writing at least 10 calendar days before trial.

**C.     Voir Dire.**

1.      If allowed, do the parties wish to participate in *voir dire*?

Plaintiff          __XX___   Yes_____   No

Defendant Nathan Unkefer, M.D.      __XX___   Yes_____   No

County Defendants     __XX___   Yes_____   No

The parties all agree that attorney conducted voir dire is critical in this case and the parties jointly request the opportunity to conduct voir dire in a reasonable manner, including adequate time to explore issues that will weigh on both cause challenges and peremptory challenges.

2.      Each party wishing to participate in *voir dire* must serve on all parties and file with the Clerk, a pleading entitled "Proposed Voir Dire Questions." The pleading must identify the specific areas about which the party wishes to inquire and must set forth proposed *voir dire* questions. This request must be filed at least 20 calendar days prior to jury selection.

**D.     Jury Instructions and Verdict.**

1.      **In General.** The parties must confer about proposed jury instructions. The Court will prepare and provide the parties with a Court-proposed set of general "stock" instructions that will be given. The stock instructions are available from the Clerk. The instructions that the

parties must submit to the Court will be those which set forth the elements and definitions of the claims or charges, and the elements and any definitions of any defenses.

2. **Sources for Instructions.** If pattern instructions are followed by the judge, the judge will indicate at the pretrial conference his or her preference for the source of instruction.

3. **Submission of Proposed Instructions.** The parties must submit one mutually approved set of jury instructions no later than August 17, 2018. For those instructions the parties were unable to agree upon, each party must submit its own proposed instructions at the same time as submission of the mutually agreed instructions.

4. **Form of Instructions.**

a. Submit sets of double-spaced instructions as follows:

___ set(s) of originals without citations and headed "Instruction No.___"; and

___ set(s) with citations and numbered accordingly, one of which will be filed.

b. If requested, also submit all instructions in a format compatible with Word Perfect. Please refer to the procedures, available on our website, for electronically submitting proposed text.

c. Submit no more than one instruction to a page.

d. All deviations from pattern instructions must be identified as "modified" in the citation and the modification must be highlighted in the body of the instruction.

e. Submit a cover sheet on all sets of instructions.

5. **Deadlines for Submitting Instructions.**

      **a.**     Instructions shall be filed on August 17, 2018.

      **b.**     Supplemental unanticipated jury instructions may be submitted at trial.

**E.**     **Statement of Case.**

The parties must confer and submit an agreed statement of the case to the Court that will be read to the jury panel during jury selection. The statement must be submitted to the Court on August 17, 2018 days before jury selection.

## XI.  OTHER MATTERS

**A.**     **Settlement Possibilities.**

    **1.**     The possibility of settlement in this case is considered:

      _ X _ Poor _____ Fair     _____ Good _____ Excellent _____ Unknown

    **2.**     Do the parties have a settlement conference set with the assigned Magistrate Judge?

      _____ Yes   _ X _ No     If yes, when?

      The Parties previously conducted a settlement conference.

If a settlement conference has already been held, indicate approximate date:

August 28, 2015.

Would a follow-up settlement conference be beneficial?

      _____ Yes   _ X _ No

    **3.**     Does either party wish to explore any alternatives for dispute resolution such as mediation or a summary jury trial?  If yes, please identify.

     If no, explain why not.

The parties have attempted to resolve the case in good faith. Because the parties view the case very differently, alternative dispute resolution is not likely to be successful.

**B.**     **Length of Trial and Trial Setting.**

    **1.**     This action is a  \_\_\_\_\_  Bench trial     \_\_X\_\_  Jury Trial       \_\_\_\_\_  Both

    **2.**     The estimated length of trial is 7-10 trial days(s).

## XII.  EXCEPTIONS

Plaintiff objects to Defendants' witness list, which contains over 50 "may call" witnesses. Defendants should be required to specifically identify potential witnesses.  Additionally, many of the "background" witnesses are cumulative and only proffered to impugn Desiree Gonzales's and her parents' characters in violation of Rule of Evidence 403.

Additionally, Plaintiff takes exception with Dr. Unkefer's contention that there are comparative fault claims against Desiree Gonzales or her parents.  The Court has already ruled on this issue.  See Court's Memorandum Opinion, Doc. No. 254, pp. 15, 16.  Finally, Plaintiff takes exception with Dr. Unkefer's claimed incorporation of all pleadings.

Dr. Unkefer submits that there are no common law or ordinary negligence claims against him.

## XIII.  MODIFICATIONS-INTERPRETATION

The Pretrial Order when entered will control the course of trial and may only be amended *sua sponte* by the Court or by consent of the parties and Court approval.  The pleadings will be deemed merged herein. The foregoing proposed Pretrial Order (prior to execution by the Court) is hereby approved this 10th day of August 2018.

Respectfully submitted,

HUNT & MARSHALL

By:    /s/ *Lee R. Hunt*
Lee R. Hunt, Esq.
Stephen R. Marshall, Esq.
518 Old Santa Fe Trail, #501
Santa Fe, New Mexico 87505
P: (505) 954-4868
F: (505) 819-0022
lee@huntandmarshall.com
steve@huntandmarshall.com
*Attorneys for Plaintiff*


LONG, KOMER & ASSOCIATES, P.A.

By: */s/ Mark E. Komer*
Mark E. Komer
P. O. Box 5098
Santa Fe, NM 87502-5098
Phone:  (505) 982-8405
mkomer@longkomer.com
email@longkomer.com

Jonlyn M. Martinez
Law Office of Jonlyn M. Martinez, LLC
P. O. Box 1805
Albuquerque, NM 87103-1805
Phone:  (505) 247-9488
jonlyn@jmartinezlaw.net

*Attorneys for the County Defendants*


Steven L. Gonzales, Esq.
GONZALES LAW FIRM, LLC
3840 Masthead St., NE
Albuquerque, NM 87109-4479
Phone:  (505) 417-3898
steve@nmbusinesslaw.com
*Attorney for Defendant Molly Archuleta*

MILLER STRATVERT P.A.

By: */s/ Thomas R. Mack*
Thomas R. Mack, Esq.
Jason T. Yamato, Esq.
Post Office Box 25687
Albuquerque, NM 87125
Phone: (505) 842-1950
tmack@mstlaw.com
jyamato@mstlaw.com
*Attorneys for Nathan Paul Unkefer, M.D.*

Dated: 9/4/2018

_____
UNITED STATES DISTRICT JUDGE